# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>MICHAEL ADAMS, in his Official Capacity as<br>Kentucky Secretary of State, *et al.*<br><br>    Defendant. | No. 3:26-cv-00019-GFVT |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**THE LEAGUE OF WOMEN VOTERS OF KENTUCKY,**
**THE NEW AMERICANS INITIATIVE,**
**ZITSI MIRAKHUR, AND JOERN SOLTAU**
**TO INTERVENE AS DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.  DOJ's Efforts to Obtain Private Voter Information from Kentucky ............................ 2

    B.  Proposed Intervenors .................................................................................................... 8

ARGUMENT ..................................................................................................................... 10

I.    MOVANTS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT. ................. 10

    A.  The Motion to Intervene Is Timely ............................................................................11

    B.  Proposed Intervenors Have Concrete Interests in the Underlying Litigation ............ 12

    C.  Disposition of this Case May Threaten the Interests of Proposed Intervenors .......... 14

    D.  Defendants' Interests Are Different from Those of Proposed Intervenors. ................ 15

II.  IN THE ALTERNATIVE, THE COURT SHOULD GRANT PERMISSIVE
    INTERVENTION ........................................................................................................ 18

CONCLUSION .................................................................................................................. 20

The League of Women Voters of Kentucky, the New Americans Initiative, Zitsi Mirakhur, and Joern Soltau (collectively, "Proposed Intervenors") respectfully move to intervene as Defendants pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, pursuant to Rule 24(b), and set forth the facts and legal argument necessary to support their motion below. *See* L.R. 7(1)(a). Proposed Intervenors append to this brief a proposed motion to dismiss by way of a response to the United States' Complaint, while reserving the right to supplement their response to the Complaint within the time allowed for response by Rule 12 after intervention is granted. *See* Fed. R. Civ. P. 24(c). The United States informed Proposed Intervenors it was "unable to state a position right now, but . . . will be able to state [its] position next week . . . ." Counsel for Defendants has not yet appeared.

## INTRODUCTION

The United States seeks to force Kentucky to turn over voters' sensitive personal information and data. It has been widely reported that the United States will use this data to build an unauthorized national voter database and to target voters for potential challenges and disenfranchisement. These efforts are being driven by self-styled "election-integrity" advocates who have previously used ill-conceived database-matching and database-analysis methods to mass-challenge voters and deny the results of elections, and who now serve in or advise the present Administration.

Proposed Intervenors are the League of Women Voters of Kentucky ("LWVKY") and the New Americans Initiative ("NAI"), non-partisan, non-profit organizations dedicated to grassroots voter engagement and protecting voting rights and civil rights in Kentucky, whose work and members' rights are at risk by the relief the United States seeks in this case; as well as Zitsi Mirakhur and Joern Soltau, individual voters whose personal, private data is at risk in this litigation. Proposed Intervenors have an extremely strong interest in preventing the United States'

1

requests for unfettered and total access to the most sensitive aspects of Kentucky's non-public voter data from being used to harass and potentially disenfranchise voters. LWVKY and NAI work to expand access to the ballot and civic engagement, as well as to protect civil liberties, and thus have an interest in protecting the voting and privacy rights of their members and all Kentucky voters. And the interests of Ms. Mirakhur and Mr. Soltau, as well as other members of LWVKY, are also at stake here. Those members likely include voters who are under particular threat from the United States' requested form of relief, such as voters like Ms. Mirakhur and Mr. Soltau, voters who have previously been registered to vote in another state, voters who registered to vote by mail, and voters whose personal information is especially sensitive and who thus have heightened privacy interests.

Proposed Intervenors are entitled to intervene as of right under Rule 24 because this motion is timely, they have substantial interests at stake, and those interests are not adequately represented by the existing Defendants, who as state actors are subject to broader public policy and political considerations beyond the legal issues presented in this case. Proposed Intervenors' distinct interests, perspective, and motivation to scrutinize the purpose of the United States' sweeping request for non-public Kentucky voter data will ensure full development of the record and assist the Court to resolve this case.

Intervention as of right pursuant to Rule 24(a), or in the alternative permissive intervention pursuant to Rule 24(b), should be granted.

## BACKGROUND

### A.    DOJ's Efforts to Obtain Private Voter Information from Kentucky

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty

states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Jan. 23, 2026), https://perma.cc/R824-QG68 .

DOJ has allegedly sent Defendants letters on July 17, August 8, and August 14, 2025, demanding, among other things, an electronic copy of Kentucky's statewide voter registration list that includes "all fields" it claims are "required under Section 303 of HAVA." Compl. ¶¶ 20–25. Per the August 14 letter—according to the Complaint—DOJ has explained that its request for "all fields" must include voters' full name, date of birth, residential address, driver's license number, and the last four digits of the registrant's Social Security number. Compl. ¶ 24. DOJ has claimed that it needs this list for purposes of enforcing the NVRA and HAVA. Compl. ¶¶ 20–25, 29.

According to the Complaint, "Defendants refused the Attorney General's demand" on August 22, 2025. *Id.* ¶ 26. DOJ then sent Defendants an email with a "proposed memorandum of understanding ('MOU')" it claimed "'satisfies all reasonable concerns regarding privacy and data security.'" *Id.* ¶¶ 28–30 (citing December 2, 2025 Email). The Complaint claims Defendants took no action on the MOU and, as of the date of the Complaint, "have refused to comply with the Attorney General's demand." *Id.* ¶¶ 31–33.

On February 26, 2026, the United States filed this lawsuit—one of at least twenty-nine nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Kentucky voter data.[1]

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY; Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of

Notably, according to extensive public reporting, DOJ's request for private, sensitive voter data from Kentucky and other states appears to be in connection with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database analysis in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

---

Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

[2] *See also* Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional reporting, these efforts involve self-proclaimed "election integrity" advocates—within and outside the government—who have previously sought to disenfranchise voters and overturn elections. They include Heather Honey, who sought to overturn the 2020 presidential election result in multiple states and now serves as DHS's "deputy assistant secretary for election integrity,"[3] and Cleta Mitchell, a private attorney who leads the "Election Integrity Network," and has promoted the use of artificial intelligence to challenge registered voters.[4] These actors and their associates have sought to compel states to conduct aggressive purges of registered voters, and have abused voter data to mount mass voter challenges. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAP.-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post/; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[4] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters/; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

complaint brought by "PA Fair Elections," a group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[5]

For example, in the months before the 2024 election, Honey and her affiliated organization PA Fair Elections pushed to remove thousands of lawful Pennsylvania voters from the rolls using faulty sources, including "Eagle AI," a voter-database analysis tool backed by Mitchell and her Election Integrity Network.[6] Then, on the eve of the election, individuals affiliated with PA Fair Elections lodged mass challenges against over 4,000 Pennsylvania voters.[7] Public reporting and hearing testimony confirmed PA Fair Elections' role in facilitating these challenges, which rested

---

[5] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck & Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[6] *See* Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024), https://perma.cc/8FNC-5KH9; *see also* Kroll & Surgey, *supra*, https://perma.cc/4MEZ-82SF ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[7] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E (same).

on self-evidently flawed data-matching analysis.[8] All were ultimately rejected. *See, e.g.*, Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5.

According to public reporting, DOJ last year asked staff from the newly created "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with Social Security Administration records as part of its efforts to apply novel and unspecified data-analysis techniques to state voter data and target voters for potential disenfranchisement.[9] DOJ officials have since claimed to have reviewed 47.5 million voting records and identified "several thousand non-citizens" registered to vote in federal elections, though public reporting indicates that these efforts have generated false positives by incorrectly flagging U.S. citizens as ineligible non-citizens.[10]

A recent DOJ federal-court filing further corroborates that United States officials have sought to use voter data alongside DOGE-inspired data-matching and aggregation techniques and have coordinated with outside "election integrity" advocates who seek to deny election results. As detailed in a filing submitted on behalf of the U.S. Social Security Administration ("SSA"):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had

---

[8] *E.g.*, Bethany Rodgers, *Testimony: Pa. Election Denial Group Behind Voter Registration Cancellation Form Mailings*, GOERIE.COM (Nov. 2, 2024), https://perma.cc/477H-36SB. A challenger in one county testified about PA Fair Elections' involvement. Chester County, *Nov. 1, 2024 Election Board Hearing* at 50:30-51:34; 58:00-58:47; 1:54:58-1:55:19, https://chestercopa.portal.civicclerk.com/event/852/media.

[9] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[10] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

## B.  Proposed Intervenors

Proposed Intervenor LWVKY is a nonpartisan organization committed to, *inter alia*, ensuring that all eligible Kentucky voters register to vote and exercise their right of suffrage at each election. *See* Ex. B, Decl. of Jennifer Jackson, M.D. ("Jackson Decl.") ¶ 5. LWVKY expends significant resources conducting on-the-ground voter engagement and assistance efforts, including registering qualified individuals to vote, keeping voters informed about key election deadlines and updates and encouraging voters to participate, and assisting voters when they experience problems in trying to vote. Jackson Decl. ¶¶ 5–7. These efforts' success, especially with respect to voter registration, depend on voters' trust that, when they provide personal information to the State as part of the registration process, that information will not be abused, their privacy will be respected, and their right to participate will be honored. Jackson Decl. ¶¶ 8, 10.

LWVKY has approximately 550 individual members and five local league chapters throughout the Commonwealth. Jackson Decl. ¶ 6. Those members include Kentucky voters whose personal data will be provided to the federal government if DOJ prevails in this lawsuit, and may include voters who are especially likely to be mistakenly caught up in the DOJ's efforts to remove voters from voter rolls, including naturalized citizens, voters with previous felony convictions, and voters who have recently changed addresses, among others. *See* Jackson Decl. ¶ 8.

Proposed Intervenor NAI is a non-partisan, nonprofit organization devoted to amplifying the political participation of foreign-born Kentuckians. Ex. C, Decl. of Nirupama Kulkarni ("Kulkarni Decl.") ¶ 4. The organization supports immigrant and refugee communities in navigating the path to citizenship, assists newly naturalized citizens in registering to vote, and works to keep those citizens involved in civic life. *Id.* To advance these goals, NAI hosts legal clinics and educational workshops for foreign-born Kentuckians who are eligible for green cards and naturalization, and engages the broader community through outreach, community organizing and public education advocacy. *Id.* ¶ 5.

Zitsi Mirakhur is a registered Kentucky voter and has lived in the State since 2020. *See* Ex. D, Decl. of Zitsi Mirakhur ("Mirakhur Decl.") ¶ 2–3. Ms. Mirakhur was born in India and became a naturalized citizen in 2008. *Id.* ¶¶ 4, 6. She has voted in Kentucky in every general election since 2020, and is a member of the League of Women Voters of Kentucky. *Id.* ¶ 10–11. Ms. Mirakhur is concerned about the prospect of having her sensitive, personal information shared with DOJ and believes that DOJ's request for this data threatens her personal privacy and liberties. *Id.* ¶ 13–14.

Joern Soltau is a registered Kentucky voter who has exercised his voting rights ever since he became a naturalized citizen in 2008. Ex. E, Decl. of Joern Soltau ("Soltau Decl.") ¶¶ 3, 7, 10. Born in Hong Kong to German parents, Mr. Soltau first moved to the United States to work in

1990 and became a permanent resident in 1992. *Id*. ¶¶ 4–5, 7. Mr. Soltau decided to become a U.S. citizen because he wanted to participate in our democracy and have a voice in who represented him in government. *Id*. ¶ 8. He is worried that the federal government's access to the sensitive information it seeks may result in the suppression of registered voters' rights, including his own. *Id*. ¶¶ 11–12.

## ARGUMENT

## I.   MOVANTS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Proposed Intervenors are entitled to intervene as of right. Under Rule 24(a)(2), "a court must permit anyone to intervene who, (1) on timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (internal quotation marks and alterations omitted); *see also Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011). Rule 24(a) is "broadly construed in favor of potential intervenors." *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991). "[C]lose cases" are "resolved in favor of recognizing an interest under Rule 24(a)." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) (quoting *Michigan State ALF-CIO v. Miller*, 103 F.3d 1240, 1243 (6th Cir. 1997)).

Intervention has been granted to League of Women Voters chapters and similar intervenor groups in materially identical lawsuits in a number of other states.[11] Here too, because the

---

[11] *See, e.g.*, Order, *United States v. Schmidt*, No. 2:25-cv-1481-CB, Dkt. No. 105 (W.D. Pa. Jan. 16, 2026) (granting League of Women Voters intervention); Order, *United States v. Simon*, No. 0:25-cv-3761-KMM-EMB, Dkt. No. 90 (D. Minn. Jan. 6, 2026) (same); Minute Order, *United States v. Weber*, No. 2:25-cv-9149-DOC-ADS, Dkt. No. 70 (C.D. Cal. Nov. 19, 2025) (same); *see also, e.g.*, Text Order, *United States v. Matthews*, No. 3:25-cv-03398-CRL-DJQ (C.D. Ill. Mar. 2, 2026); Order, *United States v. Wis. Elections Comm.*, No. 3:25-cv-1036-JDP, Dkt. No. 53 (W.D.

Proposed Intervenors easily meet Rule 24(a)'s requirements, Court should grant their intervention as a matter of right.

### A.  The Motion to Intervene Is Timely

With respect to timeliness, courts consider "all relevant circumstances," including: (1) how far the case has progressed; (2) why intervention is sought; (3) how long the proposed intervenor knew or should have known of their interest; (4) any prejudice to existing parties from delayed intervention; and (5) any unusual circumstances weighing for or against intervention. *United States v. Michigan*, 68 F.4th 1021, 1024–25 (6th Cir. 2023). The "most important" consideration in whether a motion to intervene is untimely is "whether . . . delay in moving for intervention will prejudice the existing parties in the case." *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 493 (6th Cir. 2014) (quoting Charles A. Wright, *et al.*, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 1916 (3d ed.)). Only prejudice caused by the intervenor's delay—rather than by the intervention itself—matters in assessing timeliness. *United States v. City of Detroit*, 712 F.3d 925, 933 (6th Cir. 2013).

This motion is indisputably timely. The United States filed this suit on February 26, 2026. *See* Compl. Upon receiving notice of the suit, the Proposed Intervenors promptly prepared this motion. *See Mich. State AFL-CIO*, 103 F.3d at 1245 (intervention motion "timely as a matter of law" where "filed just two weeks after the complaint, and the case was obviously in its initial stage"); *Jansen v. City of Cincinnati*, 904 F.2d 336, 340–41 (6th Cir. 1990) ("short period" of

---

Wis. Jan. 22, 2026); Text Order, *United States v. Hanzas*, No. 2:25-cv-903-MKL, Dkt. No. 42 (D. Vt. Jan. 20, 2026); Text Order, *United States v. Amore*, No. 1:25-cv-639-MSM-PAS (D.R.I. Jan. 6, 2026); Text Order, *United States v. Galvin*, No. 1:25-cv-13816-LTS, Dkt. No. 30 (D. Mass. Jan. 6, 2026); ; Order, *United States v. Nago*, No. 1:25-cv-522-LEK-RT, Dkt. No. 20 (D. Haw. Jan. 5, 2026); Order, *United States v. Scanlan*, No. 1:25-cv-371-AJ, Dkt. No. 23 (D.N.H. Jan. 5, 2026); Order, *United States v. Oliver*, No. 1:25-cv-1193-LF-JFR, Dkt. No. 25 (D.N.M. Dec. 19, 2025).

"approximately two weeks" between intervenors learning of their interest and filing their motion "does not support finding of undue delay"). Defendants have not yet filed an answer or a motion to dismiss, meaning that this litigation is at its earliest stages and intervention will not unduly delay or prejudice the existing parties.

### B.    Proposed Intervenors Have Concrete Interests in the Underlying Litigation

Proposed Intervenors have a "sufficient"—*i.e.*, a "significantly protectable"—interest in the litigation. *E.g.*, *Donaldson v. United States*, 400 U.S. 517, 531 (1971). An intervenor has an interest in the subject matter of the action where the "disposition of the action may . . . impair their ability to protect their interest in the litigation." *Purnell*, 925 F.2d at 948. Proposed intervenors, however, "need not show that substantial impairment of their interest will . . . inevitably ensue from an unfavorable disposition." *Id.*

*First*, Ms. Mirakhur, Mr. Soltau, and LWVKY's members who are registered Kentucky voters have a right to privacy in the sensitive voter data the United States seeks. DOJ has demanded that Defendants turn over voters' full name, date of birth, residential address, and driver's license number or the last four digits of a Social Security Number ("SSN4"). *E.g.*, Compl. ¶¶ 14–15, 22–25. This type of sensitive personal information is protected from disclosure by federal law, which prohibits the creation of a national voter database of the type that the United States is reportedly seeking to assemble with the data it seeks. *See, e.g.*, 5 U.S.C. § 552a(e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote); *see also, e.g.*, 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4) (Driver's Privacy Protection Act prohibiting the disclosure of "personal information" that is obtained by a state Department of Motor Vehicles ("DMV"), which is how many register to vote and provide the information sought to state government).

It is also protected from disclosure by state law. *E.g.*, Ky. Rev. Stat. § 116.095 (requiring redaction of Social Security numbers from voter registration records before inspection or copying); Ky. Rev. Stat. § 61.878(1)(a), (k)-(l) (Kentucky Open Records Act exemption to information containing Social Security numbers and other personal identifiers). These privacy interests are significant and inure to Ms. Mirakhur and Mr. Soltau and LWVKY's members who are Kentucky voters.

*Second*, and based on DOJ's similar data requests to other States, the data DOJ seeks is likely to be used to challenge the voter registration of certain Kentuckians, potentially including voters with felony convictions; voters who have moved within Kentucky or left the state and then returned (but might be deemed "duplicate" voters or "out-of-state" voters due to a shoddy matching system); and voters like Ms. Mirakhur and Mr. Soltau who are naturalized citizens (and who may have indicated they were not a citizen on a government form prior to naturalization). *See supra* p.3. Ms. Mirakhur, Mr. Soltau, and LWVKY members fall within those categories. Mirakhur Decl. ¶¶ 6–10; Soltau Decl. ¶¶ 7, 12; Jackson Decl. ¶ 9. They—especially those most likely to be targeted using the information DOJ seeks in this lawsuit—have a concrete interest in not being disenfranchised by so-called "election integrity measures." *See* Mirakhur Decl. ¶¶ 13–14; Soltau Decl. ¶¶ 11–12; Jackson Decl. ¶¶ 8–9; *see also Ala. Coal. for Immigrant Just. v. Allen*, No. 2:24-cv-1254-AMM, 2024 WL 4510476, at *1 (N.D. Ala. Oct. 16, 2024) (noting that a state purge program ostensibly targeted at noncitizens "included thousands of United States citizens (in addition to far fewer noncitizens . . .)"); *Selcuk v. Pate*, No. 4:24-cv-00390-SHL-HCA, 2024 WL 5054961, at *8–9 (S.D. Iowa Nov. 3, 2024) (noting a state purge program, based on database-matching, which purportedly targeted alleged noncitizens that flagged 2,176 voters, of whom at least 88% were citizens eligible to vote, many of them naturalized citizens).

*Third*, LWVKY and NAI have protectable interests at stake because granting the relief sought would harm their core organizational missions. Their voter registration activities would suffer as voters, fearing disclosure of their sensitive personal data to the federal government—and entry into an unauthorized, illegal national database—are chilled from registering and participating. Kulkarni Decl. ¶ 10; Jackson Decl. ¶ 10. LWVKY and NAI would be further harmed if that voter data is then used by "election integrity" activists, armed with federal power, to mount mass challenges to registered voters. Responding to such challenges would force LWVKY and NAI to divert resources from their core work of registering and engaging voters toward public education and mitigating voter disenfranchisement. Kulkarni Decl. ¶¶ 4, 5, 8–10; Jackson Decl. ¶¶ 4, 7, 10.

Courts routinely find that non-partisan public interest organizations, like the organizational Proposed Intervenors, should be granted intervention in election-related cases, recognizing their significant interest in safeguarding the electoral process.[12] This case is no exception.

### C. Disposition of this Case May Threaten the Interests of Proposed Intervenors

The Proposed Intervenors also satisfy the third prong of the analysis because the litigation may result in an order that directly affects their interests. To satisfy Rule 24(a)(2)'s interest impairment prong, intervenors "need not show that substantial impairment of their interest will . . . inevitably ensue from an unfavorable disposition." *Purnell*, 925 F.2d at 945 n.4. Impairment of their legal interest must just be "possible." *Id.* Meeting "[t]his burden is minimal." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) (citation omitted).

---

[12] *See, e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 8262029, at *1 (M.D. Pa. Nov. 12, 2020); *Pub. Int. L. Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 799–800 (E.D. Mich. 2020); *Texas v. United States*, 798 F.3d 1108, 1111–12 (D.C. Cir. 2015); *Kobach*, 2013 WL 6511874, at *1–2; *LaRoque v. Holder*, 755 F. Supp. 2d 156, 162 n.3 (D.D.C. 2010), *rev'd in part on unrelated grounds*, 650 F.3d 777 (D.C. Cir. 2011).

Here, the threat is significant. The United States proposes to obtain an immediate order compelling the disclosure of private voter data through a "summary" proceeding that bypasses the normal civil litigation process and any discovery into "the basis and the purpose" of their request, 52 U.S.C. § 20703. *See* Compl. ¶¶ 3–4 (describing this as a "special statutory proceeding" where the Attorney General may request "an order directing the officer of election to produce the demanded records, akin to a traditional order" to show cause, and where the "court does not adjudicate the factual foundation for, or the sufficiency of, the Attorney General's statement of the basis and the purpose contained in the written demand" (internal citations and quotation marks omitted)). This attempt to secure the irrevocable disclosure of private voter data to actors who may misuse it in any number of ways, including by mass-challenging or otherwise attacking Kentuckians' right to vote militates strongly in favor of allowing Proposed Intervenors into the case to represent voters' interests now.

### D.    Defendants' Interests Are Different from Those of Proposed Intervenors.

Under Rule 24(a)(2), intervention should be granted when the applicant meets the three elements of intervention described *supra*; the court can deny it only if it is convinced that the applicant's interests are adequately represented by the existing parties. But the burden to make this showing is also "minimal." *Mich. State AFL-CIO*, 103 F.3d at 1237. A putative intervenor need not "show that the [parties'] representation will *in fact* be inadequate"; indeed, it may suffice to show that "the existing party who [might] seek the same outcome will not make all of the prospective intervenor's arguments." *Id.* (emphasis added).

Proposed Intervenors easily meet this burden. As government officials, Defendants have a generalized interest in carrying out their offices' legal obligations under federal and state laws, and in minimizing burdens on governmental employees and resources. They also must consider broader public policy concerns, in particular the need to maintain working relationships with

federal officials. In contrast, Proposed Intervenors will add elements to this litigation that render existing representation inadequate: the perspective of not just civil rights groups committed to ballot access and voter engagement, but also individual voters whose private information is directly at risk. These are interests that are currently "not represented at all" in the litigation, meaning they are "surely not adequately represented, and intervention . . . must be allowed." *Grubbs v. Norris*, 870 F.2d 343, 347 (6th Cir. 1989) (internal quotation marks and citation omitted).

In addition, there may be arguments and issues that the Defendants may not be able or willing to raise that are critical to Proposed Intervenors. For example, individual voters have a more direct injury than states under the Privacy Act for misuse of their personal data, especially given that the Privacy Act grants individuals an express right to bring suit. *See* 5 U.S.C. § 552a(g)(1)(D) ("Whenever an agency fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency"). As another example, courts have found a risk that political considerations external to the legal issues presented by a case like this can motivate elections officials to pursue a settlement that would jeopardize the private information of Ms. Mirakhur, Mr. Soltau, and/or LWVKY members. *See Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-C-1867, 2024 WL 3454706, at *5 (N.D. Ill. July 18, 2024) (allowing intervention in NVRA case and observing that "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party"); *cf. Berger*, 597 U.S. at 198 (reversing denial of motion to intervene where North Carolina Board of Elections was "represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns").

16

These diverging perspectives—between the government's general need to balance various considerations and the Proposed Intervenors' personal and particular interest in the privacy of their own data—present a classic scenario supporting intervention. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 110–11 (M.D. Pa. 2011) (allowing public interest groups to intervene, "[b]ecause the EPA represents the broad public interest . . . not only the interests of the public interest groups" and similar stakeholders); *Kobach v. U.S. Elections Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL 6511874, at *4 (D. Kan. Dec. 12, 2013) (finding that applicants who had interests in protecting voter rights, particularly in minority and underprivileged communities, may have private interests that diverge from the public interest of an elections agency).

While Proposed Intervenors' motion rises or falls on its own merit, they also bring a different set of perspectives and interests than the other proposed intervenors in this case. Proposed Intervenors here include Kentucky voters—Ms. Mirakhur and Mr. Soltau—whose personal information is at risk, and whose unique experiences and interests, including as a naturalized citizen, are not reflected by the other proposed intervenors, *see* Mirakhur Decl. ¶¶ 4, 6–7, 13; Soltau Decl. ¶¶ 4, 7.

Proposed Intervenors' unique interests will help ensure that all issues relevant to the adjudication of this case are explored. For example, the United States requests the data at issue pursuant to purported public disclosure provisions in the Civil Rights Act of 1960, but any requests pursuant to those provisions must come with "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The motivations and purposes for DOJ's requests, including whether they will be used to create an unauthorized national database as has been reported, and whether they are a prelude to mass challenges based on faulty data-matching techniques, are highly relevant and

17

potentially dispositive here. Proposed Intervenor LWVKY's and NAI's unique interest as a good-government, pro-democracy organization in pursuing this highly relevant line of factual inquiry and argument is further strong grounds to support intervention.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT PERMISSIVE INTERVENTION

If the Court declines to grant intervention as of right, it should exercise its broad discretion to grant permissive intervention under Federal Rule of Civil Procedure 24(b). Rule 24(b) provides that a district court "'may permit' intervention if the applicant has 'a claim or defense that shares with the main action a common question of law or fact.'" *Buck v. Gordon*, 959 F.3d 219, 223 (6th Cir. 2020) (quoting Fed. R. Civ. P. 24(b)(3)). Under Rule 24(b), a district court "'shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'" *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 784 (6th Cir. 2007) (quoting Fed. R. Civ. P. 24(b)). Other factors that courts often evaluate include "the nature and extent of the intervenors' interest, their standing to raise relevant legal issues," and "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Usery v. Brandel*, 87 F.R.D. 670, 677 (W.D. Mich. 1980) (quoting *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

Permissive intervention is appropriate here. As discussed above, this motion is timely, coming shortly after the case began and prior to any discovery or motion practice. *See Buck*, 959 F.3d at 223 n.4; *Pub. Interest L. Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 799 (E.D. Mich. 2020). Because Proposed Intervenors seek to join the case at the beginning, their involvement runs no risk of delaying proceedings. *See Crestmark v. Simon Auto., LLC*, No. 20-11396, 2020 WL 8674222, at *2 (E.D. Mich. July 27, 2020) (noting motion to intervene timely where filed "at the

18

earliest possible stage of litigation," "[d]iscovery has not yet opened," and existing parties did not argue intervention was untimely); *Nat'l Trust Ins. Co. v. Heaven Hill Distilleries, Inc.*, No. 3:14-cv-394, 2018 WL 1542148, at *13 (W.D. Ky. Mar. 29, 2018) (similar).

Moreover, Proposed Intervenors' defense goes directly to the issues already presented in this lawsuit, such as (1) whether federal law permits the United States to force Kentucky to give it the personal information it seeks; (2) whether legal protections for individual privacy prohibit the disclosure of that information; and (3) whether the United States' motivations and its potential uses for the data sought are permissible. Proposed Intervenors' distinct perspective on the legal and factual issues before the Court will thus complement or amplify Defendants' arguments and sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it. Proposed Intervenors do not propose to add new issues to the litigation, instead, they are trying to offer their unique perspective to resolve the existing ones. *Dearborn Golden Invs., LLC v. Uppercut Bros., LLC*, No. 2:20-cv-13115, 2021 WL 3860882, at *1 (E.D. Mich. Aug. 30, 2021). As noted above, Proposed Intervenors provide the unique perspective of specific Kentucky voters, as well as vulnerable voters specifically named in the DOJ's requests, such as naturalized citizens. *See supra* Section I.D.

Because of this unique perspective, district courts routinely grant permissive intervention to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Tirrell v. Edelblut*, No. 24-cv-251-LM-TSM, 2025 WL 1939965, at *3 (D.N.H. July 15, 2025) (allowing "membership-based organization that represents cisgender athletes" to intervene as defendant in a suit challenging state restrictions on transgender athletes); *Thomas v. Andino*, 335 F.R.D. 364, 371 (D.S.C. 2020) (granting permissive intervention to state political party in challenge related to election laws); *Judicial Watch, Inc. v. Pennsylvania*, No. 20-cv-708 (M.D. Pa.

19

Nov. 19, 2020), Dkt. No. 50 at 3 (granting permissive intervention in NVRA case to Common Cause and League of Women Voters of Pennsylvania upon finding that "the presence of the intervenors may serve to clarify issues and thereby serve judicial economy" (internal quotation marks, citation, and footnote omitted)); *Donald J. Trump for President, Inc.*, 2020 WL 8262029, at *1 (granting Rule 24(b) motion where voters and organizations "have an interest in the constitutionality of Pennsylvania's voting procedures, which goes to the heart of Plaintiffs' action" (internal quotation marks and citation omitted)). This Court should do the same here.

## CONCLUSION

For the reasons stated above, the Court should grant the Motion to Intervene as Defendants as of right, or in the alternative, via permissive intervention.

Dated: March 6, 2026                         Respectfully submitted,

/s/ Corey M. Shapiro
Corey M. Shapiro
  *Counsel of Record*
William E. Sharp
Bethany N. Baxter
ACLU of Kentucky Foundation
325 W. Main St. #2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org
bbaxter@aclu-ky.org

Adriel I. Cepeda Derieux*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 457-0800
acepedaderieux@aclu.org

Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor

New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

*application for admission pro hac vice
forthcoming*