UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CASE NO. 3:26-cv-00019-GFVT

THE UNITED STATES OF AMERICA                                    PLAINTIFF

v.

KENTUCKY STATE BOARD OF ELECTIONS, *et al.*                    DEFENDANTS

---

### KENTUCKY STATE BOARD OF ELECTIONS' MOTION TO DISMISS

---

The United States of America fails to state a claim against the State Board of Elections and its members,[1] and the law does not allow the Department of Justice to "demand" Kentucky's statewide voter registration list. For these reasons, the State Board of Elections respectfully moves the Court to dismiss the Complaint, and to deny the United States' demand for records to which it is not entitled.

## **INTRODUCTION**

This case presents a question of statutory construction: Does a voter registration list *created by* the State "come into" its possession within the meaning of the Civil Rights Act? It does not. The Department's Complaint and demand therefore fail.

The State Board of Elections is the Commonwealth's *chosen* agency for administering the State's election laws and building and maintaining its statewide voter registration list.[2] In limited circumstances, the Attorney General may inspect and copy certain "records and papers" that "come *into* [the Board's] possession relating to any application, registration, payment of poll tax, or other act

---

[1] The United States has sued the State Board of Elections and its members in their official capacities. Because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office,' *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), this motion, and the case caption, collectively refers to the Board and its members sued in their official capacities as the "State Board of Elections" or "Board."

[2] KRS 117.025(3)(i).

requisite to voting."[3] Stated another way, the law authorizes the Attorney General to access those records that election officials *receive* in the voter registration process. It does not authorize the Department of Justice to demand production of the statewide voter registration list, which contains sensitive personally identifiable information of *all* of Kentucky's voters.

In capsule form, the Complaint should be dismissed and the Department's demand denied for two reasons: First, Kentucky's statewide voter registration list is a dynamic, state-created compilation (an administrative work product)—not a "record" that "came into" the State Board's possession within the meaning of the CRA. This is the decisive issue. The voter registration list is generated by the State Board—not received by it. Title III applies only to records received *from* voters and registrants as part of the registration process. And even if the Department could demand statewide voter records, its demand here is statutorily deficient.

Second, the Department's interpretation would dramatically expand its authority in an area where the Constitution assigns primary responsibility to the States. The Elections Clause establishes a constitutional default of state control, subject to Congressional override. If Congress intended to authorize the Executive Branch to demand every State's complete voter list as part of a nationwide oversight regime, it would have said so clearly. It did not.[4]

---

[3]      52 U.S.C. § 20703 (emphasis added).

[4]      The Court should also dismiss the Complaint to the extent it purports to sue Mr. Adams in his capacities as Secretary of State and the Commonwealth's chief elections official. Under Kentucky law, only the State Board has the authority to release the Commonwealth's voter registration list. KRS 117.025(3)(a) ("The Board shall . . . [m]aintain a complete roster of all qualified registered voters within the state by county and precinct, and institute appropriate safeguards to ensure that there is no inappropriate use of the voter registration roster."); *see also* July 23, 2025, correspondence from Jennifer Scutchfield, attached as **Exhibit 1**. For that reason, the Complaint fails to state any claim against Secretary Adams insofar as it purports to sue him in his capacity as Secretary of State and Kentucky's chief elections official.

## RELEVANT BACKGROUND

**A.    The Kentucky State Board of Elections—the bipartisan agency responsible for voter list maintenance in the Commonwealth**

The State Board maintains a complete roster of all of the qualified registered voters in Kentucky.[5] As of February 2026, there are 3,354,665 Kentuckians on that list of registered voters.[6] As an independent agency of Kentucky state government, the State Board of Elections is entrusted with the maintenance of that list and the administration of Kentucky's election laws.[7] The Board, with its staff, diligently works to comply with state and federal law, including the National Voter Registration Act (NVRA), the Civil Rights Act (CRA), and the Help America Vote Act (HAVA). Consistent with the NVRA's purposes "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained,"[8] Kentucky's State Board of Elections has, since 2019, removed roughly 735,000 ineligible voter registrations from the voter rolls.[9]

To do that work, the State Board relies on robust relationships with state and federal partners. For example, it contracts with the Kentucky Department of Transportation and the Administrative Office of the Court to double-check the accuracy of the voter registration list and to update it. The Board also regularly compares its voter registration list with the Social Security Master death file, and works with the Department of Justice to remove individuals who have self-identified as unable to

---

[5]    KRS 117.025(3)(i).

[6]    *See* State Board's Registration Statistics, https://elect.ky.gov/Resources/Pages/Registration-Statistics.aspx (February 2026 reports).

[7]    KRS 117.015(1) (charging the Board with the "registration and purgation of voters").

[8]    52 U.S.C.A. § 20501(b)(3), (4).

[9]    *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-94, 2018 (E.D. Ky. Nov. 14, 2017) (State Board of Elections' Notice of Compliance with Consent Decree, Doc. No. #99, March 28, 2025); *see also* Press Release, available at https://perma.cc/D96R-HEDC.

serve on federal juries due to citizenship. The Board also routinely removes registrants who have moved away or registered to vote in other jurisdictions.

**B.    The Department of Justice's demands for the Commonwealth's voter files, and the State Board's response[10]**

The State Board values its relationship with *any* agency that helps it do its work. That is why the State Board of Elections has *not* refused the Department's request—though the Complaint suggests otherwise. In fact, the Department twice suggests that the Board "refused the Attorney General's demand,"[11] and that it "refused to comply with the Attorney General's demand."[12] That demand was first sent to the Secretary of State in July 2025,[13] who directed the Department to contact the State Board of Elections[14], which demanded a response within just 14 days.[15]

Before the time to respond had expired, the Department sent yet another letter. In it, the Department "clarified" that the list "should contain *all* fields, . . . include[ing] the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number."[16] The Department also claimed that it intended to "assess your

---

[10]    In this section, the Board references and attaches the correspondence discussed in the Complaint. These attachments do not convert this motion to dismiss to one for summary judgment. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. Courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (cleaned up and collecting cases)).

[11]    Compl. [DE 1, PageID#8], ¶ 26.

[12]    *Id.* [DE 1, PageID#8–9], ¶ 33.

[13]    July 17, 2025, correspondence to Secretary of State Michael Adams, attached as **Exhibit 2.**

[14]    Aug. 8, 2025, correspondence to Executive Director Karen Sellers, attached as **Exhibit 3.** Again, it is the Board that maintain the "complete roster of all qualified registered voters within the state by county and precinct." KRS 117.025(3)(a).

[15]    July 23, 2025, correspondence from Jennifer Scutchfield, attached as **Exhibit 1**.

[16]    Aug. 14, 2025, correspondence to Secretary of State Michael Adams, attached as **Exhibit 4** (emphasis added).

state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act," that the demand was made "pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions,"[17] further suggested that the Attorney General's demand was made under the Help America Vote Act and Title III of the Civil Rights Act of 1960,[18] and—*without citation to any authority*—asserted that "Congress plainly intended that DOJ be able to conduct an independent review of each state's list," and that "[a]ny statewide prohibitions are clearly preempted by federal law."[19]

The State Board timely responded.[20] As requested, the Board outlined its substantial efforts to comply with the voter list maintenance program required by the National Voter Registration Act, including its having successfully met the requirements of a consent judgment ensuring its compliance with that federal law.[21] Later in August, the Board supplemented its response. There, it provided comprehensive answers to the Department's many questions in its July 17 correspondence.[22]

Yet the Board did not provide its statewide voter registration list. For good reason. The Board expressed concern over the broad demand for such sensitive personal data. As it explained to the Department, the Board "is committed to safeguarding the sensitive information it possesses, as that information belongs to the Kentuckians [the Board] serves."[23]

---

[17]    *Id.* (citing 52 U.S.C. § 20501(a)).

[18]    *Id.*

[19]    *Id.* at n.2. Of course, one would expect there would be *some* authority for such a claim. None has been provided.

[20]    August 22, 2025, correspondence from the Board to the Department, attached as **Exhibit 5**. Notably, the Board timely responded within the arbitrary deadline the Department had set.

[21]    *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-94, 2018 (E.D. Ky. Nov. 14, 2017) (State Board of Elections' Notice of Compliance with Consent Decree, Doc. No. #99, March 28, 2025).

[22]    August 29, 2025, correspondence from the Board to the Department, attached as **Exhibit 6.**

[23]    August 22, 2025, correspondence from the Board to the Department, attached as **Exhibit 5**.

The Department didn't respond—for months. Thus, the Board followed up on October 15, 2025. In its correspondence, the Board reiterated its concerns and that it "ha[d] not received the requested clarification as to how DOJ is complying with its requirements under both the Privacy Act of 1974 and the Driver's License Protection Act."[24] In any event, the Board provided a redacted List— that is, "a copy of the voter registration list that does not include the otherwise protected data."[25]

More than a month passed. Nothing. When the Department finally responded, it did so with another demand: that the Board execute a memorandum of understanding *within seven days*.[26] The Department did not, however, address the Board's concerns nor invite any further discussion or negotiation. Sign and send, it said. Since that demand, the Board has met twice.[27] Now, the Department sues, and it wants the records in five days.[28]

All that said, the Board seeks to follow the law. As the Board reads the law, however, it has no obligation nor any authority to share the entire statewide voter registration list with the Department. Increasingly, federal courts across the country agree.[29] This one should too.

---

[24] Oct. 15, 2025, correspondence from the Board to the Department, attached as **Exhibit 7**.

[25] *Id.* That complied with the NVRA and the Board's practice in other contexts. The Board redacts personal information because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

[26] Dec. 2, 2025, email from the Department to the Board, attached as **Exhibit 8**.

[27] During that time, the Board has communicated with the Department. *See* Dec. 16, 2025, email exchange, attached as **Exhibit 9**.

[28] Compl. [DE 1], at PageId#9.

[29] *See United States v. Benson*, --- F.Supp.3d ----, No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (on appeal); *United States v. Weber*, --- F.Supp.3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (on appeal); *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2025 WL 3496571 (D. Or. Dec. 5, 2025) (on appeal).

### C.    The Department seeks statewide voter registration lists from multiple states

On the day it sued, the Department also sued four other states—Utah, Oklahoma, West Virginia, and New Jersey—"for failure to produce their full voter registration lists upon request."[30] The Department celebrated the number of its suits—exclaiming that this suit "brings the Justice Department's nationwide total to 29 states and the District of Columbia."[31]

Even while the Department has opened new fronts in demanding statewide voter registration lists from each of the states, it is retreating from its earlier claims. Whereas it previously made its demands under the NVRA,[32] HAVA, and the CRA,[33] here the Department sues the Board on only one claim: the alleged violation of 52 U.S.C. § 20703.[34] For the reasons below, that claim fails.

---

[30]    Press Release, *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/HN9T-M772.

[31]    *Id.*

[32]    The Department drops any claim under the NVRA. Even so, although beyond the scope of the question presented here, the Board does not agree that the statewide voter registration list is a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"—the only records subject to public inspection under the Act. The reason is based in the text itself, which on its face describes two sets of records: the list and records "concerning" the program to ensure the list is accurate. *See* 52 U.S.C. 20507(i)(1).

[33]    Compl. [DE 1, PageID#9], at ¶¶ 34–38; *compare, e.g.,* this Complaint *with* the Department's Complaint in the Oregon case. There, it sued for alleged violations of the NVRA, HAVA, and the CRA.

[34]    The Department's retreat makes sense. HAVA includes *no* disclosure requirement whatsoever, *see* 52 U.S.C. §§ 20901-21145, and the NVRA's "public inspection provision" does not authorize wholesale access to the voter registration list, *Project Vote/Voting for Am., Inc.,* 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *N.C. State Bd. of Elections,* 996 F.3d at 268 (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Dahlstrom,* 673 F.Supp.3d 1004, 1016 (D. Alaska 2023) (holding the NVRA permits "the exclusion of sensitive personal information" from disclosure); *Pub. Int. Legal Found., Inc. v. Matthews,* 589 F.Supp.3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp,* 208 F.Supp.3d 1320, 1344–45 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birthdates); *True the Vote v. Hosemann,* 43 F.Supp.3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), the Department's Complaint must be dismissed if its allegations fail to state a claim upon which relief can be granted.[35] Yet the Department insists that this is a summary proceeding, and that the Court need only order the Board to produce its statewide voter registration list. But even if this proceeding is more like an administrative subpoena enforcement action, the Federal Rules of Civil Procedure apply,[36] and this Court is not a "rubber stamp."[37] Instead, the Court must determine "whether the subpoena, and the enforcement process, are authorized by Congress, whether the information sought is relevant to the agency's investigation."[38]

Even if these standards are satisfied, "[a]n agency investigatory tool might be resisted if the agency acted in 'bad faith,'" such as with the purpose of harassing the subpoena recipient or "pressur[ing] the recipient to settle a collateral dispute."[39] An investigation would be in bad faith if the agency made "a conscious decision . . . to pursue a groundless allegation without hope of proving that allegation."[40] Finally, the Court may decline to enforce a subpoena if the agency is "abusing the court's process."[41]

---

documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F.Supp.2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers); *see also* footnote 32.

[35]    *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

[36]    Fed. R. Civ. P. 81 ("These rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings.").

[37]    *United States v. Markwood*, 48 F.3d 969, 979.

[38]    *Id.*

[39]    *Id.* at 978.

[40]    *Id.*

[41]    *Id.*

## ARGUMENT

The Board tried to work with the Department. It sought to strike a balance between its privacy concerns and both agency's shared interest in election integrity. But the law here favors the Board, the Complaint should be dismissed, and the Department's demand should be denied. Below, the Board will outline its privacy concerns rooted in state and federal law (Section I); explain why the CRA does not authorize the Department's demand (Section II); show why the Department's demand was deficient even if the CRA had any application (Section III); and explain why this case presents a "major question," which further supports the Board's reading of the law.

## I.   The Board provided a redacted list to the Department—consistent with its privacy concerns and state and federal law.

First things first. Before turning to the statutory question presented, one point should be clear. The State Board has *not* refused to cooperate with the Department. To the contrary, the Board sought to accommodate the Department's request while honoring its legal obligation to safeguard sensitive personal information entrusted to it by Kentucky voters. It gave the Department a redacted list.[42]

The Department demanded every field in the Board's list, including "the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security."[43] The Board expressed concern that disclosing such information would expose the personal data of millions of Kentuckians without a clear statutory basis.[44]

---

[42]   Oct. 15, 2025, correspondence from the Board to the Department, attached as **Exhibit 7**. The Department failed to view the statewide voter registration list until November 18, 2025. *See* Electronic package delivery receipt, attached as **Exhibit 10**.

[43]   Aug. 14, 2025, correspondence to Secretary of State Michael Adams, attached as **Exhibit 4** (emphasis added).

[44]   August 22, 2025, correspondence from the Board to the Department, attached as **Exhibit 5**.

Even so, the Board tried to work with the Department. Recognizing the State and Federal government's shared interest in working *together* to ensure election integrity,[45] the Board invited further discussion on the more private information requested.[46] To be clear, the Board provided a *redacted* version of the statewide voter registration list—in compliance with state[47] and federal law.[48] The Board provides such lists to candidates, political parties, and ballot-question advocates.[49] The Board does not, however, provide social security and driver license numbers.[50]

That is consistent with federal law. The Privacy Act prohibits the disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless the disclosure meets one of thirteen exceptions not relevant here.[51] Because the Board contracts with the Kentucky Transportation Cabinet to aid in its voter-list

---

[45]    KRS 117.025(3)(i).

[46]    August 22, 2025, correspondence from the Board to the Department, attached as **Exhibit 5**.

[47]    KRS 61.878(1)(a) (exempting from disclosure public records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy); *Kentucky New Era, Inc. v. City of Hopkinsville*, 415 S.W.3d 76, 89 (Ky. 2013) (holding that agencies may apply a "categorical rule" to withhold certain information, including "phone number, social security number, or the other forms of personal information");

[48]    5 U.S.C. § 552a(b) (Privacy Act); 18 U.S.C. § 2721(a) (Driver's Privacy Protection Act); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting authority). None of exceptions to the Privacy Act apply. Yet even if one did apply, the Department has not complied with the procedural requirement to publish a System of Records Notice in the Federal Register." 5 U.S.C. § 552a(e)(4).

[49]    KRS 117.025(3)(i); 31 KAR 3:010, Section 6 (Requests for Voter Registration Lists).

[50]    KRS 61.878(1)(a) (exempting from disclosure public records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy); *Kentucky New Era, Inc. v. City of Hopkinsville*, 415 S.W.3d 76, 89 (Ky. 2013) (holding that agencies may apply a "categorical rule" to withhold certain information, including "phone number, social security number, or the other forms of personal information").

[51]    5 U.S.C. § 552a(b).

maintenance program, the Drivers Privacy Protection Act prohibits the Board from disclosing "personal information" about any individual that is obtained in connection with a "motor vehicle record."[52] The Department refused to address its obligations—or the Board's—under these statutes.

Instead, the Department sued. Yet the Board has *no* obligation to turn over Kentucky's statewide voter registration list to the Department—whether under the CRA or any other federal law.[53] The Department's demand should thus be denied, and the Complaint should be dismissed.

## II. Title III of the Civil Rights Act does not authorize the Department to demand Kentucky's statewide voter registration list.

Now, turn to the text of the Civil Rights Act. This case turns on a single statutory phrase in the CRA, which is the legal authority the Department relies on. The Department tries to make that phrase carry more weight than it can bear. The Civil Rights Act permits the Attorney General to inspect and copy only a defined category of materials: "all records and papers which come into [the Board's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting."[54] The statewide voter registration list is not one of those records. Thus, the Department's demand fails.

---

[52]    18 U.S.C. § 2721(a)(1).

[53]    Both statutes include exceptions for "law enforcement." For example, the Privacy Act provides an exception if the Department articulates "the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C.A. § 552a(b)(7). The Drivers Privacy Protection Act exempts disclosure for "use by any government agency . . . in carrying out its functions." 18 U.S.C.A. § 2721(b)(1). Neither exception allows for the sort of generalized request for all data from all state for general assessment purposes, as the Department suggests here.

[54]    52 U.S.C. § 20703 (referencing and incorporating by reference the records stated in the record keeping requirement of § 20701) (emphasis added). The record keeping requirements applies to "any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico." 52 U.S.C. § 20701.

The text includes a precise limitation. The statute reaches only records that "*come into*" the Board's possession. That phrase describes *acquisition* from an external source. There can be no reasonable argument that a record the Board creates has "come into" its possession. Rather, the ordinary and common meaning of that phrase is that the statute applies to records *received* by the Board—not records *created* by the Board itself.[55]

What the "statute's text indicates, its context confirms."[56] The Act references the records that must be preserved. Those records include the "application, registration, payment of poll tax, or other act requisite to voting." Each of those terms describes a record that originates with the voter or would-be registrant — something submitted or done in the course of becoming eligible to vote. The statute thus targets records that election officials receive *from* voters—not compilations or records assembled by the State through ongoing administrative processes. "Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications."[57]

Kentucky's statewide voter registration list is entirely different. It is not a record submitted by a voter or registrant. Nor is it a discrete record that "*comes into*" the Board's possession. It is a dynamic, continuously updated list created, structured, and maintained by the State Board of Elections. It incorporates information drawn from records obtained from registrants, but is the product of the

---

[55]    *United States v. Sweeney*, 891 F.3d 232, 238 (6th Cir. 2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69–77 (2012).

[56]    *Pereida v. Wilkinson*, 592 U.S. 224, 232 (2021).

[57]    *United States v. Benson*, --- F.Supp.3d ----, No. 1:25-CV-1148, 2026 WL 362789, at *9 (W.D. Mich. Feb. 10, 2026) (citing *Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible.")).

Board's own work—it includes updates and data obtained from multiple sources, including interjurisdictional notifications, motor vehicle records, death records, and other state and federal agencies. The list is an internally generated governmental record—not a record received in the registration process.

The preservation requirement in § 20701 further supports this reading. The statute requires election officials to "retain and preserve" the covered records for a specified period. That requirement makes sense as applied to discrete records received in the course of registration—applications, affidavits, poll tax receipts, and similar materials. It is far less coherent when applied to a constantly evolving statewide list that is, by design, subject to daily revision under state and federal list-maintenance obligations. Congress in 1960 legislated against a paper-record backdrop, not a modern, continuously recalibrated statewide digital registry. As with the federal court in Michigan, this "court is not a 'telepathic time-traveler,' and thus it 'cannot rewrite Congressional legislation to cover a situation that Congress may not have foreseen.'"[58]

At least one federal court—in this Circuit—agrees with this distinction. In *United States v. Benson*, the United States District Court for the Western District of Michigan held that the phrase "come into [its] possession" refers to documents submitted to the State as part of the voter registration process, not to a statewide voter registration list created and maintained by state officials.[59] The Department has appealed that decision, but its reasoning is sound. There, the court explained that the statutory language "naturally refers to a process by which someone acquires an item from an external

---

[58]      *United States v. Benson*, 2026 WL 362789, at *10 (W.D. Mich. Feb. 10, 2026) (citations omitted).

[59]      *Id.*

source,"[60] and that the surrounding terms confirm Congress was referring to records received from voters.[61] That reasoning flows directly from the text.

The Department's contrary interpretation would effectively read the limiting phrase "come into [its] possession" out of the statute,[62] while expanding potential criminal liability.[63] That cannot be right. If every record in the Board's possession qualifies, then the statute would cover not only registration applications, but any list, database, spreadsheet, or other record created by the State that incorporates such information, and the potential for criminal liability multiplies.[64] That is not how statutory construction works—nor how a textual limit operates. Courts must "give effect, if possible, to every clause and word of a statute."[65] The phrase "*come into*" must do work. Under the Department's endorsed construction, it doesn't. And if Congress intended to cover every record it would have said.

---

[60]     *Id.* at *9 (collecting authority).

[61]     *Id.* ("This interpretation of 'come into [their] possession' is bolstered by the next words in the sentence: 'relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.' Each of these terms refers to something that the voter submits or does as part of the registration process.").

[62]     *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.").

[63]     *See* 52 U.S.C. § 20701 ("Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both); 52 U.S.C. § 20702 (providing criminal penalties for "an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved");

[64]     *United States v. Granderson*, 511 U.S. 39, 54 (1994) ("In these circumstances—where text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor.").

[65]     *United States v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015) (quoting *Williams v. Taylor*, 529 U.S. 362, 364 (2000) ("It is a cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute." (cleaned up)).

14

In sum, courts "do not interpret a statute for all it is worth when a reasonable person would not read it that way."[66] Because Kentucky's statewide voter registration list is *created* by the State Board and does not "*come into*" its possession within the meaning of § 20701, it is not subject to "demand" by the Department under Title III of the Civil Rights Act. The Complaint, and the Department's demand, therefore fail as a matter of law.

## III.   The Department has not sufficiently stated "the basis and the purpose" for its demand.

One other point on the text. The Department's demand fails for another reason: the statute requires two distinct showings when the Department seeks to inspect records under Title III of the Civil Rights Act. To make its demand, the Department *must* state both the "basis" for the request and the "purpose therefor."[67] Each must be given independent meaning, and the Department has not properly stated its demand.

Instead, it relies on mere "labels and conclusions." The Department has asserted that it need only state that its demand is "for the purpose of investigating possible violations of federal law."[68] That is not enough. This reading—a mere "formulaic recitation"—collapses the statute's dual requirement into one.[69] If reciting the existence of enforcement authority were sufficient "*basis*," then it would render meaningless the textual requirement that the Department also state a "*purpose.*"

This Court must presume there are no *useless* words in the law. It must "give effect, if possible, to every clause and word of a statute."[70] The terms "basis" and "purpose" therefore cannot be synonymous. Yet the Department's letters state *only* that its purpose is to "assess Kentucky's

---

[66]   *Biden v. Nebraska*, 600 U.S. 477, 521 (2023) (Barrett, J. concurring).

[67]   52 U.S.C. § 20703.

[68]   United States' Resp. to motion to dismiss [DE 53, PageID#671], *United States v. Benson, et al.*, Case No. 1:25-cv-01148.

[69]   *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555.

[70]   *Keeley v. Whitaker*, 910 F.3d at 884.

compliance with the list maintenance requirements of the NVRA and HAVA,"[71] and a generalized desire to "assess compliance" does not explain the *basis* for targeting Kentucky's statewide voter registration list in the first place. The Department does not identify any information suggesting noncompliance. It does not allege any irregularities. It does not claim to have received any complaints. It does not assert that Kentucky's list-maintenance program is deficient.

Nor could it. As this Court knows, in 2017, the State Board was sued—*in this Court*—for alleged violations of the NVRA.[72] The Department intervened. A consent judgment was entered in 2018 and later extended once before expiring in March 2025. That decree required the Board to implement a general program making a reasonable effort to remove ineligible voters from the rolls consistent with the NVRA's procedural safeguards. The Board did exactly that. By the time the decree was set to expire—just last year—in March 2025, the Board had removed roughly 735,000 ineligible registrations, and publicly reaffirmed that clean voter rolls are required by state and federal law and pledged continued compliance after the decree's sunset.[73]

The Department did not object to the decree's expiration. Nor did it claim noncompliance. To the contrary, the Department's position shifted: having *sued* the Board under the NVRA years earlier, it later supported the Board in litigation filed in 2025 in which it defended the Board's list-maintenance efforts as fully consistent with the NVRA. When the Board was challenged for removing ineligible registrants under KRS 116.113(5), the Department took the remarkable step of filing a statement of interest in the Board's favor.[74] The Department cannot plausibly portray the Board's list-maintenance efforts as suspect *now* when it previously demanded compliance, oversaw compliance

---

[71]    Aug. 14, 2025, correspondence to Secretary of State Michael Adams, attached as **Exhibit 4**.

[72]    *See Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-94 (E.D. Ky. Nov. 14, 2017).

[73]    *Id.* (State Board's Notice of Compliance with Consent Decree, DE #99, March 28, 2025).

[74]    *See Kentuckians for the Commonwealth v. Adams, et al.*, 3:24-cv-00387 (Statement of Interest of the United States, DE 39, March 27, 2025).

with this Court's help, declined to ask this Court to extend the consent judgment when it had the chance, and then positively affirmed the Board's maintenance efforts.[75]

Instead, the Department merely invokes its enforcement authority and requests Kentucky's entire statewide list. The statute requires more. And the Fifth Circuit's decision in *Kennedy v. Lynd* does not compel a different result. There, the Attorney General's demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting."[76] With that explanation, the court concluded that the Attorney General had adequately stated the "basis and purpose" for seeking records to determine whether suits should be instituted to remedy those violations.

This case is materially different. The Department does not assert that it possesses information suggesting Kentucky is violating federal election law. Nor does it state that it seeks records to determine whether the Board has engaged in some unlawful practices. Instead, it seeks the Commonwealth's entire voter list to conduct a broad review of compliance—in Kentucky and across the country. Whatever § 20703 may permit, it does not authorize open-ended inspection untethered from an articulated "basis."

Requiring the Department to identify a factual predicate for its demand does not "engraft" additional conditions onto the statute, as the Department has argued elsewhere.[77] It simply enforces the words Congress chose. The Attorney General need not prove a violation at this stage. But she must articulate more than the bare statement that she wishes to ensure compliance with federal law.

---

[75]     *Id.*

[76]     *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962).

[77]     *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950).

Otherwise, the statutory requirement that she state a "basis" would be meaningless.[78]

Nor does the Board's endorsed reading improperly heighten the standard applicable to administrative demands. Even under traditional subpoena-enforcement principles, a court must determine whether the request is authorized by Congress and whether the information sought is reasonably relevant to a lawful inquiry.[79] That judicial role presupposes an identifiable inquiry grounded in some stated basis. A demand justified only by the assertion of enforcement authority leaves nothing for the Court to evaluate. While the Department may "investigate merely on suspicion that the law is being violated," the text here does not suggest that the Department may do so "just because it wants assurance that it is not."[80] By requiring a "purpose," Congress required otherwise.[81]

Here, two other federal courts agree. In *United States v. Oregon*, the federal district court for the District of Oregon concluded that "Title III explicitly requires a statement of 'the basis and the purpose,'"[82] and the Department's "interpretation fails to give full meaning to both 'basis' and 'purpose.'" Thus, the court concluded that "basis" means "a factual basis for investigating a violation of a federal statute."[83] The same in California. There, the court concluded that the Department's "basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law. Here, the DOJ failed to

---

[78]   *See*, *e.g.*, *United States v. Weber*, 2026 WL 118807, at *9 ("The requirement that the Attorney General state [her] purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute.").

[79]   *United States v. Markwood*, 48 F.3d at 977.

[80]   *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43.

[81]   *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("'"Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted[.]").

[82]   No. 6:25-CV-01666-MTK, 2026 WL 318402, at *9 (D. Or. Feb. 5, 2026).

[83]   *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *9 (D. Or. Feb. 5, 2026).

provide an explanation for why it believed the NVRA was violated in its letter to the Secretary. And there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation."[84] As the court explained, the "requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute."[85]

Section 20703 allows the Department to investigate suspected violations of federal voting law. It does not authorize the Department to demand statewide voter lists simply to reassure itself that no violation exists. The Board does not ask the Attorney General to prove a violation—only to articulate why *Kentucky* is a target for inspection. Because the Department has not articulated a sufficient statutory "basis" for its demand, the Complaint fails.

*     *     *

For these reasons, the United States has failed to articulate a sufficient basis and purpose for its request and, even if it had done so, the statewide voter registration list is not among the records that may be "demanded" under the Civil Rights Act.

## IV.    Under the major questions doctrine, the Department has no authority to gather statewide voter registration lists for its stated purposes.

One final point. The Department's demand is not ordinary law enforcement. Instead, the Department seeks every State's voter registration list so that it may compare them against federal databases and second-guess voter list maintenance in Washington.[86] That may be a policy Congress

---

[84]    *United States v. Weber*, 2026 WL 118807, at *9.

[85]    *Id.*

[86]    *See* Department's Proposed "Confidential Memorandum of Understanding," attached as **Exhibit 11**, at 2 ("The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLS for proper list maintenance and compliance with federal law."); *see also* Devlin Barrett & Nick Corasaniti, Trump Administration Quietly Seeks to Build National Voter Roll, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

19

should adopt. But it is not a program the Department may implement using an ambiguous statutory provision. Under the Supreme Court's precedent, "this is a major questions case."[87]

The Supreme Court "has long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers."[88] In "major questions cases," the Court "has reasoned that both separation of powers principles and a practical understanding of legislative intent suggest Congress would not have delegated highly consequential power through ambiguous language."[89] And the Supreme Court has repeatedly refused to discover sweeping authority in "modest words"[90] and "ancillary"[91] provisions—whether the claimed power was cancellation of hundreds of billions in student-loan debt,[92] a nationwide vaccine mandate,[93] or a forced transition of the national energy grid.[94]

This is that kind of case. The Department "claim[s] to discover in a long-extant statute an unheralded power" representing a "transformative expansion in [its] regulatory authority."[95] It does so not through any targeted enforcement action tied to a concrete violation, but through a generic "demand" mechanism—an "ancillary provision"—to assemble a nationwide program of election administration oversight out of whole cloth. In other words, it claims a previously unknown

---

[87]    *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022).

[88]    *Learning Res., Inc. v. Trump*, 607 U.S. ----, No. 24–1287, 2026 WL 477534, at *7 (U.S. Feb. 20, 2026) (cleaned up).

[89]    *Id.*.

[90]    *W. Virginia v. Env't Prot. Agency*, 597 U.S. at 723 (cleaned up).

[91]    *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ('Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

[92]    *Biden v. Nebraska*, 600 U.S. 477.

[93]    595 U.S. 109 (2022) (per curiam).

[94]    *West Virginia v. EPA*, 597 U.S. at 723.

[95]    *Id.* at 724 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)).

"extraordinary" and "unilateral" power never used for this purpose.[96] "Given these circumstances, there is every reason to hesitate before concluding that Congress meant to confer on [the Department] the authority it claims under [52 U.S.C. § 20703]."[97] That is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'"[98] The Department therefore must identify "clear congressional authorization" for the power it asserts.[99] Yet it cannot do that here.[100]

The Constitutional context makes the Department's demand even more extraordinary. The Elections Clause says: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."[101] It establishes a structural default: States prescribe the "times, places and manner" of federal elections, and Congress—not the Executive—may "make or alter" those state regulations.[102]

---

[96] *Learning Res., Inc. v. Trump*, 2026 WL 477534, at *13.

[97] *W. Virginia v. Env't Prot. Agency*, 597 U.S. at 725.

[98] *Id.*

[99] *Id.* at 723.

[100] *Biden v. Nebraska*, 600 U.S. 477, 517–18 (Barrett, J. concurring) ("We have also been skeptical of mismatches between broad invocations of power by agencies and relatively narrow statutes that purport to delegate that power. Just as an instruction to 'pick up dessert' is not permission to buy a four-tier wedding cake, Congress's use of a 'subtle device' is not authorization for agency action of 'enormous importance.'").

[101] U.S. Const. Art. I, § 4, cl. 1.

[102] *Millsaps v. Thompson*, 259 F.3d 535, 539 (6th Cir. 2001) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) ("In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'").

That default matters. If Congress intends to displace state control with a nationwide federal verification regime, it must do so with unmistakable clarity.[103] Ambiguity will not do—especially where the claimed power would reallocate the mechanics of elections administration from state officials to federal administrators without Congressional approval. Yet the fix is easy. The Court should read "come into possession" as the limiting principle that Congress provided.

The Department's interpretation has no limits. It would use the same phrase so that it may "come into possession" of *every record* in the State Board's possession. If the Department believes a centralized federal verification system is wise, it should ask Congress to authorize it because "a decision of such magnitude and consequence rests with Congress itself."[104] While "legislating can be hard and take time," and "it can be tempting to bypass Congress when some pressing problem arises," the "deliberative nature of the legislative process was the whole point of its design" of our Constitutional Republic. It is a virtue—not a vice. "Through that process, the Nation can tap the combined wisdom of the people's elected representatives, not just that of one faction or man. There, deliberation tempers impulse, and compromise hammers disagreements into workable solutions."[105] Given the fundamental importance of election law and administration,[106] it is easy to "appreciate the legislative process for the bulwark of liberty it is."[107]

---

[103]    *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (explaining that where Congressional interference would upset the usual constitutional balance of federal and state powers, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" this balance).

[104]    *W. Virginia v. Env't Prot. Agency*, 597 U.S. at 735.

[105]    *Learning Res., Inc. v. Trump*, 2026 WL 477534, at *35 (U.S. Feb. 20, 2026); *see also* Federalist No. 51 (Madison) ("Ambition must be made to counteract ambition.").

[106]    *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

[107]    *Learning Res., Inc. v. Trump*, 2026 WL 477534, at *35.

## CONCLUSION

For these reasons, the Court should dismiss the United States' Complaint and deny its demand for the Commonwealth's statewide voter registration list.

Respectfully submitted,

/s/ Carmine Gennaro Iaccarino
Carmine G. Iaccarino
Emma J. Redinger
Sturgill, Turner, Barker & Moloney, PLLC
333 West Vine Street, Suite 1500
Lexington, KY 40507
Telephone No.: (859) 255-8581
Facsimile No.: (859) 231-0851
Carmine@sturgillturner.com
ERedinger@sturgillturner.com

&

Taylor Austin Brown
  General Counsel
State Board of Elections
140 Walnut Street
Frankfort, Kentucky 40601
TaylorA.Brown@ky.gov

*Counsel for the State Board of Elections and each of its members in their official capacities as Board members*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, I filed this motion with the Clerk of this Court using the Court's CM/ECF system, which will send notification to all registered parties and to Secretary of State Michael Adams via email at sos.secretary@ky.gov.

/s/ Carmine Gennaro Iaccarino
*Counsel for the State Board of Elections and each of its members in their official capacities as Board members*