UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
CASE NO. 3:26-CV-00019-GFVT

THE UNITED STATES OF AMERICA                                        PLAINTIFF

v.

MICHAEL ADAMS, in his Official Capacity as                          DEFENDANTS
KENTUCKY SECRETARY OF STATE, *et al.*

---

## MOTION TO DISMISS FOR DEFENDANT MICHAEL ADAMS, IN HIS OFFICIAL CAPACITY OF KENTUCKY SECRETARY OF STATE

---

The United States of America through its Attorney General ("Attorney General") brought this suit seeking access to Kentucky's entire statewide voter registration list, inclusive of voters' personal data that Kentucky law makes private. The cited federal law, however, does not allow the Attorney General automatic and unlimited access to broad categories of personally identifying information about private citizens. The Complaint fails to state a claim against this Defendant, Kentucky Secretary of State Michael Adams, and for this reason Defendant Adams respectfully moves this Court to dismiss the Complaint.

## INTRODUCTION

This case concerns the scope of a little-used provision of the Civil Rights Act of 1960, an Act of Congress to "enforce constitutional rights,"[1] particularly for voters. Invoking that Act, the Attorney General asks this Court to compel Kentucky election officials to produce the Commonwealth's entire statewide voter registration database—including sensitive personally

---

[1] *See* Public Law 86-449 (1960).

identifying information for millions of voters, such as partial social security numbers and driver's license numbers.

Nothing in the Civil Rights Act authorizes such a demand, or mandates Kentucky's compliance. Critically, the dispute here is narrower than the Complaint suggests: Kentucky has already produced the bulk of its statewide voter registration to the Attorney General. The only information withheld consists of sensitive personal identifiers—driver's license numbers and Social Security numbers— access to which Congress has never authorized the Attorney General to compel. The real question before this Court is whether a Jim Crow-era recordkeeping statute aimed at keeping states from disenfranchising black voters requires states to surrender all voters' most sensitive personally identifying information to federal investigators absent any clear congressional directive, or even an express basis from the Attorney General. Let it be clear: It does not.

While Title III of the Civil Rights Act requires election officials to preserve certain election records for twenty-two months after a federal election and permits the Attorney General to inspect those preserved records upon written demand,  52 U.S.C. §§ 20701–20703, it does not authorize the Attorney General to compel states to surrender complete voter databases containing highly sensitive personal information. The government's complaint stretches the Act far beyond its text and structure. The Attorney General attempts to transform a limited record-inspection provision into a sweeping surveillance tool.

That interpretation fails for several independent reasons. First, and most fundamentally, Kentucky's statewide voter registration list is not a "record" that "came into" the Board's possession within the meaning of Title III. The Act reaches only records received from voters and registrants in the course of the registration process—not administrative compilations created by

the State itself. That textual limitation is decisive and dispositive of the Complaint. Second, the Attorney General's demand did not satisfy the statutory requirement to state both the basis and purpose for the demand. Third, Title III does not authorize the compelled disclosure of statewide voter databases or sensitive personal identifiers such as driver's license or Social Security numbers. Fourth, the government improperly attempts to use the Civil Rights Act to investigate potential violations of the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), despite the fact that those statutes contain their own enforcement mechanisms. Fifth, the interpretation urged by the Attorney General would raise serious constitutional, federalism and privacy concerns by requiring states to disclose sensitive personal information absent any clear congressional authorization.

Because the complaint fails to state a claim under Rule 12(b)(6), it should be dismissed.

## STATEMENT OF FACTS

### A. Kentucky's election administration structure.

Kentucky law assigns primary responsibility for voter registration and voter list maintenance to the Kentucky State Board of Elections and the Commonwealth's 120 county clerks. The Secretary of State serves as Kentucky's chief election official and chairs the State Board of Elections. However, under legislation enacted in 2019, the Secretary of State does not manage the day-to-day operations of the State Board of Elections, which operates as an independent agency under Kentucky law.

Voter registrations are received and processed by county clerks throughout the Commonwealth. *See* KRS 116.045(2). Kentucky law allows voter registration through multiple methods, including in person, by mail, through the federal postcard application, through mail-in applications prescribed by the Election Assistance Commission, and through other methods

approved by the State Board of Elections. *See* KRS 116.045(4). Consistent with the NVRA, Kentucky also permits voter registration through motor-vehicle licensing offices and designated voter-registration agencies. *See* KRS 116.0455; 31 KAR 3:020. The statewide voter registration database is maintained by the State Board of Elections.

**B. Kentucky's voter-list maintenance program.**

Kentucky conducts ongoing voter-list maintenance through multiple sources of information, including data received from the Kentucky Office of Vital Statistics (deaths), the Kentucky Department of Corrections, the Administrative Office of the Courts, the Kentucky Transportation Cabinet, federal courts, the United States Postal Service, and interstate voter-data sharing programs.

Kentucky law requires the removal of voters from the registration rolls upon receipt of reliable information establishing that a voter is deceased, has been declared incompetent, has been convicted of a felony, has registered in another state, or is otherwise ineligible. *See* KRS 116.113**.** Between 2019 and February 2026, Kentucky removed hundreds of thousands of ineligible registrations through these processes, including 334,858 deceased voters, 44,351 felons, 3,879 voters declared incompetent, 36,712 voters who moved out of state, 13,542 duplicate registrations, and 352,747 inactive voters.[2] These removals occur on an ongoing basis.[3]

**C. Prior Federal litigation confirmed Kentucky's compliance with Federal voter-list maintenance requirements.**

Kentucky's voter-roll maintenance procedures have previously been the subject of federal litigation in this very Court. In *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-00094 (E.D. Ky.), a

---

[2] These facts are drawn from official public Kentucky State Board of Elections records subject to judicial notice under F.R.E. 201.

[3] The Kentucky Election Integrity Process (KEIP) can be found at https://elect.ky.gov/Resources/Pages/List-Maintenance.aspx.

private organization alleged that Kentucky had failed to comply with the list-maintenance provisions of the NVRA. The litigation resulted in a consent decree governing certain list-maintenance activities. The decree expired on March 31, 2025, and the Attorney General did not seek to extend it.

The expiration of that decree reflected the conclusion of the federal oversight period relating to those claims. In separate litigation in the Western District of Kentucky challenging Kentucky's removal of voters who registered in another state, the Department of Justice filed a Statement of Interest *supporting* the position of the Secretary of State and the State Board of Elections, agreeing that such removals are permissible under federal law and defending the Commonwealth's voter list-maintenance procedures.

**D. Kentucky's Partial Production and the Narrow Scope of this Dispute.**

In response to the Attorney General's request for voter registration data, the State Board of Elections provided the Commonwealth's statewide voter roll information. However, the State Board of Elections redacted certain highly sensitive personal identifiers before producing the data – *viz*., Social Security numbers and driver's license numbers.

Those fields were withheld because they contain confidential personal identifiers belonging to millions of Kentucky voters which are protected state privacy laws. The Attorney General seeks to compel disclosure of the most sensitive personal identifiers maintained in Kentucky's voter registration system, information that Congress has never required states to disclose under the Civil Rights Act.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mere legal conclusions or formulaic recitations of statutory elements are insufficient. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts in the Sixth Circuit accept well-pleaded facts as true but need not accept legal conclusions or unwarranted inferences. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F. 3d 430, 434 (6th Cir. 2008). Dismissal is appropriate where the complaint fails to plausibly allege that the defendant violated the statute invoked.

## ARGUMENT

### I.    The Complaint fails to state a claim under the Civil Rights Act of 1960.

The Attorney General asserts a single claim under Title III of the Civil Rights Act of 1960, alleging that Defendants failed to comply with a written demand for election records. But the Complaint fails to plausibly establish that the Act requires the disclosure the Attorney General seeks.

### A.  The Complaint fails to plausibly allege a valid statutory demand.

The Civil Rights Act authorizes the Attorney General to inspect certain election records upon written demand. The Complaint alleges only that the Department of Justice seeks the voter database to review Kentucky's compliance with federal voter-list maintenance requirements. But the Act requires that any such demand "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The Complaint merely asserts that the Attorney General issued a demand containing such a statement. This conclusory allegation is insufficient. A generalized desire to investigate election administration does not constitute the type of specific "basis" contemplated by the statute. Because the complaint fails to plausibly allege a valid statutory demand, the claim cannot proceed.

The deficiency is confirmed by examining what the August 14 Letter actually stated, as described in the Complaint. *See* Compl. ¶¶ 23–24. The demand cited NVRA and HAVA "list maintenance" compliance as its stated purpose—without identifying any specific election under investigation, any specific alleged deficiency in Kentucky's voter rolls, or any particular registered voter whose eligibility was in question. Such a generalized compliance audit rationale falls short of a legally sufficient "basis." The August 14 Letter's open-ended demand for "all fields" of an entire statewide voter database—including driver's license numbers and partial Social Security numbers for every registered voter in Kentucky—demonstrates that the demand is not tethered to any particularized investigative basis.

The government's reliance on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) is misplaced. In *Lynd*, the Attorney General's demand sought information the Attorney General already possessed, "tending to show that distinctions on the basis of race or color have been made with respect to registration and voting." 306 F.2d at 231, fn. 6. That concrete factual predicate is absent here. The Attorney General does not allege any specific irregularity, any received complaint, or any identified deficiency in Kentucky's program. Indeed, the Attorney General cannot make such an allegation credibly. The Department of Justice previously intervened to achieve NVRA compliance, overseeing the successful completion of a consent decree. The Attorney General not only declined to seek an extension of that decree, but also filed a Statement of Interest in another proceeding affirmatively praising Kentucky's list-maintenance efforts. The Department of Justice cannot now invoke the Civil Rights Act to conduct an open-ended nationwide audit of the same program it previously certified as compliant.

Two other federal courts have now reached the same conclusion on the sufficiency of the basis-and-purpose requirement. In *United States v. Oregon*, 2026 WL 318402, at *17, the court held that

"basis" means "a factual basis for investigating a violation of a federal statute," and that the Attorney General interpretation fails to give full meaning to both basis and purpose. In *United States v. Weber*, 2026 WL 118807, at *9, the court required "specific, articulable facts pointing to the violation of federal law," and found the DOJ's demand on California fatally deficient. The statutory requirement "is not merely perfunctory—it is a critical safeguard." *Id.* The same infirmity defeats the demand here.

The Department of Justice's own proposed MOU (Exhibit 11 to the KSBE's Motion to Dismiss) confirms the actual purpose of the demand: Section III states that "The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law." This is a nationwide database-comparison program, not a particularized investigation of Kentucky's compliance. A generalized nationwide data-gathering exercise cannot satisfy the statutory requirement of a stated "basis" targeting a specific jurisdiction. *See Morton Salt*, 338 U.S. at 642–43.

**B. Kentucky's statewide voter registration list is not a record that "came into" the Secretary of State's possession within the meaning of Title III—and that is dispositive.**

This case turns on a single statutory phrase. Title III reaches only "all records and papers which come into his [the officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701 (emphasis added). The phrase "come into" possession is not surplus language. It is a precise and deliberate textual limitation describing acquisition from an external source. Under any ordinary reading, a record an official creates does not "come into" her possession—she already has it. *See United States v. Sweeney*, 891 F.3d 232, 238 (6th Cir. 2018) (words take their ordinary, contemporary, common meaning); *Pereida v. Wilkinson*, 592 U.S. 224, 232 (2021) ("What the statute's text indicates, its context confirms").

Context confirms the textual reading. The surrounding terms—"application, registration, payment of poll tax, or other act requisite to voting"—each describe something submitted or performed by the voter or registrant. These are documents that flow from citizens to officials; they "come into" the official's possession from outside. Kentucky's statewide voter registration list is entirely different. It is not submitted by anyone. It is a dynamic, continuously updated administrative compilation generated by the State Board of Elections itself from multiple sources—motor vehicle records, death records, court data, and interstate notifications. The State Board of Elections does not receive it; rather, it Board builds it. A record it creates has never "come into" its possession within any ordinary meaning of that phrase.

The government's contrary reading would render the limiting phrase "come into" entirely superfluous—a result foreclosed by fundamental canons of statutory construction. *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) (courts must give effect to every clause and word); *U.S. v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015).). If every record in the State Board of Elections' possession qualified, the phrase "come into" would do no work at all.

At least three federal courts—in this Circuit and others—agree with Defendants. In *U.S. v. Benson*, No. 1:25-CV-1148, 2026 WL 362789, at *9 (W.D. Mich. Feb. 10, 2026), the court held that the phrase "come into [its] possession" "naturally refers to a process by which someone acquires an item from an external source" and that the surrounding terms confirm that Congress was referring exclusively to records received from voters, not to a statewide voter registration list created and maintained by state officials. *Id.* at *9–10. The District of Oregon and the Central District of California reached the same conclusion in parallel proceedings. *U.S. v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *U.S. v. Weber*, No. 2:25-CV-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026). Each is on appeal, but their reasoning flows

directly from the text, and this Court should adopt it. The government cannot plausibly argue that Kentucky's statewide voter registration list "came into" the State Board of Elections' possession when the State Board of Elections itself created it.

### C. Title III's text does not authorize the compelled disclosure of Statewide Voter Databases.

Even if a valid demand had been issued, the statute does not authorize the sweeping disclosure the Attorney General seeks. Section 20701 requires election officials to preserve for 22 months records "relating to any application, registration, payment of poll tax, or other act requisite to voting." Section 20703 allows the Attorney General to inspect those preserved records. The plain text therefore links the inspection authority to records preserved in connection with a specific, identifiable past federal election within the 22-month retention window.

The Attorney General's August 14 demand, as described in the Complaint, did not identify any specific federal election under investigation. Compl. ¶¶ 23–24. It sought Kentucky's current, live statewide voter registration database—a continuously updated administrative system, not a preserved election record. A demand for a live database untethered to any particular election and any particular 22-month retention period falls entirely outside the temporal scope of Section 20701 and therefore outside the inspection authority of Section 20703. This is an independent textual basis for dismissal that requires no novel legal theory: the statute's plain structure simply does not reach what the government is asking for here.

Courts must interpret statutes according to their ordinary meaning. *See Bostock v. Clayton County*, 590 U.S. 644 (2020). The Act refers to discrete categories of election records relating to particular acts of voting, not aggregated voter databases containing private personal information of millions of individuals.

This textual interpretation is one the Court must resolve *de novo*. Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts no longer defer to agency interpretations of ambiguous statutes. The Attorney General's expansive reading of "records" under 52 U.S.C. § 20701 to encompass modern, comprehensive, statewide electronic voter registration databases is an agency construction that is entitled to no deference. This Court must independently determine what "records and papers… relating to any application, registration, payment of poll tax, or other act requisite to voting" means in the statute's text—and under that plain text, the answer does not include the wholesale compelled production of a multi-million-record electronic database containing sensitive Personally Identifiable Information ("PII") fields that were not contemplated, let alone required, by Congress.

**D. Historical context confirms that Title III was intended to preserve paper election records.**

The historical context of Title III further confirms the narrow scope of the statute. Congress enacted the Civil Rights Act of 1960 in response to widespread destruction and manipulation of voter-registration records in certain jurisdictions during the Jim Crow era. The purpose of Title III was to ensure that records relating to voter registration and voting were preserved long enough for federal investigators to determine whether discriminatory practices had occurred. At the time the statute was enacted, voter registration records consisted primarily of local paper documents, such as registration applications and poll books maintained by county officials. Congress required those records to be preserved for twenty-two months so that federal authorities could inspect them if allegations of voter suppression arose.

Nothing in the statutory history suggests that Congress intended to create a federal right to obtain statewide electronic voter databases containing sensitive personal information about

millions of voters—technology that did not exist when the statute was enacted. Interpreting Title III to compel disclosure of modern statewide voter databases would dramatically expand the statute far beyond the purpose Congress intended.

### E.  The Attorney General cannot use Title III to enforce NVRA or HAVA.

The Complaint makes clear that the Attorney General's objective is to evaluate Kentucky's compliance with voter-roll maintenance requirements under the NVRA and related federal election statutes. But those statutes contain their own enforcement provisions. The NVRA authorizes the Attorney General to bring civil enforcement actions for violations of its provisions. *See* 52 U.S.C. § 20510. Similarly, HAVA authorizes the Attorney General to bring civil actions for declaratory or injunctive relief to enforce its requirements. *See* 52 U.S.C. § 21111.

Neither statute requires states to disclose their entire voter databases to the federal government. Allowing the Attorney General to obtain such information through Title III would make superfluous the enforcement mechanisms Congress established in those statutes. The Supreme Court has repeatedly warned against statutory interpretations that allow one statute to swallow the detailed regulatory framework of another. *See*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). This principle applies with particular force here. Where Congress has expressly provided enforcement mechanisms in the NVRA and HAVA—including civil enforcement actions by the Attorney General under 52 U.S.C. § 20510 and 52 U.S.C. § 21111— those remedies are exclusive and cannot be circumvented through the invocation of a separate, older statute. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981) (where Congress has provided "elaborate enforcement provisions" in a statute, it "cannot be assumed to have intended to authorize" additional remedies that bypass that framework). The Attorney General's use of Title III as an alternative investigative vehicle for what is, in substance,

an NVRA and HAVA compliance inquiry is precisely the statutory end-run that *Sea Clammers* prohibits.

## II.    The Attorney General's interpretation conflicts with basic principles of Federalism.

The United States Constitution's Elections Clause assigns states primary responsibility for administering elections. U.S. Const. art. I, § 4. Federal courts therefore interpret election statutes with sensitivity to the balance between federal and state authority. The Supreme Court has repeatedly emphasized that federal statutes should not be interpreted to intrude upon areas of traditional state authority absent a clear statement from Congress. *Cf. Gregory v. Ashcroft*, 501 U.S. 452 (1991).

Kentucky's General Assembly has repeatedly asserted its specific intent to protect the privacy of its voters' personal information. While voter registration records generally are public information, K.R.S. 116.095 requires that "[i]f a registered voter's Social Security number is included on his or her registration information, the Social Security number shall be redacted by the county clerk before it is duplicated and furnished to [a] citizen requesting the copy and before it is inspected or duplicated by the citizen." In the more general Kentucky Open Records Act, excepted from disclosure are "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy[.]" K.R.S. 61.878(1)(a). *See also, e.g.*, Ky. A.G. Open Records Decision 05-ORD-224 ("we find no error in [agency's] decision to redact [individual's] driver's license and social security number.").

Election administration is one of the most traditional areas of state sovereignty. Requiring states to provide federal officials with complete voter databases containing voters' sensitive

personal information would represent a substantial intrusion into state election administration. Title III contains no clear statement authorizing such a requirement.

### III.    The Attorney General's theory implicates the Major Questions Doctrine.

The Supreme Court has recently emphasized that courts should not presume that Congress delegated authority over issues of vast political and economic significance without a clear statutory statement. *See West Virginia v. EPA*, 597 U.S. 697 (2022). Under this "major questions doctrine," courts require clear congressional authorization before allowing federal agencies to exercise sweeping regulatory power.

The interpretation urged by the Attorney General would grant the Department of Justice authority to compel states nationwide to provide federal investigators with complete voter registration databases containing sensitive personal information for tens of millions of voters. Such authority would represent a substantial expansion in the federal role in the administration of state election systems. Yet Title III contains no clear indication that Congress intended to grant the Attorney General such sweeping authority. Courts should not presume that Congress silently authorized such a significant expansion of federal power. The scale of the claimed authority is itself disqualifying under the major questions doctrine. Applied nationwide, the Attorney General's interpretation would authorize demands for the comprehensive voter registration databases of all 50 states, potentially encompassing the sensitive PII of more than 160 million registered voters, on the basis of a 1960 recordkeeping statute enacted for the entirely different purpose of preventing localized destruction of paper voting records in jurisdictions practicing racial discrimination. This is precisely the kind of "transformative expansion" in an agency's regulatory authority that the Supreme Court held in *West Virginia* requires Congress to speak with exceptional clarity. *See* 597 U.S. at 724. No such clarity exists in Title III.

IV.    **The government's reading of Section 20703 raises a nondelegation concern that independently supports a narrowing construction.**

The nondelegation doctrine requires that when Congress confers authority on the executive branch, it must supply an "intelligible principle" to guide the exercise of that authority. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Under the Department of Justice's reading, Section 20703 grants the Attorney General virtually unfettered discretion to demand election records from any state, in any format, concerning any subject matter, for any stated investigative purpose—with no meaningful statutory limit on scope, timing, or content. The "basis and purpose" requirement of Section 20703 provides no intelligible principle if, as the government contends, the court may not review its sufficiency. The result is an open-ended delegation of compulsive power over state election administration with no governing standard whatsoever.

The Supreme Court's recent decisions signal renewed judicial attention to this problem. Justice Gorsuch's dissent in *Gundy v. United States*, 588 U.S. 128, 163–187 (2019), joined by three other Justices, called for rigorous enforcement of the nondelegation doctrine against statutes that grant agencies "unguided discretion." *Biden v. Nebraska*, 600 U.S. 477 (2023), further reinforced the Court's skepticism of broad agency authority claimed under ambiguous statutory text. The nondelegation concern provides an independent and compelling basis for the Court to adopt the narrower reading of Section 20703 advanced throughout this brief: one that limits the Attorney General's inspection authority to election-specific, temporally bounded records with a particularized investigative basis—and that does not reach comprehensive state voter databases or the sensitive PII of private citizens.

V.    **The demanded disclosure would conflict with Federal privacy protections.**

The Attorney General has also failed to satisfy a threshold procedural prerequisite under the federal Privacy Act. Before an agency may collect a new system of records from individuals, it must publish a System of Records Notice ("SORN") in the Federal Register. *See* 5 U.S.C. § 552a(e)(4). The Department of Justice has not complied with this requirement. While the proposed MOU (Exhibit 11) references an existing SORN, JUSTICE/CRT-001, that SORN was published in 2003 and does not encompass the nationwide, state-by-state voter database collection program the Department of Justice is attempting to implement. Collecting millions of voters' personal information from 50 states under a 2003 SORN created for a fundamentally different purpose is itself a violation of the Privacy Act, independent of the other deficiencies in the demand.

**VI.     Kentucky's sovereign interest in its voter registration system commands heightened protection under the "Special Solicitude" doctrine.**

In *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), the Supreme Court recognized that states are entitled to "special solicitude" in proceedings implicating their quasi-sovereign interests—interests that the Court described as qualitatively distinct from those of a private litigant. While *Massachusetts* arose in the standing context, its principle applies with equal force here: when a federal agency action directly threatens a state's sovereign authority over a core governmental function, courts must give greater weight to the state's interests before permitting federal compulsion to proceed.

The administration of elections is among the most fundamental exercises of state sovereignty. *See* U.S. Const. art. I, § 4; *Rucho v. Common Cause*, 588 U.S. 684 (2019) (recognizing that regulation of elections is one of the most significant aspects of state governments). Kentucky's sovereign interest in maintaining the security, integrity, and privacy of its statewide voter registration system is not merely a bureaucratic record-keeping interest—it reflects the

Commonwealth's constitutional responsibility to its citizens to administer elections free from undue federal interference. Under the special solicitude doctrine, that interest demands that Congress speak clearly before invading that prerogative. Title III speaks no such clarity.

**VII.   The constitutional privacy interests of Kentucky's voters independently preclude the demanded disclosure.**

In addition to the State's institutional interests under the Elections Clause and the Tenth Amendment, there is another important constitutional dimension that has not been addressed: the privacy interests of the *voters themselves*. The Supreme Court recognized in *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977) that the Constitution protects an individual's "interest in avoiding disclosure of personal matters," and that this interest is distinct from the more familiar liberty interest in making personal decisions. The Court reaffirmed this constitutional privacy interest in *NASA v. Nelson*, 562 U.S. 134, 138 (2011), holding that government demands for personal information implicate a constitutionally protected privacy interest that must be weighed against the government's asserted need.

The millions of Kentucky voters whose driver's license numbers and partial Social Security numbers are sought by the Attorney General are not parties to this proceeding. They have received no notice that their personal identifying information is the subject of a federal demand. They have had no opportunity to be heard. Under *Whalen* and *NASA v. Nelson*, those voters possess a constitutionally protected interest in avoiding compelled disclosure of their sensitive personal information to federal investigators. That constitutional interest informs the statutory construction: Congress in 1960 cannot be presumed to have authorized the mass involuntary disclosure of the private identifying information of millions of citizens without their knowledge or consent when the statutory text contains no clear expression of that intent. *See Edward J. DeBartolo Corp. v.*

*Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (courts will not interpret a statute to raise "serious constitutional problems" if a reasonable alternative reading is available).

**VIII. The comprehensive nature of the demand implicates the constitutional privacy reasoning of *Carpenter v. United States*.**

In *Carpenter v. United States*, 585 U.S. 296, 310 (2018), the Supreme Court held that when the government obtains a "comprehensive chronicle" of an individual's personal information—particularly information that reveals political associations, physical movements, or personal relationships—traditional rules permitting governmental access without heightened scrutiny must yield to constitutional privacy realities. The Court emphasized that the aggregation of individually innocuous data points can create a privacy intrusion that is constitutionally qualitatively different from access to any single record. *Id.* at 320.

The demand at issue here is precisely the kind of comprehensive personal data compilation that *Carpenter* recognized as constitutionally distinct. A statewide voter registration database aggregates name, residential address, date of birth, driver's license number, and partial Social Security number for every registered voter in the Commonwealth—creating a comprehensive portrait of political participation and personal identity for millions of citizens. While *Carpenter* addressed the Fourth Amendment directly, its reasoning operates here as a powerful tool of statutory construction: Congress in 1960 cannot be presumed to have silently authorized what would today constitute a *Carpenter*-level intrusion into the personal data of millions of citizens. Where a statute's text is ambiguous, courts construe it to avoid raising constitutional concerns of this magnitude. *See Bond v. United States*, 572 U.S. 844, 860 (2014).  A straightforward narrowing construction resolves this case.

Under that analysis:

- Title III allows the Attorney General to inspect actual election records relating to registration and voting.

- States must preserve and provide access to those records when properly requested.

- But the statute does not require states to disclose complete statewide voter databases or confidential personal identifiers.

Kentucky has fully complied with that narrower—and textually faithful—interpretation of the statute. The State preserved the required election records and produced its statewide voter roll data to the Attorney General. The only information withheld consists of highly sensitive personal identifiers that Congress has never required states to disclose. The Attorney General seeks relief that goes far beyond what Title III authorizes.

## CONCLUSION

The Attorney General asks this Court to compel Kentucky election officials to provide the federal government with the Commonwealth's entire voter registration database and sensitive personal information belonging to millions of voters. The Civil Rights Act of 1960 does not, and was not intended to, authorize such a sweeping demand.

Because the Complaint fails to plausibly allege a violation of federal law, Defendant respectfully requests that the Court dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). To the extent any portion of the Complaint survives dismissal, Defendant alternatively requests that any order of production be narrowly tailored to records demonstrably within the scope of 52 U.S.C. § 20701, exclude sensitive personal identifiers—including driver's license numbers and Social Security digits—not clearly mandated for disclosure by Title III of the

Act, and afford Defendants a reasonable compliance period consistent with due process and the

operational requirements of Kentucky's election administration infrastructure.

Respectfully submitted,

/s/ Jay L. Phillips
Matt Malone (90508)
Jay L. Phillips (100068)
EMBRY MERRITT WOMACK NANCE, PLLC
201 East Main Street, 14th Floor
Lexington, Kentucky 40507
(859)543-0453
matt.malone@emwnlaw.com
jay.phillips@emwnlaw.com
*Counsel for Michael Adams, in his official capacity
as Kentucky Secretary of State*

AND

*/s/ Jennifer S. Scutchfield w/permission*
Jennifer S. Scutchfield (87515)
Assistant Secretary of State
General Counsel
Office of the Secretary of State
700 Capital Avenue
State Capitol, Suite 152
Frankfort, KY 40601
(502)782-7417
jscutchfield@ky.gov
*Counsel for Michael Adams, in his official capacity
as Kentucky Secretary of State*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 31, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

/s/ Jennifer S. Scutchfield

*Counsel for Defendant Michael G. Adams, in his official capacity as Kentucky Secretary of State*