## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>MICHAEL ADAMS, in his Official Capacity as KENTUCKY SECRETARY OF STATE and as CHIEF ELECTION OFFICIAL for the KENTUCKY STATE BOARD OF ELECTIONS; ROSS OWENS, III in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; ERIC FARRIS in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; JOHN BROWN, III in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; SUE PERRY in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; DEANNA BRANGERS in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; CORY SKOLNICK in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; DWIGHT SEARS in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; JULIE GRIGGS in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER,<br><br>*Defendants*. | Case No. 3:26-cv-00019-GFVT |

## MEMORANDUM OF LAW IN SUPPORT OF KENTUCKY ALLIANCE FOR RETIRED AMERICANS' PROPOSED MOTION TO DISMISS

**INTRODUCTION**

Over the last several months, the Department of Justice has filed lawsuits against thirty states and the District of Columbia, claiming extraordinary and unprecedented power to demand any voter registration data, at any time, for any purpose, without any meaningful review. On that premise, DOJ has demanded that Kentucky (and nearly every other state) turn over its complete, unredacted voter registration list. DOJ claims it makes this demand to determine if Kentucky is complying with the National Voter Registration Act (NVRA) and Help America Vote Act (HAVA)—federal laws related to the maintenance of voter registration lists. But those laws not only expressly assign the responsibility for voter list maintenance to the states, they broadly defer to the states as to *how* to conduct that maintenance. Nor is there any basis in any law that authorizes the fishing expedition that DOJ effectively admits it is on.

And while DOJ claims to be "investiga[ting]" Kentucky's compliance with the NVRA and HAVA, *see* Compl. ¶ 10, Dkt. No. 1, its complaint alleges no basis whatsoever to suspect that the state is out of compliance with either, nor does it bring any claims under those statutes. Instead, it alleges a single claim under Title III of the Civil Rights Act (CRA), which DOJ contends gives it sweeping authority to demand any voter data at any time for any purpose. *See id.* ¶¶ 34–38. But DOJ fails to comply with Title III's express mandate that any demand made under its auspices identify both its basis and purpose. In fact, DOJ failed to state *any basis* for its demand here *at all*. And the purpose it asserted—to ensure compliance with the NVRA and HAVA—is not proper under Title III, which was enacted to enable investigations of *violations of federal voting rights* to *protect* those rights. It is not a blank check to audit state election data for any reason at all.

As the Supreme Court has recognized, when "an agency claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Here, that skepticism is amply

1

warranted. And while the Court can and should dismiss the complaint because the demand facially failed to comply with Title III, there are also strong reasons to suspect that DOJ's purported purpose is pretextual. DOJ has made the same demand of nearly every state in the nation (and sued scores of them when they refused to turn over private voter information). This strongly indicates that DOJ does not have any specific reason to justify any "investigation" of *Kentucky*, but instead seeks to amass unprecedented amounts of private voter data for some other purpose. This is especially true when it comes to Kentucky specifically, given the history recounted in the Kentucky State Board of Elections ("KSBE" or "Board") Defendants' motion to dismiss, including that DOJ did not seek to extend a consent decree that previously required Kentucky to undertake certain list maintenance procedures when it expired in the Spring of 2025, and that DOJ noted this point when it filed a Statement of Interest less than a year ago in *Kentuckians for the Commonwealth v. Adams*, No. 3:24-cv-00387 (W.D. Ky. Mar. 27, 2025), *in support of* Kentucky's list maintenance efforts.

In addition, because Kentucky has given DOJ its voter list, redacting only private, sensitive voter information protected by state law, *see* KSBE Mot. to Dismiss, Ex. 7 (Oct. 15 Ltr.) at 1–2, Dkt. No. 9-7, that sensitive data is the *only* information in dispute here. As even the case upon which DOJ relies makes clear, Title III is intended to reach *only* "public records," *not* "confidential, private papers and effects." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962). Nor does Title III (nor any other federal law) preempt state protections for private voter data. Finally, DOJ also has failed to satisfy the requirements of the federal Privacy Act, which are necessary before it may obtain the information it seeks here.

Any one of these defects warrants dismissal. And indeed, every court that has ruled on motions to dismiss DOJ's parallel voter-data suits thus far has granted them. *See, e.g.*, *United*

2

*States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1236 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 1:25-cv-01148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026). This Court should do the same.

**BACKGROUND**

**I.      Federal law leaves the authority to administer voter registration lists with the states.**

The Elections Clause of the Constitution empowers the states in the first instance to regulate and administer elections. U.S. Const. art. I, § 4, cl. 1. While Congress may preempt state law, that power goes only "so far as it is exercised, and no farther." *Ariz. v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 9 (2013). And while Congress has enacted federal laws concerning voter registration in recent decades, these laws sit "atop state voter-registration systems," *id.* at 5, and confirm that the power to compile and maintain voter registration lists remains with the states.

As relevant here, Congress enacted the NVRA in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). It makes states the custodians of voter lists, *see id.*, and by its plain terms, charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining those lists, *id.* § 20507(c)–(g), and making "reasonable effort[s]" at list maintenance, subject to strict safeguards to protect against removal of lawful voters, *see id.* §§ 20507(a)(4), 21083(a)(4)(A).

Congress enacted HAVA in the wake of the 2000 elections "to help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017) (internal

3

citation omitted). It requires states to create a "computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1)(A), and to "perform list maintenance" consistent with the NVRA's "reasonable efforts" provision, *id.* § 21083(a)(2)(A). HAVA is explicit that this list is to be "defined, maintained, and administered at the State level," *id.* § 21083(a)(1)(A), and directs that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State," *id.* § 21085. These choices were deliberate; indeed, HAVA's legislative history stressed how important the maintenance of a decentralized electoral system is to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001).

Consistent with that principle, Congress has traditionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the NVRA and HAVA, which purposefully operate through the states themselves.

## II.   DOJ has undertaken an unprecedented effort to amass voter data held by the states.

Last spring, DOJ began an unprecedented campaign to obtain state voter files, including sensitive and personal information about each voter. It has sent demands to at least 48 states and D.C., and plans to make similar demands on all 50.[1] The vast majority of states have declined to

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Mar. 18, 2026), https://perma.cc/LW77-Z4LT; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

4

turn over sensitive personal information that is typically protected by state law. DOJ has since sued 29 states and D.C., attempting to judicially compel that private voter information.[2]

DOJ initiated its demand for Kentucky's "statewide voter registration list" in a letter to Kentucky Secretary of State Michael Adams on July 17, 2025. KSBE Mot. to Dismiss, Ex. 2 (July 17 Ltr.) at 1, Dkt. No. 9-2. Secretary Adams responded with a letter clarifying that KSBE, not the Secretary, maintains the records requested. KSBE Mot. to Dismiss, Ex. 1 (July 23 Ltr.), Dkt. No. 9-1. Approximately three weeks later, DOJ sent KSBE a letter reiterating its request for Kentucky's statewide voter registration list and attached its original July 17 request letter. *See* KSBE Mot. to Dismiss, Ex. 3 (Aug. 8 Ltr.), Dkt. No. 9-3. In the letter, DOJ asked KSBE to produce the requested information within 14 days. *Id.* Less than one week later, on August 14, DOJ sent another letter directed to Secretary Adams making clear that the voter list Kentucky was being asked to produce should "include *all fields* contained within the [registration] list." KSBE Mot. to Dismiss, Ex. 4 (Aug. 14 Ltr.) at 1, Dkt. No. 9-4 (emphasis in original). That letter also included a broad statement that the "purpose" of DOJ's request "is to ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2.

KSBE responded on August 22, identifying several resources demonstrating Kentucky's compliance with its voter list maintenance obligations. KSBE Mot. to Dismiss, Ex. 5 (Aug. 22 Ltr.) at 1, Dkt. No. 9-5.[3] KSBE also sought clarification from DOJ regarding how it planned to comply with the Privacy Act and the Driver's Privacy Protection Act in order to keep Kentucky

---

[2] *See* Martinez-Ochoa, O'Connor, & Berry, *supra* note 1.

[3] Those resources included: (1) KSBE's website dedicated to voter list maintenance information, (2) the public records of a prior case in which DOJ intervened to ensure Kentucky was properly maintaining its voter list; (3) a Statement of Interest filed by DOJ on March 27, 2025 in another federal court case in which DOJ expressed support for Kentucky's list maintenance efforts, and (4) testimony dated July 29, 2025 from KSBE's General Counsel regarding the state's voter list maintenance activities. KSBE Mot. to Dismiss, Ex. 5 (Aug. 22 Ltr.) at 1, Dkt. No. 9-5.

voters' social security numbers and driver's license numbers contained in these voter files secure. *Id.* at 2. One week later, KSBE sent a second letter to DOJ providing information about Kentucky's submissions to the most recent Election Administration and Voting Survey report. *See* KSBE Mot. to Dismiss, Ex. 6 (Aug. 29 Ltr.) at 1, Dkt. No. 9-6.

On October 15, KSBE sent DOJ a third letter. *See* KSBE Mot. to Dismiss, Ex. 7 (Oct. 15 Ltr.) at 1, Dkt. No. 9-7. In it, KSBE noted that it had not received any additional information from DOJ about how it planned to comply with the Privacy Act and Driver's Privacy Protection Act. In the absence of that additional clarification, KSBE provided DOJ with a copy of the state's voter registration list that omitted driver's license numbers and partial social security numbers, pursuant to Kentucky state law. *Id.* at 2. Records submitted by the Board Defendants show that DOJ did not even bother to view the voter list that KSBE provided to it until over a month later, on November 18. *See* KSBE Mot. to Dismiss, Ex. 10, Dkt. No. 9-10.

After more than a month of silence from DOJ, on December 2, KSBE received a demand to execute a memorandum of understanding ("MOU") with DOJ within seven days. *See* KSBE Mot. to Dismiss, Exs. 9, 11, Dkt. Nos. 9-9, 9-11. KSBE ultimately did not take any action on the MOU but was in active communication with DOJ about the issue through December 16. *Id.* Ex. 9.

## III.    DOJ filed suit to attempt to compel Kentucky's unredacted voter registration list.

On February 26, 2026, DOJ filed this lawsuit against Secretary Adams, KSBE, and KSBE's members. *See generally* Compl. Its complaint does not contend that DOJ aims to investigate any potential violations of federal voting rights. *See id.* Instead, it alleges that DOJ seeks Kentucky's unredacted voter file to assess the state's compliance with its list-maintenance obligations under the NVRA and HAVA. *Id.* ¶¶ 10–16. Yet DOJ brings no claim under either of those statutes. Its sole cause of action is asserted under Title III of the CRA. *Id.* ¶¶ 17–19.

This lawsuit is one of the latest of similar suits that DOJ has filed against 29 states and the District of Columbia making virtually the same allegations and similarly seeking to compel unredacted state voter data. DOJ filed the first of these suits in September 2025 against other states seeking the same information, except in those cases, DOJ also explicitly asserted claims under the NVRA and HAVA.[4] However, in the next 22 lawsuits that DOJ filed against states seeking the same relief (including in this one against Kentucky), DOJ abandoned its NVRA and HAVA claims.[5] The courts that have adjudicated motions to dismiss thus far have dismissed DOJ's NVRA and HAVA claims, noting that the NVRA's disclosure provision does not provide a basis for seeking the information that DOJ demands, and that HAVA has no disclosure provision at all— "end[ing] the inquiry." *Weber*, 2026 WL 118807, at \*15; *see also Oregon*, 2026 WL 318402, at

---

[4] *See* Compl., *United States v. Bellows*, No. 1:25-cv-468 (D. Me. Sep. 16, 2025); Compl., *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sep. 16, 2025); Compl., *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025); Compl., *United States v. Bd. of Elections*, No. 1:25-cv-1338 (N.D.N.Y. Sep. 25, 2025); Compl., *United States v. Benson*, No. 1:25-cv-1148 (W.D. Mich. Sep. 25, 2025); Compl., *United States v. Simon*, No. 25-cv-3761 (D. Minn. Sep. 25, 2025); Compl., *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sep. 25, 2025); Compl., *United States v. Pennsylvania*, No. 2:25-cv-1481 (W.D. Pa. Sep. 25, 2025).

[5] *See* Compl., *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Dec. 2, 2025); Compl., *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. Dec. 1, 2025); Compl., *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. Dec. 2, 2025); Compl., *United States v. Copeland Hanzas*, No. 2:25-cv-903 (D. Vt. Dec. 2, 2025); Compl., *United States v. Hobbs*, No. 3:25-cv-6078 (W.D. Wash. Dec. 2, 2025); Compl., *United States v. Oliver*, No. 1:25-cv-1193 (D.N.M. Dec. 2, 2025); Compl., *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. Dec. 11, 2025); Compl., *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025); Compl., *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025); Compl., *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. Dec. 12, 2025); Compl., *United States v. D.C. Bd. of Elections*, No. 1:25-cv-04403 (D.D.C. Dec. 18, 2025); Compl., *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 18, 2025); Compl., *United States v. Raffensperger*, No. 5:25-cv-00548 (M.D. Ga. Dec. 18, 2025); Compl., *United States v. Wis. Elections Comm'n*, No. 3:25-cv-1036 (W.D. Wis. Dec. 18, 2025); Compl., *United States v. Fontes*, No. 2:26-cv-00066 (D. Ariz. Jan. 6, 2026); Compl., *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 6, 2026); Compl., *United States v. Beals*, No. 3:26-cv-00042 (E.D.V.A. Jan. 16, 2026); Compl., *United States v. Ziriax*, No. 5:26-cv-00361 (W.D. Okla. Feb. 26, 2026); Compl., *United States v. Henderson*, No. 2:26-cv-00166 (D. Utah Feb. 26, 2026); Compl., *United States v. Warner*, No. 2:26-cv-00156 (S.D. W. Va. Feb. 26, 2026); Compl., *United States v. Caldwell*, No. 3: 26-cv-2025-ZNQ-JTQ (D.N.J. Feb. 26, 2026); *see also* Compl. at 8–9.

*6–7. Now DOJ has jettisoned those claims and proceeds under Title III alone, while still relying on its discredited interpretation of the NVRA and HAVA. *See, e.g.*, KSBE Mot. to Dismiss, Ex. 4 (Aug. 14 Ltr.), Dkt. No. 9-4.

This is an odd litigation strategy, to be sure, and from the beginning, this unprecedented effort to amass sensitive voter data has raised more questions than provided answers. The questions have only multiplied as DOJ recently changed its explanation for why it needs this data on appeal in the cases that it has lost. Specifically, DOJ is now asserting (for the first time) that it requires the information so as to remove noncitizens from the voter rolls.[6] But in the cases in which those appeals are pending, DOJ never alleged—not in any of its letters, its complaints, or in its briefs opposing dismissal—that the actual target of its investigation was noncitizen voter registration, much less that it had any reason to suspect that noncitizens were in fact registering or voting in those states. *See, e.g.*, NAACP Intervenor-Appellees' Opp'n to Mot. to Expedite Appeal at 12–13, *United States v. Weber*, No. 26-1232 (9th Cir. Mar. 12, 2026), Dkt. No. 32-1. Nor has it made any such allegations in Kentucky.

## LEGAL STANDARD

A complaint must be dismissed when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At this stage, the Court accepts all well-pleaded factual allegations as true but need not accept "legal conclusions" or "[t]hreadbare recitals" of the elements supported only by "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a complaint to survive, the "[f]actual allegations must . . . raise a right to relief above the speculative

---

[6] *See* DOJ Mot. Expedite Appeal at 2, *United States v. Weber*, No. 26-1232 (9th Cir. Mar. 3, 2026); DOJ Mot. Expedite Appeal at 2, 7, 15, *United States v. Oregon*, No. 26-1231 (9th Cir. Mar. 3, 2026); DOJ Mot. Expedite Appeal at 3, 7, 16, *United States v. Benson*, No. 26-1225 (6th Cir. Feb. 27, 2026).

level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (first alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

DOJ's claim that this is a "summary" proceeding, akin to an administrative subpoena enforcement action, does not alter this standard. Compl. ¶ 4. Even in such proceedings, "the Federal Rules of Civil Procedure [still] apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964); *see also* Fed. R. Civ. P. 81 ("These rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings."). Under the Federal Rules, the Court does not simply act as a "rubber stamp"—the Court must determine "whether the subpoena, and the enforcement process, are authorized by Congress, whether the information sought is relevant to the agency's investigation, and whether or not the investigation and enforcement of the subpoena is an abuse of the court's process." *United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995). If the government can satisfy those standards, a court may still reject an agency's attempts to compel the production of information if the agency is acting in "bad faith," such as making "a conscious decision . . . to pursue a groundless allegation without hope of proving that allegation." *Id.* at 978 (citation omitted).

## ARGUMENT

DOJ brings a single claim under Title III of the CRA. But Title III does not authorize DOJ's demand. Nor has DOJ satisfied Title III's threshold requirements. Title III is a voting rights enforcement tool, not an unrestrained right to demand state voter data for any purpose, at any time, without any scrutiny. And the only information still in dispute here is sensitive personal data that Kentucky law protects. Title III does not bar Kentucky from redacting that data, and federal law does not preempt Kentucky's protections. Separately, DOJ has not complied with the federal

9

Privacy Act or the Drivers Privacy Protection Act, prerequisites to obtaining and maintaining the data it seeks (even if it could demand it). Any one of these deficiencies requires dismissal.

## I.     Title III of the CRA does not authorize DOJ's demand for Kentucky's unredacted statewide voter list.

### A.     DOJ erroneously relies on a single, out-of-circuit case that is both distinguishable and has been superseded by intervening precedent.

DOJ alleges that Title III grants it the "sweeping power" to obtain any state voting records upon demand, no questions asked. *See* Compl. ¶¶ 2–4. It contends that once it makes that demand, the court may not review it. *Id.* ¶ 4. DOJ's support for this claim is a decades-old, out-of-circuit case: *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). *See* Compl. ¶¶ 1–4. There, the court found that Title III "[creates] a special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225–26. And although, on its face, Title III requires the Attorney General to provide the "basis and the purpose" of its demand, the Fifth Circuit in *Lynd* concluded that a court has no power "to ascertain the factual support for, or the sufficiency of" that statement. *Id.* at 226.

*Lynd* was never binding on this Court, but it has not been good law on this point even in the Fifth Circuit for over 60 years. This is because, two years after the Fifth Circuit decided *Lynd*, the Supreme Court rejected its conclusion that demands under statutes like Title III are insulated from judicial review. In *United States v. Powell*, 379 U.S. 48, the Supreme Court considered a statute that—using language identical to that in Title III—confers jurisdiction on district courts "by appropriate process to compel" compliance with federal document demands. *Id.* at 52 n.10. The Court concluded that, because the statute did not specify any other "appropriate process," "the Federal Rules of Civil Procedure apply," and courts may "inquire into the underlying reason for" the demand. *Id.* at 52, 58 & n.18. Thus, *Powell* "squarely rejects" *Lynd*'s reasoning. *Oregon*, 2026

10

WL 318402, at *8 & n.15 (noting DOJ has not been able to cite *any* binding authority that supports its position "nor even any cases which apply *Lynd* . . . within the last sixty years").

Moreover, in *Lynd*—unlike in this demand for Kentucky's voter file—it was undisputed that an appropriate basis and purpose for the government's demand had been provided. The decision emphasized that "[t]he record establishes without contradiction that the . . . demand [in that case] was made and that it adequately stated the basis and the purpose therefor." *Lynd*, 306 F.2d at 229; *see also id.* at 229 n.6 (quoting demand, which stated it "is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction," and "[t]he purpose of this demand is to examine the aforesaid records in order to ascertain whether or not" such violations of federal law have in fact occurred). The court stressed that "one of the clearest purposes of" Title III is to examine relevant records "relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.* at 228. The court also underscored that it was of "great importance" that it was "*not* . . . confidential, private papers and effects" that were at issue, but rather only "public records which ought ordinarily to be open to legitimate reasonable inspection," *id.* at 231 (emphasis added), and that, if there were "a genuine dispute" as to whether specific information "comes within" the reach of Title III, "the Court would, of course, be open for its determination," *id.* at 226.

Here, in contrast, (1) there *is* a dispute as to whether DOJ adequately stated the basis and purpose for its demand; (2) DOJ's demand is laser focused on—and in fact *only* seeks—private, confidential information, not records that ought ordinarily be open to inspection; and (3) the parties strongly dispute whether the information demanded does in fact come within the reach of Title III. Thus, under *Powell* (but arguably under *Lynd*, too), the Court is not only empowered to but has

11

the duty to determine whether DOJ's demand does in fact comply with the requirements of the statute it invokes. *See CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458, 460 (5th Cir. 2018) (explaining an agency's authority to demand documents and information "is a creature of statute," and, as such, it "must comply with statutory requirements"); *see also CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*ACICS*"), 854 F.3d 683, 689, 690 (D.C. Cir. 2017).

Even if DOJ's request was viewed under the traditional principles of an agency's subpoena power, this Court would still play an integral role in determining whether DOJ "has met the statutory requirements pertaining to the issuance and enforcement of the [demand]." *Markwood*, 48 F.3d at 977. As detailed below, DOJ has failed to make a proper Title III demand.

**B.      DOJ failed to allege that it has properly made a Title III demand.**

Although DOJ purports to ground its authority in the text of Title III, *see* Compl. ¶¶ 1–2, it ignores the text's explicit requirements that any demand for records under its authority "shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphasis added). This requirement "is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at \*9; *see also Oregon*, 2026 WL 318402, at \*9. Because DOJ does not sufficiently allege it satisfied these requirements, its complaint must be dismissed.

DOJ's demand—set forth in its August 14 letter—states no "basis" at all, much less identifies "what conduct [DOJ] believes constitute[d] an alleged violation" of federal law.[7] *Source*

---

[7] The complaint baldly asserts that the letter *did* include "a statement of the basis" for the demand—without explaining what the basis might be. Compl. ¶ 36 (quoting 52 U.S.C. § 20703) (alteration in original). This Court need not accept that conclusory assertion. *See Doe v. Baum*, 903 F.3d 575, 580 (6th Cir. 2018). Instead, it may examine the letter itself, which plainly fails to identify a basis for the demand. *See* KSBE Mot. to Dismiss, Ex. 2 (July 17 Ltr.), Ex. 4 (Aug. 14 Ltr.), Dkt. Nos. 9-2, 9-4; *Hester v. Chester County*, 162 F.4th 780, 784 (6th Cir. 2025) (The court

12

*for Pub. Data*, 903 F.3d at 458–59; *see* KSBE Mot. to Dismiss, Ex. 2 (July 17 Ltr.), Ex. 4 (Aug. 14 Ltr.), Dkt. Nos. 9-2, 9-4. That omission alone is fatal. Courts do not enforce agencies' investigative demands when they fail to "comply with statutory requirements." *Source for Pub. Data*, 903 F.3d at 460; *see also, e.g.*, *ACICS*, 854 F.3d at 689 (same). And courts considering parallel cases that DOJ has brought against other states demanding private voter data have dismissed its complaints on that ground. *See Oregon*, 2026 WL 318402, at *9 (dismissing DOJ's complaint in part because its demand did not include "a factual basis for investigating a violation of a federal statute"); *Weber*, 2026 WL 118807, at *9 (holding a proper demand under Title III requires DOJ to put forward "specific, articulable facts pointing to the violation of federal law").

DOJ's stated purpose for its demand, "to ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA," KSBE Mot. to Dismiss, Ex. 4 (Aug. 14 Ltr.) at 2, Dkt. No. 9-4, does not suffice under Title III. A "purpose" cannot be valid unless it actually falls within the ambit of Title III's authority. As the Oregon court explained in dismissing DOJ's parallel case filed against that state, "[i]f *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 2026 WL 318402, at *9 (emphasis in original). In other contexts, courts have likewise rejected investigative demands premised on purposes beyond the statute's grant of authority. *See, e.g.*, *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *12, 17 (E.D. Pa. Nov. 21, 2025) (striking DOJ subpoena seeking information that had "no relevance to the investigation Congress permitted or to the investigation the Department of Justice tells the world it is pursuing"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp.

---

"may consider documents attached to the complaint or incorporated by reference that are central to the claim.").

3d 229, 237 (D. Mass. 2025) (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026). Title III authorizes DOJ to enforce federal voting protections—not to supervise state list-maintenance procedures. *See infra* Section III. DOJ cannot satisfy the statute by reciting a purpose untethered from the authority Congress conferred.

Even if the purpose were germane, there are several reasons to believe that DOJ's stated purpose is pretext. First, over the past several months, DOJ's stated justification for demanding states' voter files has repeatedly shifted. When DOJ filed its first wave of lawsuits in September 2025, it asserted claims under Title III, NVRA, and HAVA.[8] Beginning in December, however, in the face of multiple courts concluding that neither NVRA nor HAVA supported its demand, DOJ abandoned its NVRA and HAVA claims and proceeded to file nearly two dozen cases across the country seeking relief solely under Title III, as it has done here.[9] More recently, on appeal from the summary dismissals of DOJ's claims under Title III in California, Oregon, and Michigan, DOJ has pivoted yet again, asserting that states' voter files are needed to facilitate the removal of *noncitizens* from the voters' rolls.[10]

This ever-changing set of legal theories and purported purposes undermines DOJ's justifications for its extraordinary nationwide demand for voter registration data. At a minimum, it raises serious doubts that the reasons DOJ offered to the state of Kentucky—in its demand letters and in its complaint here—reflect the true nature of its request. *See, e.g.*, *Markwood*, 48 F.3d at 978 ("[T]he dispositive question in each case . . . is whether the [agency] is pursuing the authorized

---

[8] *See supra* note 4.

[9] *See supra* note 5.

[10] *See supra* note 6.

14

purposes in good faith." (second and third alterations in original) (quoting *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317–18 (1978)).

Second, even if DOJ's stated reasons for pursuing states' voter files had remained constant, there is little reason to believe that DOJ has any genuine or even particularized concern about Kentucky's list maintenance. DOJ's actions in recent federal litigation concerning Kentucky's voter list make this clear. In 2017, KSBE was sued in this very court for alleged violations of the NVRA. *See* Compl., *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-0094 (E.D. Ky. Nov. 14, 2017), Dkt. No. 1. DOJ intervened in the case, *see* Order, *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-0094 (E.D. Ky. June 21, 2018), Dkt. No. 34, and in less than a month, the parties entered into a consent decree requiring KSBE to implement a general program removing ineligible voters from the rolls consistent with the NVRA's procedural safeguards, *see* Consent Judgment, *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-0094 (E.D. Ky. July 3, 2018), Dkt. No. 39.

KSBE removed around 735,000 voters from its state voter rolls by the time the consent decree expired in March 2025. *See* State Board's Notice of Compliance with Consent Decree, *Judicial Watch, Inc. v. Grimes*, No. 3:17-cv-0094 (E.D. Ky. Mar. 28, 2025), Dkt. No. 99. Notably, prior to the expiration of the consent decree, DOJ did not lodge any objection, seek to extend the duration of the consent decree, or claim that Kentucky was failing to comply with the NVRA. To the contrary, just days before the decree's expiration, DOJ filed a Statement of Interest in a separate lawsuit defending KSBE's list-maintenance efforts and urging dismissal of a complaint against KSBE on this very issue. *See* DOJ Statement of Interest, *Kentuckians for the Commonwealth v. Adams*, No. 3:24-cv-00387 (W.D. Ky. Mar. 27, 2025), Dkt. No. 39. Against this backdrop—which DOJ's complaint ignores—it is clear that DOJ's present assertion that it must obtain Kentucky's voter file to evaluate compliance with federal list maintenance laws lacks any basis. Nor has DOJ

15

claimed—much less made any allegations that would assert the conclusion—that Kentucky has ceased complying with its list maintenance obligations. *See, e.g.*, *Weber*, 2026 WL 118807, at *9 (dismissing DOJ complaint seeking California's unredacted state voter list for DOJ's "fail[ure] to provide an explanation for why it believed the NVRA was violated").

DOJ's recent pivot in other similar cases to claim that it needs private voter data to identify and remove noncitizen voters, *see, e.g.*, DOJ Mot. Expedite Appeal at 2, *United States v. Weber*, No. 26-1232 (9th Cir. Mar. 3, 2026), only further undermines its position. First, it is simply inconsistent with DOJ's original story (and its story here) that it seeks this data to determine if the State is complying with the NVRA and HAVA's list maintenance procedures. Second, those statutes require only that states "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" either "the death of the registrant" or "a change in the residence of the registrant," in accordance with other provisions of the law. 52 U.S.C. § 20507(a)(4).

Thus, DOJ's new assertion, that what it is attempting to do with this massive effort to compile private voter information nationwide is to identify any evidence that there are noncitizens on the rolls, is not legitimately connected to what it has claimed it is doing here—namely, investigating whether Kentucky is in compliance with federal list maintenance obligations. And, such a pivot would be particularly bizarre here, where Kentucky has already explained its robust efforts to ensure that noneligible voters—including specifically noncitizens—are not on its voter rolls. *See* KSBE Mot. to Dismiss Exs. 1, 5, Dkt. Nos. 9-1, 9-5. DOJ provides no basis whatsoever to presume that these aggressive efforts are in any way falling short, much less violating any federal law.

16

**C.      Title III does not grant DOJ general audit power over state elections data.**

Even if DOJ had facially complied with Title III's requirements that it state its basis and purpose in its demand, the law does not grant the authority DOJ asserts. To insist otherwise, DOJ purports to rely on Title III's text. But in doing so, it ignores both the language of Title III and its statutory framework—staking its claim on certain phrases while avoiding others. That is not how statutory interpretation works. Courts "construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)). Textual analysis therefore requires reading the words "in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting *Util. Air. Regul. Grp.*, 573 U.S. at 320).

In particular, when an agency claims sweeping statutory authority, courts do not assume that Congress means "to confer the power the agency has asserted" simply because an isolated phrase can bear that reading. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see also Oregon*, 2026 WL 318402, at *9 (quoting *West Virginia*, 597 U.S. at 721, for same). Instead, consistent with separation-of-powers principles, courts examine the statute as a whole to determine whether Congress in fact granted the authority the agency claims. *Oregon*, 2026 WL 318402, at *9. Applying that rule, courts have rejected expansive constructions that had "a colorable textual basis" but strained the statute's structure and design. *See West Virginia*, 597 U.S. at 721–23 (collecting cases).

Here, the statutory framework confirms that Title III creates an enforcement tool that enables DOJ to investigate potential violations of federal voting rights law—not a general review power over state election systems. Congress codified Title III in the chapter titled "Elective Franchise," alongside the substantive voting protections it had enacted three years earlier in the

17

Civil Rights Act of 1957. *See* 42 U.S.C. §§ 1971–1974 (1958 & Supp. IV).[11] Read within that structure, Title III functions as an enforcement mechanism designed to protect federal voting rights—not a roving mandate to supervise state election regulation. *See Smith v. Doe*, 538 U.S. 84, 85 (2003) ("[F]ormal attributes of legislative enactment, such as the manner of its codification . . . are probative of the legislature's intent . . . ."); *Kansas v. Hendricks*, 521 U.S. 346, 352 (1997) (interpreting statute based on where it was originally codified).

The language of Title III tracks its structure. It directs states to preserve records "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. Those categories are keyed to the substantive guarantees codified alongside it, which prohibit deprivations of "the opportunity to register to vote," including "registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 42 U.S.C. § 1971(a)–(e) (1958 & Supp. IV). The parallel is deliberate: the statute protects against barriers to voting, and Title III ensures the preservation of records necessary to investigate and remedy violations of those protections.

Title III's demand provision—requiring a "basis" and a "purpose" for any records demand—reinforces that design. 52 U.S.C. § 20703. The "basis" and "purpose" requirement is consistent with a rights-enforcement tool designed for discrete investigations of potential violations. But it makes little sense if Title III confers freestanding access to state election data for any purpose or no purpose at all. *See FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (stating that courts must read statutes to "fit, if possible, all parts into a[] harmonious whole").

---

[11] Title III was later recodified in Title 52 of U.S. Code as part of a non-substantive reorganization of election-related statutes. *See* Editorial Reclassification of Title 52 U.S.C.A, 52 U.S.C.A. Disp Table (stating that provisions were "editorially transferred" to from titles 2 and 42 to Title 52).

Finally, the text and structure of Title III align with its legislative history.[12] Title III was passed specifically to facilitate voting rights investigations—filling a specific need that was preventing the enforcement of voting rights laws. *See* Civil Rights Act of 1960, Pub. L. No. 86-449, tit. III, 74 Stat. 86, 88–89 (now codified at 52 U.S.C. §§ 20701–06); 106 Cong. Rec. 5296 (1960); *see also id.* at 5309 (Representative Addonizio stating: "Title III . . . does no more than facilitate investigations regarding denials of the right to vote"). Its purpose was tied explicitly to right-protection: "to provide a more effective protection of the right of all qualified citizens to vote." H.R. Rep. No. 86-956, at 7 (1959), 1959 WL 3581, at *1944.

Moreover, when Title III was enacted, there was nothing like the modern federal list maintenance statutes now found in NVRA and HAVA. *See supra* pp. 2–4. Those statutes were enacted much later, for different purposes. *See supra* pp. 2–4. And it was not until HAVA was enacted in 2002 that federal law required states to ask for driver's license numbers or Social Security numbers on voter registration forms. *See* 52 U.S.C. § 21083(a)(5)(A)(i). The Congress that enacted Title III could not have intended it to require disclosure of such private information, or believed that it was relevant or necessary to conduct the sort of investigations that Title III was enacted to facilitate.[13] And because those regulatory statutes did not exist in 1960, Congress similarly had no reason to cabin Title III with language distinguishing between rights-enforcement investigations and regulatory supervision.

---

[12] Courts may take judicial notice of legislative history and therefore may consider it on a motion to dismiss. *See Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226–27 (1959); *see also Bell v. City of Country Club Hills*, 841 F.3d 713, 716 n.1 (7th Cir. 2016).

[13] For that same reason, the court in *Lynd* had no reason to consider whether turning over all of the data that DOJ requested in that case would also mean turning over private voter data similar to that DOJ demands here.

19

Thus, to the extent the language in Title III is broad, it reflects a broad grant of power *to investigate violations of federal voting rights*—not to enforce a regulatory scheme that would not exist for another three decades. Indeed, even *Lynd* recognizes that Title III was intended for voting rights enforcement. *See* 306 F.2d at 228. Although a "statute may be applied to new situations not anticipated by Congress, if, fairly construed, such situations come within its intent and meaning," it "should not be stretched to apply to new situations not fairly within [its] scope." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 158 (1975) (quoting *Jerome H. Remick & Co. v. Am. Auto. Accessories Co.*, 5 F.2d 411 (6th Cir. 1929)).

In sum, nothing in Title III's text, structure, or context supports the conclusion "that Congress intended to grant [DOJ] such expansive and unfettered authority to invade citizens' right to keep their sensitive information private." *Oregon*, 2026 WL 318402, at *9. If Congress intended to create a general federal auditing power, it would have said so. *See West Virginia*, 597 U.S. at 721–24. Even when Congress enacted the NVRA and HAVA, it did not give DOJ the power it now claims it has to investigate compliance with those statutes. Instead, it provided for a public disclosure provision that, in its estimation, was sufficient for these purposes. *See* 52 U.S.C. § 20507(i); *infra* p. 16. For all of these reasons, DOJ's complaint must be dismissed with prejudice.

## II.    Title III does not preempt Kentucky's privacy protections.

DOJ's complaint also must be dismissed because granting it would violate Kentucky's privacy protections for sensitive voter data, which are not preempted by federal law. Although DOJ characterizes this case as an effort to obtain Kentucky's voter registration list, Kentucky provided that list months ago. *See* KSBE Mot. to Dismiss, Ex. 7 (Oct. 17 Ltr.) at 3, Dkt. No. 9-7. What it did not provide—because state law forbids it—are voters' sensitive personal identifiers, namely their Social Security and driver's license numbers. *Id.* Those redacted identifiers are the only information at issue here and Kentucky law bars their disclosure. *See, e.g.*, KRS § 116.095;

20

KRS § 61.878. As a result, DOJ may obtain them *only if* federal law preempts Kentucky privacy protections. It does not. This provides an independent basis for dismissal.

Title III does not evince a "clear and manifest purpose" that Congress intended to preempt state privacy laws that protect highly sensitive information. *Arizona v. United States*, 567 U.S. 387, 400 (2012). To the contrary, in the principal case DOJ cites in its complaint, the Fifth Circuit explained that Title III is intended to reach *only* "public records which ought ordinarily to be open to legitimate reasonable inspection," but not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The information that DOJ seeks here is not of the type ordinarily "open to legitimate reasonable inspection." *Id.* Instead, DOJ seeks obviously sensitive information that enjoys strong privacy protection under both federal and state law. *See Weber*, 2026 WL 118807, at *9.

Nor is there a conflict between Title III and Kentucky's protection of this private voter data. A conflict arises only when compliance with both laws is impossible or when state law stands as an obstacle to Congress's objectives. *McHenry County v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *Arizona*, 567 U.S. at 399). Kentucky can fully comply with Title III by producing covered records while redacting Social Security and driver's license numbers. Indeed, *Lynd*, the primary case on which DOJ relies, confirms that Title III is not concerned with "confidential, private papers and effects." 306 F.2d at 231. Redaction cannot pose any obstacle to Congress's objectives under Title III unless it would thwart the investigation of federal voting rights violations—but as DOJ has admitted, here, it is not investigating any violation of voting rights.

Congress's choices when it enacted the NVRA and HAVA—the statutes DOJ purports to seek to enforce via its demand here, *see* Compl. ¶¶ 7, 9—confirm that there is no conflict between Kentucky's privacy protections and Title III. If Congress thought that it was necessary (or even desirable) for DOJ to have access to a database containing highly sensitive information about every

21

voter in order to ensure that a state was complying with its list maintenance obligations, it would have done so *in the NVRA and HAVA*. It did not. To the contrary, courts have repeatedly found that the NVRA inspection provision, which Congress designed to enable "critical scrutiny and public audits of voter data," does *not* prohibit states from redacting sensitive personal information. *See Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 446 (D. Md. 2019) (ordering disclosure of records "subject to compliance with the relevant State law"); *see also, e.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022). HAVA contains no disclosure provision at all; instead, it explicitly confirms that voter registration lists must be "maintained" and "administered at the State level"—not by the federal government. 52 U.S.C. § 21083(a)(1)(A). Simply put, Title III cannot be read to require what the statutes DOJ invokes it to enforce do not.

## III.    DOJ's failure to comply with the Privacy Act independently requires dismissal.

Finally, even if DOJ could use Title III to demand the private data of Kentucky's over 3.3 million registered voters, it must first comply with the Privacy Act, 5 U.S.C. § 552a *et seq.* Its failure to do so provides yet another reason why its complaint must be dismissed.

Congress enacted the Privacy Act after the Watergate scandal in response to "a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981). These concerns persist today, including for Intervenor, who is staunchly opposed to Kentucky giving its members' sensitive data to DOJ. *See* Mem. Supp. Mot. to Intervene at 2, Dkt. No. 3; Decl. of Kirk Gillenwaters ¶¶ 4, 8–15, Dkt. No. 3-3. The Act accordingly "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women*

22

*Voters v. U.S. Dep't of Homeland Sec.* ("*LOWV*"), 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does this in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2.

In its rush to sweep up the sensitive information of every registered voter in Kentucky, DOJ overlooked the Act's basic procedural requirements. Specifically, the Act imposes certain obligations on any agency that "maintains" a "system of records." 5 U.S.C. § 552a(e). Both of those terms are defined by the statute. A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5); *see also id.* § 552a(a)(4) (defining "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number . . . or other identifying particular assigned to the individual"). Kentucky's voter registration list, which contains the names of all registered voters as well as their voter registration identifiers and other identifying information, plainly qualifies as a "system of records" under the Privacy Act. The term "maintain" is defined to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" Kentucky's voter registration list, the obligations imposed by subsection (e) are triggered. *See id.* § 552a(e)(4); *Weber*, 2026 WL 118807, at *17 (noting that DOJ's request for voting records "includes a litany of personal and sensitive information that is governed by the Privacy Act").

Most relevant here, "[w]hen an agency 'establish[es] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *LOWV*, 2025 WL 3198970, at *2 (alterations in original) (quoting 5 U.S.C. § 552a(e)(4)). A SORN must include, among other things, the name

23

and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, and all "routine use[s]" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.*

Congress enacted the Privacy Act to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by federal agencies" and to "ensure adequate safeguards are provided to prevent misuse of such information." *Id.* at *2 (citation modified). If DOJ wishes to compile a federal database of registered voters, the Act requires (at a minimum) that DOJ give the public adequate notice about its intention to do so by publishing a SORN that accurately discloses the system of records it intends to create and the uses to which it will put that information. *See Pippinger v. Rubin*, 129 F.3d 519, 527 (10th Cir. 1997) (noting the Privacy Act "requir[es] publication of the establishment and existence of a government-maintained 'system of records'" and that agencies "publish in the Federal Register notice of revisions in the *character* of existing systems of records"); *see also* 5 U.S.C. § 552a(e)(4); *id.* § 552a(e)(11) (requiring a 30-day notice period "of any new use or intended use of the information in the system," to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency").

DOJ does not appear to dispute that the Privacy Act is applicable to its collection of voter data. Nor does DOJ appear to dispute that it must publish a SORN that would apply to voter registration lists, as it has alleged in parallel litigation in other states that a SORN it identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records," supplies the requisite authority. *E.g.*, Compl. ¶ 23, *United States v. Oliver*, No. 1:25-cv-1193 (D.N.M. Dec. 2, 2025), Dkt. No. 1. Yet the complaint in this case is bereft of any allegations that an appropriate SORN has been published. In other cases, DOJ has referenced a SORN, but it "does

24

nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level," much less the uses to which it intends to put the information. *Weber*, 2026 WL 118807, at *18.[14] Instead, it simply states that the categories of individuals covered by the system may include "[s]ubjects of investigations, victims, [and] potential witnesses," in addition to other categories not relevant here. Privacy Act of 1974; System of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). This is plainly insufficient.

Finally, there is no impediment to the Court dismissing the complaint based on DOJ's failure to comply with the Privacy Act. Even if construed as an affirmative defense, the Court may grant a motion to dismiss if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). Here, the complaint clearly alleges DOJ's intention to collect, use, and retain a system of records that requires compliance with the Privacy Act. Its failure to do so independently warrants dismissal.[15]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint with prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[14] DOJ's complaints seeking the same information from other states have cited two other notices in the Federal Register, but they, too, fail to "give sufficient notice to the American public as required under the Privacy Act." *Weber*, 2026 WL 118807, at *18. The first simply adds an allowable "routine use" to the SORN that is not applicable here. *See* Privacy Act of 1974; System of Records, 70 Fed. Reg. 43904 (July 29, 2005). The second adds a blanket routine use to all DOJ SORNs that is relevant in the event of a data breach. *See* 82 Fed. Reg. 24147 (May 25, 2017).

[15] The Drivers Privacy Protection Act provides another independent basis for dismissal. That Act prohibits the disclosure of, among other things, drivers' license numbers and social security numbers, subject to exceptions not applicable here. *See* 18 U.S.C. § 2721. Because KSBE contracts with the Kentucky Transportation Cabinet to assist in voter-list maintenance, the Board is prohibited by the Act from "disclosing 'personal information' about any individual that is obtained in connection with a 'motor vehicle record,'" including an individual's driver's license number. KSBE Mot. to Dismiss at 10–11 (citing 18 U.S.C. § 2721).

25

Dated: March 25, 2026

Respectfully submitted,

**TRUE GUARNIERI AYER, LLP**

*/s/ J. Guthrie True*
J. Guthrie True
124 West Clinton Street
Frankfort, KY  40601
Telephone:  (502) 605-9900
Facsimile:  (502) 605-9901
E-mail: gtrue@truelawky.com


**ELIAS LAW GROUP LLP**

Elisabeth Frost
Lucas Lallinger
Tina Meng Morrison
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law
llallinger@elias.law
tmengmorrison@elias.law
Tel: (202) 968-4490

*Counsel for Proposed-Intervenor*

26

## CERTIFICATE OF SERVICE

I, J. Guthrie True, hereby certify that on March 25, 2026, I caused the foregoing to be filed using the Court's CM/ECF system, which effected service on all counsel of record.


/s/ *J. Guthrie True*
J. Guthrie True
124 West Clinton Street
Frankfort, KY  40601
Telephone:  (502) 605-9900
Facsimile:  (502) 605-9901
E-mail: gtrue@truelawky.com

*Counsel for Proposed-Intervenor*

27