# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| MICHAEL ADAMS in his official capacity as Kentucky Secretary of State and as chief election official for the Commonwealth of Kentucky State Board of Elections; and ROSS OWENS III, JOHN BROWN III, SUE PERRY, DEANNA BRANGERS, CORY SKOLNICK, DWIGHT SEARS, and JULIE GRIGGS, each in their official capacity as Members of the Commonwealth of Kentucky State Board of Elections, | Case No. 3:26-cv-00019 |
| | **UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS BY DEFENDANTS (Dkts. 9 & 33) AND INTERVENOR-DEFENDANTS (Dkts. 29, 36, & 38)** |
| Defendants. | |

Plaintiff United States of America respectfully submits this Consolidated Response in Opposition to: (1) the Motion to Dismiss by the Defendant Members of the Commonwealth of Kentucky State Board of Elections ("KSBE") (Dkt. 9); (2) the Motion to Dismiss by Defendant Secretary of State Michael Adams ("Secretary Adams") (Dkt. 33); (3) the Motion to Dismiss by Intervenor-Defendants League of Women Voters, et al. ("LWV Intervenors") (Dkt. 36); (4) the Motion to Dismiss by Intervenor-Defendant Kentucky Alliance for Retired Americans ("KARA Intervenors") (Dkt. 38); (5) and the Motion to Dismiss by Intervenor-Defendant Jefferson County Clerk David Yates ("Intervenor Yates") (Dkt. 29). Collectively, the moving Defendants and Intervenor-Defendants are referred to as "Movants." The United States submits this consolidated

1

response in opposition to all motions to dismiss to facilitate the Court's review of the duplicative and overlapping arguments made by Movants. All of the motions to dismiss should be denied.

## I.    INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the United States to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States demanded Kentucky's federal election records. The United States made a written demand to Secretary Adams and KSBE for Kentucky's statewide voter registration list ("SVRL"). Secretary Adams and KSBE refused to comply with that demand, necessitating this action. Compl., Dkt. 1.

Title III is a unique provision of federal law because it is purely an investigative tool. The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added).  "[T]he function sought to be exercised by the Attorney General is… purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228.

The Court's inquiry here is a limited one: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to

2

one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

Movants seek to expand that narrow inquiry by making several unfounded arguments. Some of those will be briefly summarized here. Defendants observe that in March 2025, Kentucky was released from a consent decree regarding list maintenance, arguing that it forecloses a factual basis for the United States to make a new request for the Commonwealth's SVRL. *See* Dkt. 9 at 16-17; Dkt. 33 at 5, 7. That argument fails because the consent decree did not concern HAVA enforcement. Moreover, the United States did not have the benefit of a report from the Election Assistance Commission until after June 30, 2025, which includes data reported by the Commonwealth that raises concerns about whether Kentucky presently is engaging in reasonable list maintenance practices. Intervenor-Defendants maintain that the Department of Justice is amassing a nationwide voter database. *See* Dkt. 36 at 1-6; Dkt. 38 at 4-6.  It is not. The United States is engaging in an individualized assessment of each state's compliance with the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA") and is keeping each SVRL separate from the others. Defendants further contend that the request for an SVRL invokes the Major Questions Doctrine, *see* Dkt. 9 at 19-22; Dkt. 33 at 14, but the conditions for that doctrine are not met here. Movants also argue that Kentucky's privacy laws prohibit disclosure of the SVRL to the United States, even though state law expressly permits use for federal law enforcement; to the extent it does not, it is preempted. Finally, Movants' affirmative defenses such as the Privacy Act do not justify dismissal of the United States' Complaint.

## II.      BACKGROUND

On July 3, 2018, Kentucky entered into a consent decree with the United States and Judicial Watch in which the Commonwealth admitted that "the practices currently in place in Kentucky do not comply with the NVRA's requirement that states conduct a general voter registration list maintenance program that makes a reasonable effort to remove ineligible persons from the voter rolls due to a change in residence outside of the jurisdiction. 52 U.S.C. § 20507(a)(4)(B)." *Judicial Watch & United States v. Adams*, No. 3:17-cv-094, Consent Judgment (E.D. Ky. July 3, 2018), Dkt. 39, Ex. 11 to Second Declaration of Eric Neff ("Neff 2d Decl."). On March 28, 2055, that consent decree terminated. Kentucky provided a notice of compliance to the court declaring, "Kentuckians deserve clean voter rolls. State and federal law require them…. The Board will continue to comply with state and federal law to maintain voter rolls in a manner that inspires confidence in Kentucky's elections." *Adams*, Notice of Compliance (E.D. Ky. Mar. 28, 2025), Dkt. 99, Neff 2d Decl. Ex. 12.

Less than four months later, the United States discovered information in the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS") released on June 30, 2025, that gave it cause for concern regarding Kentucky's voter list maintenance. On July 17, 2025, the United States sent correspondence to Secretary Adams and then the KSBE on August 8, 2025, asking about the information Kentucky provided in the latest EAVS data.  Among other concerns, Kentucky failed to report any number for removing duplicate registrations for any county. Kentucky also sent far fewer confirmation notices to persons on the voter rolls, with Kentucky's reporting notices being sent to just three percent of total active registered voters compared to the national average of 19.5 percent. *See* Dkt. 26-2.

4

On August 14, 2025, the Attorney General sent another letter to Secretary Adams and the KSBE renewing the July 17 request with a demand for the SVRL, pursuant to the CRA. The letter emphasized the importance of receiving the identifiers required under HAVA—a state driver's license number or the last four digits of the registrant's social security number[1]—necessary to register individuals for federal elections and cited 52 U.S.C. § 21083(a)(5)(A)(i). *See* Dkt 26-5. Besides the federal requirement, the HAVA identifiers are also important for looking at the list maintenance concerns about duplicate registrations identified in the July 17 letter. As stated in the letter, the basis for the demand was Title III of the CRA and the purpose was to "ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

In an August 22, 2025, letter, the KSBE refused to provide the unredacted SVRL due to privacy concerns. On October 15, 2025, Kentucky sent a redacted SVRL to the United States. On December 2, 2025, the United States offered a Memorandum of Understanding to Kentucky to address the privacy concerns. *See* Dkt 26-7. The KSBE met twice thereafter but failed to provide the requested SVRL. This litigation followed. Compl., Dkt. 1.

### III.    ARGUMENT

**A.    The Federal Rules of Civil Procedure are inapplicable to this summary proceeding to compel federal election records under Section 305 of the CRA.**

Movants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Dkt. 9 at 8; Dkt. 33 at 3, 5-6; Dkt. 36 at 9; Dkt. 38 at 8-9. In doing so, they repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225. The United States will correct their misconception.

---

[1] Kentucky may qualify for an exception to part of HAVA's requirements as its law requires the collection of all nine digits of a social security number as part of the registration process, thus making the collection of driver's license numbers optional. *See* Ky. Rev. Stat. § 116.155 and 52 U.S.C. § 21083(a)(5)(D).

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

In other words, Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall

comfortably within this paradigm.

A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Movants. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026). Consistent with the Supreme Court's treatment of similar statutes, *Benson* construed "a request for records under the CRA as a form of administrative subpoena." *Id.* at *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'"[2] *Id.* (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). Consequently, *Benson* acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (quoting *Markwood*, 48 F.3d at 976).

Defendants rely on two district court decisions out of the Ninth Circuit to reach a contrary conclusion. There, the district courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's determination in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 at **7-8 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 at *8 & n.15 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026). *Powell* applied the Federal Rules of Civil Procedure to an IRS

---

[2] Movants' assertion that *Markwood* requires applying the Federal Rules is misplaced. *See* Dkt. 9 at 8, 18; Dkt 36 at 12; Dkt. 38 at 14. There, the rules applied only because the statute expressly provided "that the Federal Rules of Civil Procedure apply to CID enforcement proceedings, unless their application is inconsistent with the false claims CID statute." *Markwood*, 48 F.3d at 980 (*citing* 31 U.S.C. § 3733(j)(6)). No such language appears in Title III of the CRA. *See* 52 U.S.C. §§ 20703, 20705.

administrative summons.  The Supreme Court explained that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402 at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). The *Oregon* court omitted any explanation that the quoted language from *Powell* referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for election officers to object to Title III proceedings being initiated against them. *See id.*

The *Weber* court, in addition to *Powell*, referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, 2026 WL 118807 at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an

8

application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority. Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (citation omitted). Far from supporting Defendants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

As the Supreme Court clarified, "the post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971). That has happened here, with the Defendants notified of and responding to the Motion to Compel, along with the Intervenor-Defendants. Even if the Court decides to apply the Federal Rules of Civil Procedure, the rules should be applied on a limited basis – that is, no discovery is permitted – consistent with the investigative, pre-suit, summary nature of a CRA proceeding. In evaluating the motions to dismiss, all reasonable inferences must be drawn in the United States' favor, *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020), within the constraints imposed by the CRA. *Lynd*, 306 F.2d at 225-30. Taking as true the allegations in the

9

Complaint, the United States has satisfied each of the four elements of its CRA action. Therefore, the motions to dismiss must be denied.

    **B.      Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Movants suggest that the only permissible basis for a Title III request is to investigate racial discrimination in voting and not to assess a state's compliance with HAVA and the NVRA. Dkt. 9 at 12; Dkt. 33 at 14; Dkt. 36 at 1-2, 12; Dkt. 38, 11-12. They are mistaken. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the

10

Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Dkt. 9 at 12; Dkt. 33 at 14; Dkt. 36 at 1-2, 12; Dkt. 38, 11-12. They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this

11

purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as Neff 2d Decl., Ex. 13). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert*

12

*v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of Movants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, 2026 WL 362789 at *8, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

13

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

**C.     Kentucky's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election.**

Congress broadly established the scope of federal election records covered by Title III. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election.   52 U.S.C. § 20701 (emphasis added); *see also Lynd*, 306 F.2d at 226.

Contrary to what Movants argue, the *Benson* decision does not substantially change the application of "all records" to the SVRL, as required by the plain language of Section 301 of the CRA, 52 U.S.C. § 20701. Dkt. 9 at 12-15; Dkt. 33 at 9; Dkt. 36 at 12, 16. Regardless of who created the SVRL, Secretary Adams and the Members of the KSBE have "custody, possession, or control of such record or paper" and must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

Kentucky's SVRL is merely a composite of individual records relating to voter registration for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562

14

U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. §21803, the SVRL is the method by which Kentucky accumulates the records who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384) – namely, voter "registrations." 52 U.S.C. § 20701; *cf.* Ky. Rev. Stat. § 116.025(1) (requiring a voter to appear on the registration list to vote); Ky. Rev. Stat. § 116.013 (defining a voter as "any name contained in any registration list").

Indeed, federal courts that have applied 52 U.S.C. § 20701 have concluded that Congress meant what it said in the statute. It does not exclude any voting record that State Defendants maintain, despite their argument that the SVRL is excluded because they "created" it. *See* Dkt. 9 at 2, 12-15; Dkt. 33 at 2-3, 8-10. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

The United States substantially briefed the Court on *Benson* in its Motion to Compel. *See* Dkt. 26 at 16-19. Notwithstanding Movants' arguments, *Benson* does not preclude the United States from obtaining the Commonwealth's SVRL. *See* Dkt. 9 at 12-15; Dkt. 33 at 9; Dkt. 36 at 12, 16. *Benson* agreed with the United States regarding the summary nature of a Title III proceeding, but in doing so it reached a few atextual conclusions. In particular, *Benson* read Section 301 of the CRA more narrowly than Congress intended in the statute's reference to "all records." *See* 2026 WL 362789 at *9-10. The United States respectfully disagrees. Such a reading carves out vast

15

numbers of federal election records, which was plainly not Congress's intent when passing Title III. *Lynd*, 306 F.2d at 226.

Nothing in Section 301 restricts "all records and papers" to only those records and papers submitted by voters; even assuming that the examples of documents in the statute each "refers to something that the voter submits or does," *Benson*, 2026 WL 362789 at \*9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves – including statewide voter registration lists – would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers.'" *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789 at \*10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and which

16

"relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 230701, 20703. According to *Benson*, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789 at *9. That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Secretary Adams and the KSBE acquired the relevant records carrying out their duties as those responsible for administering federal elections in Kentucky.

Contrary to *Benson*, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

17

Federal courts addressing similar provisions of federal election law interpret election records expansively. The District of Maryland, for example, when asked by a private, nongovernment party, found that the "focus on the information sought" was significant "rather than the particular language used to characterize that information" when interpreting the NVRA. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)). With that focus on the information sought, the state's voter registration list qualified as election records. *Id.* at 441-43; *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (holding that "all records" under Section 8(i)(1) for request by private, third party included voter registration records). That is consistent with one of the cases cited by Defendant KSBE, which uses an expansive definition of election records. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). Dkt. 9 at 6, 10. As a result, the SVRL is encompassed by Section 301 of the CRA and must be produced to the United States.

> **D.     The Attorney General's has a basis and purpose to investigate Kentucky's compliance with federal election laws.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On August 14, 2025, the United States sent Defendants a written demand for a copy of Kentucky's SVRL. *See* Dkt. 26-5. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess Kentucky's compliance with the SVRL maintenance provisions of the National Voter Registration Act (NVRA)." *Id.* at 2.

18

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that it has not provided the true reason for the demand. Dkt 9 at 15-19; Dkt 33 at 6-8; Dkt. 38 at 12-16.

Defendants contend that there is no factual basis for the demand because the United States let a consent decree with Kentucky concerning NVRA list maintenance expire in March 2025. Dkt. 9 at 16-17; Dkt. 33 at 5, 7. However, the decree did not address the federal law requirements regarding HAVA, which is a concern here. HAVA defines the required unique identifier stating that an individual applying for voter registration "may not be accepted or processed by a State unless the application includes (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or (II) in the case of any other applicant… the last 4 digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A)(i). Where an applicant has neither a driver's license nor a social security number, the State must assign a unique identifying number prior to registration. *Id*. at (ii).

Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as Neff Decl., Ex. 4). One of the problems was that even though some of the registration applications had HAVA identifiers, counties failed to input that information, so it never made it to the SVRL. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Neff Decl., Ex. 5).

The EAVS data indicates that there might be a similar problem here in Kentucky. No county in Kentucky reported any duplicate registrations on the EAVS Report, and the United States asked for information about that in its July 17 letter. *See* Dkt. 26-2 at 2. Having the HAVA identifiers is important in examining an SVRL because if more than one registration has the same HAVA identifier, then it is likely that there is a duplicate registration. To be sure, there is other analysis that goes into determining duplicate registrations, but the HAVA identifier can play an important part.

Moreover, the EAVS data from June 2025 showing Kentucky sending 97,539 confirmation notices out of more than 3.2 million active registered voters, or confirmation notices to 3 percent of its total registered voters—significantly lower than the national average of 19.5 percent—indicates a potential list maintenance problem. *See* Dkt. 26-2 at 2. The United States' July 17 and August 14, 2025, letters "collectively put [Kentucky] on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." *See, e.g., Benson*, 2026 WL362789 at 8 n.3.[3]

The Intervenors' arguments that list maintenance is not the true purpose and the Department of Justice is amassing a nationwide voter database are simply wrong, for the reasons discussed in the introduction. Dkt. 38 at 4-5. As noted by the United States District Court for the Eastern District of North Carolina, such arguments also are "speculative and premature." *United States v. North Carolina Board of Elections*, Case No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025), Order Denying Motion for Reconsideration of Motions to Intervene at 7.[4] The argument, further is based entirely

---

[3] Defendants claim that the United States filed a Statement of Interest "affirmatively praising Kentucky's list maintenance efforts." Dkt. 33 at 7; *see also* Dkt. 9 at 16. Not so. As the Statement of Interest says, "the United States files this Statement of Interest for the limited purpose of articulating its views of Section 8(a)(3)(A) of the NVRA, 52 U.S.C. 20507(a)(3)(A), which permits cancellation of a voter registration "'at the request of the registrant.'" Neff 2d Decl, Ex. 15.

[4] Dkt. 87 in No. 5:25-cv-00283.

on unreliable hearsay. *E.g. United States v. Weber*, 2026 WL 118807 * 11 (relying on "[r]eports from other agencies also point[ing] to the federal government laying the groundwork" for the alleged database).

Obtaining an SVRL to assess and enforce HAVA and the NVRA is not new. As mentioned in its Motion to Compel, the United States used the CRA to obtain statewide voter lists to assess list maintenance in Georgia and Texas. Dkt. 26 at 18. Similarly, in 2007, the United States entered a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. Apr. 4, 2007). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." *Id.* at *5(emphasis added).[5] The United States entered into similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance.[6] Similarly, Indiana was required by consent decree to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by… [Section 20701]." Dkts. 5 at 6 in *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006); Neff 2d Decl., Ex. 18.

After the Indiana consent decree was entered, the United States moved to amend it to obtain

---

[5] Paragraph 11 of the consent decree explicitly invokes the CRA, referring to 42 U.S.C. § 1974, which was later transferred to 52 U.S.C. § 20701. 2007 WL 1059565 *5.

[6] *See United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006); Neff 2d Decl., Ex. 17. In New Jersey, paragraph 5 of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendants to retain voter registration and list maintenance records. Dkt. 2 in 2:06-cv-04889.

21

the full, unredacted SVRL, including driver license numbers and social security numbers. Dkt. 16

in *Indiana*, 1:06-cv-01000; Neff 2d Decl., Ex. 19. As discussed in the Motion, the United States

was entitled to the unredacted SVRL pursuant to Title III, notwithstanding any conflicting state

laws. *Id*. at 2. The consent decree acknowledged that the State is "required to provide the requested

under the relevant statutes and pursuant to the Supremacy Clause of the Constitution." *Id*. The

parties further recognized that "compliance with this request [was] a release of public information

to a member of the public." *Id*. Importantly – as is the case here – the United States agreed to "use

the voter registration list information to assess the State's compliance with federal voting laws,

including, but not limited to, the NVRA." *Id*. The Order granting the Motion to Amend the Consent

Decree required Indiana, within 21 days of the order, to

> immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter's full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver license number, race, voter status… and voting history. The State shall produce such data in electronic format on a CD ROM or DVD.

Dkt. 18 in *Indiana*, 1:06-cv-01000; Neff 2d Decl., Ex. 20.

The United States' use of Title III of the CRA is not limited to investigating compliance

with HAVA and HVRA. It also has used the law in the enforcement of the Uniformed and Overseas

Citizen Absentee Voting Act ("UOCAVA"). The United States sued Alabama for the State's

noncompliance with 42 U.S.C. § 1973ff-1(c),[7] which required the State to report to the Election

Assistance Commission, not later than ninety days after a regularly scheduled general election for

Federal office, certain data regarding ballots from absent uniformed services voters and overseas

voters. *See* Dkt. 1, *United States v. Alabama*, Case No. 2:08-cv-00920 (M.D. Ala. March 28, 2009);

Neff 2d Decl., Ex. 21. The United States sought data in 21 Alabama counties under the CRA, and

---

[7] UOCAVA was transferred to 52 U.S.C. §§ 20301, *et seq*.

22

the Court issued an Order approving that request, and indicated that it would send demand letters to each of those counties for those election records. *Id*. at Dkt. 24. A copy of a letter sent to Shelby County in 2009 requesting election records pursuant to Title III is attached to the 2nd Declaration of Eric Neff as Exhibit 22.  The United States filed a similar lawsuit in Vermont to obtain records for enforcement of the UOCAVA reporting requirement and the parties agreed that election officials are required to retain election records under the CRA. *See, e.g.*, Dkt. 1, *United States v. Vermont*, Case No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009); Neff 2d Decl., Ex. 23.

The United States has also used the CRA in enforcement of the Voting Rights Act. The United States sought election records from counties gathering evidence for a lawsuit brought under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), Dkt. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A copy of a letter sent to Newton County, Georgia is attached to the 2nd Declaration of Eric Neff as Exhibit 24. The Federal Prosecution of Election Offenses explains under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – in many instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 75 (8th ed. 2017). It provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates."[8] *Id*. at 78.

---

[8] In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate

**E.    The United States is entitled to unredacted "reproduction" and "copying" of Kentucky's SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants ask the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available SVRL. Dkt. 9 at 6-7, 9; Dkt. 33 at 13; Dkt. 36 at 16-18. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704.

---

and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Federal Law Constraints on Post-Election 'Audits'* 2 (April 2024), https://www.justice.gov/crt/media/1348586/dl?inline (last visited April 15, 2026).

24

Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Kentucky's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Movants that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[9] *Lynd*, 306 F.2d at 230.

Finally, if Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For

---

[9] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff 2d Decl. ¶ 20. As of April 15, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU. *Id*. One other state agreed to provide its SVRL to settle a CRA lawsuit. *Id*.

25

each voter in Kentucky, that requires their social security number or other HAVA identifier.[10] *See* 52 U.S.C. § 21083(a)(5)(D). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[11] Moreover, Kentucky does not participate in the Help America Vote Verification ("HAVV") system to verify social security numbers for applicants registering to vote. It is one of five states that has never submitted a HAVV request to the Social Security Administration to verify voter registrations since it was instituted in 2011.[12] The only way for the United States to determine whether Kentucky has a social security number for each person registered to vote for federal elections is by reviewing its complete SVRL. There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA and to ensure that Kentucky is in compliance with HAVA's identification requirements are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868;

---

[10] Kentucky is one of five states that may be exempt from Section 303(a)(5)'s requirements of a driver's license number, last four digits of the social security number, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). The Social Security Administration (SSA) has determined at the time that HAVA was enacted, Kentucky was one of five states permitted to use the full 9-digit social security number on applications for voter registration. *See* Soc. Sec. Admin., Help America Vote Verification, https://www.ssa.gov/data/havv/ (last visited Apr. 15, 2026).

[11] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[12] *See* Soc. Sec. Admin., Help America Vote Verification, Social Security Administration, Weekly Data for Help America Vote Verification (HAVV), https://www.ssa.gov/data/havv/havv-totals-since-2011.html (last visited Apr. 15, 2026).

26

*cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same that twenty-five states (including Kentucky) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[13] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Kentucky's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

**F.     The Major Questions Doctrine Does Not Prevent the United States from Obtaining Kentucky's Unredacted SVRL.**

Defendants argue that the Major Questions Doctrine ("MQD") prevents the United States from obtaining a copy of the SVRL. Dkt. 9 at 19-22; Dkt. 33 at 14-15. They assert that the United States has adopted a "recent" interpretation of Title III that is impermissible, arguing that Title III

---

[13] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Apr. 15, 2026).

has "never been used," or has been "little-used" to investigation violations of federal election law. Dkt. 9 at 20-21; Dkt. 33 at 1. Both assertions are incorrect. The MQD does not apply.

The United States exercises *investigatory* power under Title III, which is an express grant of authority from Congress to the Attorney General. *See* 52 U.S.C. §§ 20701-20706. None of the Supreme Court's major-questions precedents – which analyze the scope of delegations of traditionally congressional authority – support using that doctrine to analyze an executive official's mode of investigation regarding a concededly lawful federal statute. Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for such declaratory and injunctive relief as are necessary to carry out the relevant requirements under the statutes. *See* 52 U.S.C. § 20510(a) (NVRA); 52 U.S.C. § 21111 (HAVA).

The MQD is limited to "'extraordinary cases' that call for a different approach" than ordinary statutory interpretation "in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (brackets omitted)). In short, the Court has "long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers." *Learning Resources, Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287 & 25-250, 2026 WL 477534 at *7 (U.S. Feb. 20, 2026) (plurality opinion) (quoting *West Virginia*, 597 U.S. at 723 (brackets in original)). That is not this case.

The MQD applies only when interpreting "ambiguous statutory text." *Learning Resources*, 2026 WL 477534 at *7 (quoting *West Virginia*, 597 U.S. at 723); *see also Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (noting that "none" of the Court's major-question

precedents "purports to depart from the best interpretation of the text"). As discussed above, nothing about the text providing the Attorney General investigative authority under Title III is ambiguous.

Moreover, the Attorney General is not claiming any delegated authority. *Learning Resources*, 2026 WL 477534 at *7 (plurality opinion); *see Biden v. Nebraska*, 600 U.S. at 508 (Barrett, J., concurring) ("emphasiz[ing] the importance of *context* when a court interprets a delegation to an administrative agency"). Each of the Supreme Court's major-questions decisions asked whether "context," "includ[ing] not just other language within the statute, but 'constitutional structure' and 'common sense'" counseled against the Government's asserted "highly consequential power." *Learning Resources*, 2026 WL 477534 at *7 (plurality opinion) (citations omitted). In each case, the President or an administrative agency claimed the ability to regulate private conduct or exercise some other authority typically enjoyed by Congress. *See, e.g.*, *id.* at *10 ("[W]hatever may be said of other powers that implicate foreign affairs, we would not expect Congress to relinquish its tariff power through vague language, or without careful limits."); *West Virginia*, 597 U.S. at 724 ("[T]he Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 760 (2021) (per curiam) ("The new, administratively imposed moratorium went further than its statutory predecessor, covering all residential properties nationwide and imposing criminal penalties on violators.").

The Attorney General also is not claiming any new authority to revise or maintain Kentucky's voter lists. Rather, the Attorney General seeks to verify that the Commonwealth is complying with specific requirements under federal law including the use of a HAVA identification number (in Kentucky, the full social security number) on a voter registration application. *See* 52

29

U.S.C. § 21083(a)(5)(D). There is no question that enforcement of HAVA is for "the purpose of investigating possible violations of a Federal statute," and so the demand for the information meets the requirements of the CRA. *Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

Consequently, for all the foregoing reasons, the MQD does not apply to the CRA and does not foreclose the United States from obtaining Kentucky's SVRL pursuant to Section 305 of the Act.

> **G.      The CRA respects federalism by trusting states to comply with federal election law and empowering the Attorney General to verify that they do so.**

Defendants argue that the United States is foreclosed from using the CRA to obtain Kentucky's SVRL by principles of federalism. They suggest that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to Kentucky's state privacy laws, a Constitutional right of privacy, and the special solitude doctrine. Dkt. 9 at 9-11; Dkt 33 at 13-19. They are mistaken.

The Attorney General's use of the CRA to investigate compliance with HAVA and the NVRA and, if appropriate, to bring an enforcement action, fully respects the federal structure. Without question, the United States Constitution invests states with the primary responsibility for the conduct of federal elections, as well as individuals with limited privacy rights. But at the same time, the Constitution explicitly authorizes Congress to regulate federal elections where it deems appropriate. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as

30

Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the CRA, HAVA, and the NVRA, adopting a "trust, but verify" approach. State election officials including the Defendants are given the primary responsibility for administering federal elections. Specifically, Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

Each of these provisions regulate the conduct of federal elections and make state officials responsible for implementing them. But contrary to what Defendants argue, that does not mean that the Attorney General, as the Nation's chief law enforcement officer, plays no role at all. Far from it. At the same time state election officials were trusted to conduct federal elections, Congress

31

empowered the Attorney General to verify that they are doing do in compliance with federal law. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4). Adopting this approach of trust but verify thereby respects the federal structure and the primacy of state officials in conducting federal elections.

Title III of the CRA promotes the transparency of the state's conduct of federal elections by giving the Attorney General pre-suit investigative tools to evaluate a state's records pertaining to those elections, including its SVRL. As *Lynd* explained, "the right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right" to maintain a lawsuit. 306 F.2d at 227. "His right to records does not require that he show he could win without them." *Id.* In other words, the CRA's purpose "is to enable the Attorney General to determine" if an enforcement action "should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Id.* at 228. To afford the Attorney General the ability to verify compliance with federal law, the CRA "has equipped him with the machinery thought suitable for the effective fulfillment of that obligation." *Id.* at 230. "Wide scope must be accorded the Attorney General" in his ability to review federal election records like the SVRL and "extends as far as the sovereign State itself." *Id.* at 228. If the Attorney General's review reveals that state election officials are not in compliance with federal law, then the United States can bring an appropriate enforcement action. Trust, but verify.

32

The United States believes that Constitutional privacy rights and Kentucky state law can be read in harmony with federal law. In the case of Constitutional privacy rights, Defendant Adams argues that "voters possess a constitutionally protected interest in avoiding compelled disclosure of their sensitive personal information to federal investigators." Dkt. 33 at 17. In support of this, Defendant cites *NASA v. Nelson*, a case where privacy rights were only assumed arguendo. *NASA v. Nelson*, 562 U.S. 134, 138 (2011). The Supreme Court explained that the Privacy Act provided protections against disclosure of personal information compiled as part of federal duties, such that even any assumed Constitutional right was not violated. *Id.* at 156-59. Here, voters are not only protected by the Privacy Act, they are protected by Section 304's specific provisions preventing public disclosure of personal information.

Defendant Adams further argues that this Court should grant it "special solicitude" in its SVRLs. Dkt. 33 at 16-17. This does not stand up to scrutiny. As discussed above, the Constitution's Elections Clause grants the federal government authority to supplant state election law. Putting aside that the Supreme Court created the "special solicitude" doctrine as a workaround to standing when the EPA refused to "regulate greenhouse gas emissions present[ing] a risk of harm to [the State]" from other states, its actual application outside of the case is suspect, at best. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007), *see also id.* at 536 (Roberts, C.J., dissenting) ("[S]pecial solicitude is conspicuously absent from the Court's Opinion" and the statute the majority opinion relied upon). It does not stand for the proposition that states deserve any special consideration when the United States invokes its right to investigate compliance with federal election laws.

Where there is a direct conflict between state and federal laws, then state law must yield. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed

33

subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced, as discussed below.

### H.   The United States is Complying with Federal Privacy Laws.

Defendants and Intervenors make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of Kentucky's federal election records. *See* Dkt. 33 at 16; Dkt. 29 at 4-5; Dkt. 36 at 13-14; Dkt. 38 at 22-25. Those arguments are misguided at best. They are affirmative defenses and not a basis for dismissing the Complaint. *See generally Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("courts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses") (citation omitted). There is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[14] The Complaint, incorporating the demand, is in full compliance.

### 1.  The United States is complying with the Privacy Act.

Defendant and Intervenors argue that the United States must comply with the Privacy Act, and the United States is doing that. Defendant KSBE argues that the United States has not

---

[14] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act.

"identifie[d] any SORN that would allow it to obtain the Commonwealth's unredacted VRL." Dkt. 33 at 16; *see also* Dkt. 38 at 22-25.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 CFR 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department

of Justice's Privacy Policy.[15] The United States made its requests and filed this case pursuant to those statutes. *See* Dkt. 1 ¶¶ 10-16, 24; Dkt. 26-5. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Neff 2d Decl. ¶ 7. That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. *Id*.

### 2. The First Amendment does not prohibit the United States' access to data maintained under HAVA or the NVRA.

Intervenor Yates contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment and implicates a statutory bar to collecting such data. *See* Dkt. 29 at 4-5. His argument misses the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment. But that does not foreclose the United States from enforcing federal election laws like HAVA and the NVRA. Enforcing HAVA and the NVRA are within the scope of an authorized law enforcement activity—necessarily implying that the United States can obtain the materials consistent with the Privacy Act. 5 U.S.C. § 552a(e)(7). Moreover, Intervenor Yates' argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

---

[15] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited April 15, 2026).

### 3. Kentucky's Open Records Laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA.

Movants ask the Court to legislate limitations conspicuously absent from Title III. They cite to Commonwealth Open Records laws to support the argument that only a redacted version of the Commonwealth's SVRL is required. *See* Dkt. 9 at 6-7; Dkt. 33 at 13; Dkt. 36 at 16-18. But the Commonwealth's law expressly disclaims this argument, providing that disclosure is appropriate where permitted by law. Kentucky law cannot restrict "the exchange of public records or the sharing of information between public agencies when the exchange is serving a legitimate government need or is necessary in the performance of a legitimate government function. Ky. Rev. Stat. § 61.878(5).

The United States and its enforcement of HAVA and the NVRA are exactly the category of "legitimate government need" or "legitimate government function" which Kentucky necessarily exempts, contrary to the State Defendants' non-preemption arguments. *See* Dkt. 9 at 9-11; Dkt. 33 at 13, 17-18. The United States needs to review the unredacted data to verify that the HAVA identifiers are being collected by the Commonwealth. *See* 52 U.S.C. § 21083(a)(5)(A). That information is not provided in the redacted or public voter list.[16]

On its face, though, Kentucky law does not prohibit the disclosure of the state's SVRL as the Movants claim. Title III defines election records at 52 U.S.C. § 20701 and requires the Commonwealth to produce them upon demand. 52 U.S.C. § 20703. Kentucky law does not specifically identify voter or election records, though does make certain information confidential

---

[16] If Movants' position were to be adopted, it would eviscerate HAVA enforcement of 52 U.S.C. § 21083(a)(5)(A) and list maintenance in general. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law. That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.

from *public* disclosure. Ky. Rev. Stat. § 61.878(1)(a) and § 116.095 (requiring redaction of a social security number before the registration records before it is "furnished to the citizen requesting the copy"). Most of the provisions cited by Movants fall within Kentucky's Open Records law and the Legislature found "an essential relationship" between the "management of public records" and the "coordination of strategic planning for computerized information systems in state government." Ky. Rev. Stat. § 61.8715. It recognized "that while all government records are public records… not all these records are required to be *open to public access*." *Id*. (emphasis added). The United States is not asking for *public* disclosure of Kentucky's SVRL. It is requesting an intergovernmental transfer of the data to assess the Commonwealth's compliance with federal election law. Pursuant to the CRA's privacy provisions and the Privacy Act, none of the information obtained will be publicly disclosed.

Section 304 of the CRA makes clear that the records that must be produced are not limited to only those that redact personal identifying information (PII). Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet Defendants ignore the plain language of Section 304 and ask the Court to rewrite the CRA to exclude all non-public records and information.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted VRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a

38

protective order. *Lynd*, 306 F.2d at 230.

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss (Dkts. 9, 29, 33, 36, & 38) be denied, and that the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Dkt. 26) be granted.

Dated this 15th day of April, 2026,


Respectfully submitted,

PAUL C. MCCAFFREY
United States Attorney
Eastern District of Kentucky
260 W. Vine Street
Suite 300
Lexington, KY 40507-1612
859-685-4820
Fax: 859-233-2533
Email: Paul.McCaffrey@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief
Voting Section, Civil Rights Division


/s/ Joseph W. Voiland
JOSEPH W. VOILAND
BRITTANY E. BENNET
Trial Attorneys
Voting Section, Civil Rights Division
4 Constitution Square
150 M. Street NE, 8th Floor
Washington, D.C. 20002
joseph.voiland@usdoj.gov
brittany.bennett@usdoj.gov
202-353-5318