**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT FRANKFORT**
**CASE NO. 3:26-CV-00019-GFVT**

**THE UNITED STATES OF AMERICA**                                      **PLAINTIFF**

v.

**MICHAEL ADAMS, in his Official Capacity as**                        **DEFENDANTS**
**KENTUCKY SECRETARY OF STATE**, *et al.*

---

**REPLY OF DEFENDANT MICHAEL ADAMS, IN HIS OFFICIAL CAPACITY AS**
**KENTUCKY SECRETARY OF STATE, TO THE UNITED STATES OF AMERICA'S**
**CONSOLIDATED RESPONSE TO OUTSTANDING MOTIONS TO DISMISS**

---

Comes now, Defendant, Michael Adams, in his official capacity as Kentucky Secretary of State, by Counsel for his Reply to the United States' Consolidated Response to Motions to Dismiss by Defendants (Dkts. 9 & 33) and Intervenor-Defendants (Dkts. 29, 36, & 38) hereby states as follows:

**<u>INTRODUCTION</u>**

The United States' consolidated response (Dkt. 39), rather than confronting the textual and structural deficiencies that Secretary Adams identified in his Motion to Dismiss (Dkt. 33), largely re-argues its Motion to Compel and asks this Court to accept as settled matters of law that four federal courts, including one in this Circuit, have now expressly rejected. The response does not cure the Complaint's infirmities; it confirms them.

The government seeks to compel Kentucky to surrender a comprehensive electronic database containing the sensitive personally identifying information of millions of voters—driver's license numbers and Social Security numbers—on the strength of a 1960 recordkeeping statute enacted to prevent local destruction of paper election records in jurisdictions engaging in

1 of 15

racial discrimination. No court of appeals has ever endorsed the sweeping construction the government urges. The government asks this Court to endorse exactly that construction. It should decline.

Seven independent grounds require dismissal or, at minimum, a narrowing of any compelled production. Each is addressed in turn.

## ARGUMENT

**I.    The Government's Procedural Hedge Confirms That the Federal Rules Apply and That the Complaint Must Be Dismissed Under Rule 12(b)(6).**

The government devotes significant pages to arguing that the Federal Rules of Civil Procedure, particularly FRCP 12(b)(6), do not apply to this proceeding and then immediately concedes that "[e]ven if the Court decides to apply the Federal Rules of Civil Procedure, the rules should be applied on a limited basis." Dkt. 39 at 9. This hedge is dispositive for purposes of the pending motion.

If the government is correct that the FRCP do not apply, there is no procedural mechanism for Defendants to challenge the Complaint at all, a result that raises serious due process concerns and that not a single court of appeals has endorsed in the context of a contested CRA proceeding. If the FRCP do apply, as three district courts have now held, and as this Court should hold, then the Complaint must satisfy *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Simply put, it does not.

The government's reliance on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), is misplaced for two reasons. First, *Lynd* predates *Twombly* and *Iqbal* by nearly fifty years and did not address whether a CRA complaint must plausibly allege the specific statutory prerequisites for a valid

demand. Second, the government's own concession that the FRCP may apply in a "limited" fashion cannot simultaneously exempt the Complaint from the core requirement that it plausibly plead a cognizable claim. The government cannot use the summary-proceeding framing as both a shield against procedural scrutiny and a sword to obtain compelled production without meeting any pleading threshold.

Under proper *Iqbal/Twombly* analysis, the Complaint's conclusory assertion that the demand satisfied the "basis and purpose" requirement is precisely the kind of formulaic recitation that the Supreme Court held insufficient. *Iqbal*, 556 U.S. at 678. The Complaint must be dismissed.

## II.    The Government's August 14 Demand Did Not Satisfy the Statutory Basis-and-Purpose Requirement, and the Response Fails to Cure That Deficiency.

The Civil Rights Act requires that any demand for federal election records "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The government's response does not engage with the substance of Secretary Adams's argument on this point. Instead, it retreats to the 1962 *Coleman II* formulation—that it is sufficient for the AG to state that the purpose is "investigating possible violations of a Federal statute"—and declares the matter resolved. Dkt. 39 at 18. That circular standard cannot be what Congress intended when it used both the words "basis" and "purpose" in the same provision.

### A.    *Two Courts Have Expressly Rejected the Government's Minimalist Reading of the Basis-and-Purpose Requirement.*

In *United States v. Oregon*, 2026 WL 318402, at *17 (D. Or. Feb. 5, 2026), the court held that "basis" means a factual basis for investigating a violation of a federal statute—not merely a recited statutory citation. In *United States v. Weber*, 2026 WL 118807, at *9 (C.D. Cal. Jan. 15,

2026), the court required "specific, articulable facts pointing to the violation of federal law" and found the DOJ's generalized compliance audit rationale "fatally deficient." The government dismisses both decisions as having "misread" *United States v. Powell*, 379 U.S. 48 (1964), Dkt. 39 at 7–8, but it does not explain—because it cannot—why a demand untethered to any specific irregularity, individual voter, or identified county satisfies **any** meaningful reading of the word "basis."

### B.      The Government's Own MOU Confirms That This Is a Nationwide Programmatic Audit, Not a Particularized Investigation of Kentucky.

The proposed Memorandum of Understanding offered to Kentucky (Exhibit 11 to the KSBE's Motion to Dismiss, Dkt. 9) states that "the Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law." (Emphasis added.) That template language was sent to states across the country. The government's response calls this argument "speculative and premature" (Dkt. 39 at 20) and labels the MOU an "unreliable hearsay" source (Dkt. 39 at 21).  The MOU, however, is the government's own document, offered by the government in this very litigation. It is not hearsay. It is an admission.

The government further reveals in footnote 9 of its response that as of April 15, 2026, fourteen states have already provided their SVRLs without any MOU, two states under an MOU, and one state via litigation settlement. Dkt. 39 at 25 n.9. This is not a particularized investigation of Kentucky's compliance; it is a systematic nationwide data-collection program. A generalized nationwide audit cannot satisfy the requirement that the demand state a basis targeting this jurisdiction. Cf. *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950) (even investigative authority must bear a rational relationship to the purpose stated).

Beyond confirming the nationwide scope of the program, the proposed MOU is itself evidence that the government's demand is half-baked rather than carefully calibrated to the statutory authority it invokes. The MOU purports to address Kentucky's privacy concerns, but a careful reading reveals that it would afford Kentucky's voters *fewer* protections than a straightforward production of the unredacted SVRL without any MOU at all.[1] Most notably, the MOU conditions production on Kentucky's agreement to remove voters from its rolls in compliance with federal agency determinations of ineligibility—an obligation that neither federal nor state law imposes, and one that would effectively deputize the Commonwealth as an enforcement arm of the Executive Branch on terms Congress never authorized. Specifically, Section VIII of the MOU relating to the NVRA/HAVA Compliant Voter Registration List, states the following:

> After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

> You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.[2]

> An investigative demand that can only be operationalized by extracting extra-statutory

concessions from the states it targets is not a carefully scoped exercise of pre-suit investigative

---

[1] The MOU's voter-removal provision has no basis in Title III of the CRA, 52 U.S.C. §§ 20701–20706, which is purely an investigative records-production mechanism and confers no authority on the federal government to direct state list-maintenance decisions. Nor does the NVRA or HAVA authorize the Attorney General to condition an investigative demand on a state's advance agreement to act on federal ineligibility determinations. *See* 52 U.S.C. § 20507 (NVRA list-maintenance obligations run to states, not to federal direction); 52 U.S.C. § 21083 (HAVA computerized list requirements impose no analogous federal-direction obligation). To the extent the MOU attempts to create obligations beyond what any of these statutes authorize, it is ultra vires and its existence as a precondition to resolving this dispute confirms that the government is pursuing policy objectives that outrun its legal authority.

[2] See Dkt. 9, Exhibit 11 p. 5

authority—it is an improvised program dressed in statutory clothing. The government's failure to reconcile the MOU's terms with the actual requirements of Title III, the NVRA, and HAVA is further reason to deny the Motion to Compel and grant dismissal.

### C.    *The Government's Prior Conduct Undermines Any Claimed Particularized Basis.*

The Response does not squarely address the significance of the Department of Justice's prior Statement of Interest in a separate proceeding defending Kentucky's voter list-maintenance procedures, or the expiration of the consent decree without extension. The government's answer—that the consent decree did not address HAVA compliance—is legally distinct from the NVRA but factually indistinguishable. The EAVS data concerns cited in the July 17 and August 14 letters (confirmation notice rates, duplicate removal reporting) bear on the same list-maintenance practices the DOJ recently certified as compliant. The government cannot credibly claim a particularized factual basis to investigate practices it recently defended in court.

### III.    Kentucky's Statewide Voter Registration List Is Not a Record That "Came Into" Any Officer's Possession Within the Plain Meaning of Title III.

The government's response to Defendant's strongest textual argument is its most analytically strained. Section 20701 reaches "all records and papers which come into [an officer's] possession" relating to specified voter acts. The government's response argues that "come into possession" is merely a temporal phrase and that any record an official currently holds satisfies it. Dkt. 39 at 16–17. That reading is wrong, and it is the reading that **four** federal courts—including *Benson* in this Circuit—have now rejected.

*A.*      *The Government's Naturalization Certificate Analogy Confirms, Rather Than Refutes, the Textual Point.*

To rebut *Benson's* "come into" analysis, the government points to 8 U.S.C. § 1454(a), which distinguishes between persons who "shall have" a certificate of naturalization and those who "may come into possession of it." Dkt. 39 at 17. The government argues this shows the phrase is temporal, not source-based. The analogy backfires. Naturalization certificates are government-issued documents that flow from an external governmental source to private holders; private individuals and third parties acquire them from outside—they do not self-generate them. The statute's structure thus confirms precisely what Defendant argued: "come into possession" describes the acquisition of records from an external source. The KSBE did not receive Kentucky's SVRL from an external source; it built the SVRL from administrative data it compiled. That process is categorically different.

*B.*      *The Government's Expansive Reading Renders the Phrase "Come Into" Superfluous.*

Under the government's construction, every record in an election official's control at any moment qualifies—eliminating any operative distinction between "come into possession" and "in the possession of." Congress used the former, not the latter. That choice must be given effect. *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) (courts must give effect to every clause and word); *U.S. v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015). The surrounding terms—"application, registration, payment of poll tax, or other act requisite to voting"—all describe documents that flow from voters to officials. Kentucky's SVRL flows from no one; the State generates it. Under the canon of *ejusdem generis*, the catch-all "other act requisite to voting" cannot encompass state-created administrative compilations of the very records Congress enumerated.

C.      *The Government Selectively Accepts Benson While Rejecting Its Textual Analysis.*

The government relies on *Benson* for the proposition that Title III is a summary proceeding to which the FRCP do not apply, Dkt. 39 at 7, while simultaneously urging this Court to reject *Benson's* "come into possession" holding as "atextual." Dkt. 39 at 15–16. The government cannot selectively harvest the holding it likes from *Benson* while discarding the textual analysis it does not. Both holdings arise from the same court's careful analysis of the same statute. This Court should follow *Benson's* textual conclusion and decline the government's invitation to pick and choose.

The weight of authority rejecting the government's position grew further still on April 28, 2026—two days before this Reply was filed—when the United States District Court for the District of Arizona granted the motion to dismiss in *United States v. Fontes*, No. CV-26-00066-PHX-SMB (D. Ariz. Apr. 28, 2026). *Fontes* is yet another court to dismiss an Attorney General SVRL demand under Title III, and the fourth to do so on the "come into possession" grounds squarely at issue here. The *Fontes* court expressly adopted *Benson's* reasoning, holding that "coming into [the state's] possession" "refer[s] to only those documents that state election officials receive from prospective voters," and that a VRL created and maintained by state officials is categorically outside that phrase's reach. *Fontes* slip op. at 5. Crucially, the *Fontes* court added an independent statutory harmony rationale that reinforces the Defendant's position here: if a VRL were deemed a § 20701 document, then § 20702—which prohibits willful alteration of any such document—would directly conflict with the NVRA and HAA, both of which affirmatively *require* states to modify their voter lists on an ongoing basis. *Id.* at 7. This statutory-conflict rationale provides this Court with yet another independent ground to reject the government's reading—one the

government's consolidated response does not address and cannot answer. This Court should join the consensus of its sister courts and dismiss the Complaint.

**IV.    The Civil Rights Act Does Not Authorize Compelled Production of a Comprehensive Statewide Electronic Voter Database.**

Even assuming a valid demand and that the SVRL "came into" the KSBE's possession, Section 20703's inspection authority is linked to records preserved under Section 20701's twenty-two-month retention requirement. The August 14 demand sought Kentucky's **current, live** statewide voter registration database—a continuously updated electronic system, not a set of preserved records tied to a specific identified federal election within any twenty-two-month window. The Complaint identifies no particular election under investigation. Dkt. 33 at 10. The government's response does not address this temporal limitation at all.

Moreover, under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), this Court owes no deference to the Attorney General's expansive construction of "records and papers" to encompass a multi-million-record electronic database containing sensitive PII fields that did not exist when the statute was enacted in 1960. The government's response does not engage with *Loper Bright* at all. This Court must independently determine the statute's meaning, and under that independent assessment, the plain text does not reach what the government is asking for here.

**V.    The NVRA and HAVA's Own Enforcement Mechanisms Preclude Use of Title III as an Alternative Investigative Vehicle.**

The government's response asserts that the CRA, NVRA, and HAVA "work together" to give the Attorney General a complete toolkit for election law enforcement. Dkt. 39 at 13. But "working together" is not the relevant legal standard. The question under *Middlesex County*

*Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981), is whether Congress's provision of "elaborate enforcement provisions" in a statute forecloses implied supplementation through a separate, older statute. It does.

The NVRA expressly authorizes the Attorney General to bring civil enforcement actions. 52 U.S.C. § 20510. HAVA does the same. 52 U.S.C. § 21111. Neither statute requires states to produce their entire voter databases as a pre-suit investigative measure. Allowing the government to use Title III to conduct comprehensive pre-suit database collection—bypassing the standing, pleading, and cause-of-action requirements applicable to NVRA and HAVA enforcement actions— would render those enforcement mechanisms superfluous. The Supreme Court has "repeatedly warned against statutory interpretations that allow one statute to swallow the detailed regulatory framework of another." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). The government's interpretation does precisely that.

The government points to historical uses of the CRA in conjunction with other statutes— Georgia, Indiana, Maine, Alabama—those circumstances, however, involved consent decrees and post-suit discovery contexts. Dkt. 39 at 21–23. Not one of those examples involved a contested pre-suit demand for a complete, unredacted statewide voter database opposed by the state. A history of uncontested compliance does not establish a legal authority to compel such compliance.

## VI.    The Major Questions Doctrine Independently Precludes the Government's Claimed Authority.

The government argues the Major Questions Doctrine ("MQD") does not apply because (1) the text of Title III is "unambiguous," and (2) the Attorney General is not claiming "delegated authority." Dkt. 39 at 27–29. Both contentions miss the mark.

First, the government cannot simultaneously assert that the text is clear and unambiguous and argue that the Court's role is "limited" to a narrow four-element inquiry that precludes meaningful textual review. If the text is genuinely clear and favorable to the government, the government should welcome full de novo textual analysis—the very analysis that *Loper Bright* now requires. The government's argument that courts cannot look behind the demand's stated purpose is in direct tension with its claim that the text unambiguously authorizes the demand.

Second, the MQD does not require a formal "delegation" in the agency-rulemaking sense. *West Virginia v. EPA*, 597 U.S. 697, 721–24 (2022), focuses on whether the government asserts authority of vast "economic and political significance" that Congress has not "clearly" conferred. The claimed authority here—to compel all fifty states to produce unredacted voter databases containing PII for more than 160 million registered voters, based on a 1960 recordkeeping statute aimed at localized paper-record destruction—is precisely the kind of transformative expansion the MQD is designed to check. The government's response points to no case in which a federal court has endorsed anything approaching this scope of compelled pre-suit data production from state governments under Title III.

The government's assertion that the MQD applies only to "ambiguous" text, and therefore cannot apply here, is also foreclosed by *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring), which clarifies that MQD is better understood as a tool of textual analysis—looking for clear congressional authorization of claimed authority—rather than a separate ambiguity-triggered doctrine. Under that framework, Title III's 1960 text contains no clear authorization for the compelled surrender of comprehensive electronic statewide voter databases.

## VII.    The Government's Privacy Act Response Is Inadequate.

The government responds to the Privacy Act argument by pointing to JUSTICE/CRT-001, a System of Records Notice published in 2003. Dkt. 39 at 35. This response raises more questions than it answers. A SORN published in 2003 for a Civil Rights Division case investigation system cannot, without more, encompass a novel 2025–2026 nationwide program systematically collecting complete voter registration databases—including driver's license numbers and Social Security numbers—from all fifty states. The government provides no analysis of whether the collection's scope, purpose, and data elements fall within the stated categories of records in CRT-001, what routine uses were published, and whether a program of this scale required a new or amended SORN under 5 U.S.C. § 552a(e)(4).

The government's treatment of this issue in a single dense paragraph, without citation to the relevant SORN's actual terms, is not a sufficient response to a procedural deficiency that independently warrants dismissal or, at minimum, a stay pending compliance. The Court should require the government to demonstrate, with specificity, which published SORN authorizes this collection and how the program's scope falls within the SORN's stated categories of records and routine uses.

## VIII.   The Constitutional Privacy Interests of Kentucky's Voters Require a Narrowing Construction.

The government's response to the constitutional privacy argument relies primarily on *NASA v. Nelson*, 562 U.S. 134 (2011), and the protections afforded by Section 304's nondisclosure requirements. Dkt. 39 at 33. But *NASA v. Nelson* assumed *arguendo* that a constitutional privacy interest exists—it did not hold that Section 304-style protections are categorically sufficient to satisfy it in every context. The millions of Kentucky voters whose driver's license numbers and partial Social Security numbers are at issue have received no notice and have had no opportunity

to be heard. The government's assurances of secure storage do not substitute for the clear congressional authorization that *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977), and *NASA v. Nelson* require before the government may demand mass disclosure of sensitive personal information.

The aggregation concern identified in *Carpenter v. United States*, 585 U.S. 296, 310 (2018), is particularly apt. The demanded database—name, address, date of birth, driver's license number, and Social Security number for every registered voter in Kentucky—constitutes precisely the kind of "comprehensive chronicle" that *Carpenter* held warranted heightened scrutiny. Where, as here, a reasonable narrowing construction is available (limiting production to actual voter-submitted records and excluding aggregated PII databases), courts must adopt it to avoid serious constitutional concerns. *Bond v. United States*, 572 U.S. 844, 860 (2014); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

## CONCLUSION

For the foregoing reasons, and those set forth in Defendant's Motion to Dismiss (Dkt. 33), Secretary Adams respectfully requests that the Court dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

/s/ Jay L. Phillips
Matt Malone (90508)
D. Eric Lycan (86032)
Jay L. Phillips (100068)
EMBRY MERRITT WOMACK NANCE, PLLC
201 East Main Street, 14th Floor
Lexington, Kentucky 40507
(859)543-0453
matt.malone@emwnlaw.com
Eric.lycan@emwnlaw.com
jay.phillips@emwnlaw.com
*Counsel for Michael Adams, in his official capacity
as Kentucky Secretary of State*

AND

*/s/ Jennifer S. Scutchfield w/permission*
Jennifer S. Scutchfield (87515)
Assistant Secretary of State
General Counsel
Office of the Secretary of State
700 Capital Avenue
State Capitol, Suite 152
Frankfort, KY 40601
(502)782-7417
jscutchfield@ky.gov
*Counsel for Michael Adams, in his official capacity
as Kentucky Secretary of State*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

/s/ Jay L. Phillips

*Counsel for Defendant Michael G. Adams,*
*in his official capacity as Kentucky*
*Secretary of State*