**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT FRANKFORT**
**CASE NO. 3:26-CV-00019-GFVT**

THE UNITED STATES OF AMERICA                                                    PLAINTIFF

v.

MICHAEL ADAMS, in his Official Capacity as                            DEFENDANTS
KENTUCKY SECRETARY OF STATE, *et al.*

---

**RESPONSE OF DEFENDANT MICHAEL ADAMS, IN HIS OFFICIAL CAPACITY OF KENTUKCY SECRETARY OF STATE, TO THE UNITED STATES OF AMERICA'S MOTION TO COMPEL**

---

Comes now, Defendant, Michael Adams, in his official capacity as Kentucky Secretary of State, by Counsel, for his Response to the United States' Motion to Compel (Dkt. 26) and hereby states as follows:

## INTRODUCTION

The United States (hereafter "the government") characterizes this as a "straightforward case." It is not. The government's Motion to Compel is procedurally premature and directed at records that fall outside the plain statutory reach of Title III of the Civil Rights Act of 1960 ("CRA"). This Court should deny the Motion on three grounds, any one of which is independently sufficient.

First, the government's own correspondence reveals that Defendants never issued a flat refusal to produce records under the CRA. The Kentucky State Board of Elections' ("KSBE") August 22, 2025 letter was a conditional response that identified specific, facially legitimate concerns under the Privacy Act of 1974 and the Driver's Privacy Protection Act ("DPPA"), and requested clarification before production. The United States never meaningfully responded to

those concerns in the pre-litigation period. Because a genuine refusal is a statutory predicate to invoking this Court's jurisdiction under the CRA's summary proceeding mechanism, the Motion is procedurally premature.

Second, the electronically self-generated SVRL is not the type of record that "come[s] into" the possession of an officer of election within the meaning of 52 U.S.C. § 20701. As the United States District Court for the Western District of Michigan correctly recognized in *United States v. Benson*, <u>*infra,*</u> the CRA's retention and production obligations attach only to records received from external sources—registration applications submitted by voters—not to database compilations generated by the state itself. The government's own preferred interpretation would produce anomalous results at odds with the statute's text, structure, and the historical context of its enactment.

Third, the Kentucky legislature enacted HB 139 during the 2026 legislative session which allows certain voter data to be produced, but only subject to strict conditions relating to the specific data to be produced. The government's demand would place Defendants in violation of Kentucky law.

For these reasons, elaborated below, the Motion to Compel should be denied.

### **LEGAL STANDARD**

The United States correctly notes that Title III of the CRA establishes a summary proceeding with a "severely limited" inquiry. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). However, that limited inquiry does not override this Court's threshold Article III obligations. A federal court must satisfy itself of subject matter jurisdiction regardless of the procedural posture

of a case. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). The CRA's summary proceeding framework presupposes a justiciable controversy; it does not create one where none exists.

Under the CRA, the Court's inquiry is limited to four questions: (1) whether the Attorney General made a written demand for federal election records stating the basis and purpose; (2) whether that demand was directed to an "officer of election"; (3) whether the officer failed or refused to make the records available; and (4) whether the Attorney General has made a simple statement to the Court establishing these facts. *Lynd*, 306 F.2d at 225-26; 52 U.S.C. § 20703. Each of these elements is subject to this Court's scrutiny, including whether the demand was actually refused and whether the records sought are within the scope of the statute.

## ARGUMENT

### A. The Motion Is Procedurally Premature Because Defendants' August 22 Letter Was a Conditional Response, Not a Refusal, and the United States Never Satisfied the Conditions.

The CRA's summary proceeding is triggered only when an officer of election "has failed or refused" to make demanded records available. 52 U.S.C. § 20703. The word "refused" carries its ordinary meaning: an unequivocal declination to comply. Where a custodian has instead expressed willingness to produce, subject to clarification of legitimate legal questions, there has yet been no "failure" or "refusal" sufficient to invoke the Court's summary jurisdiction.

The record here does not support a finding of refusal. The KSBE's August 22, 2025 letter to DOJ did not categorically decline to produce the SVRL. Rather, it identified specific, facially legitimate legal questions regarding the Department's compliance with the Privacy Act of 1974 and the Driver's Privacy Protection Act ("DPPA"), and requested clarification before production. See Neff Decl., Ex. 5. Specifically, KSBE raised two distinct issues:

First, KSBE questioned whether DOJ had satisfied its own obligations under the Privacy Act—including the requirement to maintain a published System of Records Notice ("SORN") for any system of records it creates from produced voter data—and whether HAVA's limited carve-out for social security numbers applied to all Privacy Act provisions or only to Section 7.

Second, KSBE questioned how disclosure of driver's license numbers to DOJ would "carry out" a government function within the meaning of the DPPA's discretionary disclosure exception, 18 U.S.C. § 2721(b)(1), given that DOJ's stated purpose—"to ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA"—did not self-evidently require individual driver's license numbers to accomplish.

These are not pretextual objections or dilatory tactics. They are legitimate federal statutory questions about how another federal agency intends to handle sensitive personal information belonging to millions of Kentucky citizens. The KSBE's August 22 letter concluded that "[b]efore a voter list containing driver's license numbers or partial social security numbers is released, responses to our concerns are required." This is a conditional position, not a flat refusal.[1]

The distinction is legally significant. The CRA's summary proceeding exists to overcome obstruction: to prevent state officials from using procedural delays and bad-faith objections to frustrate federal election law enforcement. *See Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963). It was not designed to circumvent good-faith requests for clarification of competing federal legal obligations. Nothing in the CRA, in *Lynd*, or in any other authority forecloses a state official from asking a federal agency to explain how it intends to comply with federal privacy law before handing over the personal identifying information of millions of citizens.

---

[1] Of note, KSBE did, in fact, provide DOJ with the voter files. The only data which was omitted were voters' Social Security Numbers and Drivers License Numbers.

The procedural record reinforces the conditional rather than absolute nature of Defendants' position. Following the August 22 letter, the KSBE did not simply go silent. KSBE General Counsel Taylor Brown engaged directly with DOJ's new point of contact in December 2025, acknowledged the MOU proposal, and explained that Board approval by majority vote was required. See Neff Decl., Ex. 6 (Email Exchanges). The Board met on December 16, 2025 and January 5, 2026 specifically to consider the MOU. Id. at ¶ 15. This is not the behavior of an official that has "refused" production; it is the behavior of an official navigating legitimate institutional and legal constraints.

The United States' failure to respond substantively to the Privacy Act and DPPA questions raised in the August 22 letter before filing suit is telling. The August 14 Letter addressed privacy concerns only in general terms—noting that data would be "kept securely and treated consistently with the Privacy Act," and citing the DPPA's government-function exception. Neff Decl., Ex. 4. It did not answer KSBE's specific question about whether DOJ had promulgated or would promulgate the required SORN. It did not explain, beyond a conclusory assertion, how receiving individual driver's license numbers furthers the NVRA list maintenance audit function as opposed to receiving the list with those fields redacted.

This Court should follow the approach of those courts that have recognized, even within the CRA's expedited framework, that the proceeding presupposes a genuine refusal, not a conditional response to unanswered legal questions. The *Benson* court's own acknowledgment that the CRA's summary proceeding functions like an administrative subpoena, *United States v. Benson*, 2026 WL 362789, at *7 (W.D. Mich., February 10, 2026)[2], supports this conclusion:

---

[2] *See also United States v. Adrian Fontes*, 2:26-cv-00066-PHX-SMB Order Granting Fontes' Motion to Dismiss entered on April 28, 2026.

administrative subpoena enforcement has consistently required courts to assess whether the subpoena recipient had a meaningful opportunity to raise legitimate objections before being compelled. *Donaldson v. United States*, 400 U.S. 517, 529 (1971). Here, the KSBE raised legitimate objections. The government chose litigation over engagement. The Motion is premature.

Separately, the government's own conduct in proposing an MOU undermines its assertion of a flat refusal. An MOU is a negotiated instrument. If the United States genuinely believed Kentucky had categorically refused production and that its legal authority was absolute, there would have been no reason to offer a memorandum of understanding. The MOU proposal is an implicit concession that Defendants' concerns were not frivolous and that a negotiated resolution was both possible and appropriate.

**B. Kentucky's Statewide Voter Registration List Is Not a "Record" Subject to Compelled Production Under Title III of the CRA.**

Even if this Court were to reach the merits of the USA's Motion to Compel, the SVRL is not within the scope of records subject to production under Title III. Section 301 of the CRA requires officers of election to retain and produce "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. The SVRL is not a record that "comes into" an officer's possession from an external source; it is an internally generated electronic database compiled by state officials from individual registration applications. The distinction matters, and the plain text of the statute supports it.

The United States District Court for the Western District of Michigan recently addressed this precise question in *United States v. Benson* and concluded that the CRA's production

obligation extends only to documents that "people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." 2026 WL 362789, at *9. The *Benson* court grounded this conclusion in the statutory phrase "come into his possession," which it read as referring to a process of acquisition from an external source: voters submitting applications rather than internal document generation. *Id*. Defendant Adams respectfully urges this Court to adopt the *Benson* court's construction.

The government's effort to dismiss *Benson* as making an "overly pedantic" distinction, Mot. at 15, reads Congress's deliberate word choice out of the statute. Statutory interpretation begins with the text, and the text here is not ambiguous. Congress used the phrase "come into his possession" **not** "are in his possession," not "are maintained by him," and not "are created by him." The verb phrase "come into" denotes a process of acquisition, more specifically, acquiring something from somewhere else. It carries a transactional or directional quality that "are in" or "are maintained by" do not.

This reading is confirmed by comparing § 20701 to other federal statutes that use the phrase "come into possession" to denote acquisition from an external source rather than self-generation. <u>See</u>, <u>e.g.</u>, 44 U.S.C. § 3572(f) (imposing duties on officers who "come into possession of such information by reason of his or her being an officer," clearly contemplating information received in the course of official duties from external parties); 30 U.S.C. § 1732(b) (triggering disclosure timelines from the point information "comes into the possession of the Secretary"). In each case, the phrase marks a moment of external acquisition, not internal creation.

The government's counter-argument—that an officer "comes into possession" of internally generated records the moment those records are created—collapses the distinction between possession and creation. But ordinary English does not support that construction. A person "comes

into possession" of a house when she acquires it from a seller; she does not "come into possession" of a house she builds herself. A law firm "comes into possession" of a client's documents when the client delivers them; the firm does not "come into possession" of a brief it drafts for that client. The government's reading would require ignoring the directional, acquisitive meaning of the phrase.

The government also argues that even under *Benson's* framework, individual officers within the KSBE who did not themselves generate the SVRL would have "come into possession" of it from other officers who did. Mot. at 18. This argument proves too much. Under that logic, any document created anywhere within a state agency could be compelled by the government from any other official in the agency, simply by positing that the record passed from the creator to a colleague. That interpretation would render § 20701's limiting phrase functionally meaningless, because every government record is "possessed" by some official. Courts are obligated to give effect to every word of a statute, not to read language into irrelevance. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) *citing Duncan v. Walker*, 533 U.S. 167 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause … shall be superfluous.").

The government's invocation of the maxim "all means all," quoting *Lynd*, is rhetorically forceful but legally misleading in this context. *Lynd's* "all means all" language was directed at the breadth of records within the defined category, "all records and papers which come into his possession relating to … voter registration", not at the definitional predicate "come into his possession." *Lynd* did not address, because it did not need to address, whether a state-compiled database would qualify. The court's instruction that "all means all" means that once a record

qualifies under the statutory definition, no subcategory may be excluded. It does not mean that the definitional gateway itself is to be ignored.

Furthermore, the government's practical argument—that most voter registration data now exist only in electronic form, and therefore denying SVRL access would eviscerate the CRA's purpose—is a policy argument, not a legal one. Courts interpret statutes as written, even when the result is imperfect policy. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020). If Congress intended to expand the CRA's scope to reach state-generated databases, it has had ample opportunity to do so in the sixty-plus years since the statute's enactment. The absence of such an amendment counsels restraint, not judicial revision.

Moreover, the government's access to individual voter registration applications, which unquestionably "come into" the possession of election officials from applicants, would provide substantial investigatory value for assessing NVRA and HAVA compliance. The government has not shown, and cannot show, that individual applications are inadequate for its stated investigatory purpose. Its preference for the compiled database, rather than underlying applications, reflects a convenience interest, not a statutory entitlement.

*C. Kentucky HB 139 Section 30 Independently Confirms that Federal Data-Sharing Requires a Written Memorandum of Understanding with Defined Privacy Limitations.*

An additional and independent basis for denying the Motion to Compel is provided by Kentucky's own recently enacted law governing precisely this type of federal-state data exchange. Section 30 of Kentucky House Bill 139 (2026 RS HB 139)—which has been fully enacted and thus carries the full force of Kentucky law—creates a new section of KRS Chapter 116 that directly addresses the conditions under which the State Board of Elections may share voter registration

data with federal agencies.[3] That statute confirms that Defendants' insistence on a written, signed memorandum of understanding before production is not mere recalcitrance—it is a legal requirement.

Section 30(1) of HB 139 provides that the State Board of Elections "is authorized to enter into agreements with agencies of the federal government to identify individuals who are deceased or who are not citizens of the United States but are registered to vote in this state." Section 30(1) of Kentucky House Bill 139 (2026 RS HB 139). Section 30(2)(a) then mandates that any such agreement "shall have its terms agreed to in a written memorandum of understanding or similar document signed by individuals authorized to do so from the federal agency and the State Board of Elections. *Id. at* 30(2)(a).

Critically, Section 30(2)(b) prescribes the minimum content of any such written agreement. It must contain provisions guaranteeing, at a minimum, the following:

1. The federal agency shall be provided with a copy of the roster of all qualified registered voters within the state maintained by the State Board of Elections pursuant to KRS 117.025;

2. The Copy of the roster that is provided to the federal agency shall include only the name, date of birth, and last four (4) digits of the Social Security number, if available, of registered voters within the state;

3. The copy of the roster that is provided to the federal agency shall not include any other information, including, but not limited to the residential or mailing address, driver's

---

[3] HB 139 does not take effect until January 2028.

license number, voting history, or political party affiliation of registered voters within the state; and

4. The federal agency shall be prohibited from acquiring a copy of the roster under KRS 117.025(3)(i).

The significance of Section 30 to this Motion cannot be overstated. The United States demands, pursuant to its August 14, 2025 letter, a complete copy of the SVRL including "the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Neff Decl., Ex. 4 (emphasis added). Section 30(2)(b)2-3 of HB 139 directly prohibits exactly this: a production to a federal agency that includes residential addresses and driver's license numbers. The Kentucky General Assembly, exercising its authority over state election administration under the Elections Clause, has determined that such data elements may not be shared with federal agencies even in the context of an authorized data-sharing agreement—let alone in the absence of one.

The United States will likely contend that Section 30 is preempted by the CRA and HAVA. But this argument fails for the same reason its preemption argument fails elsewhere in this brief: preemption of conflicting state law does not answer whether the CRA's own textual scope reaches the SVRL, and it does not answer whether DOJ complied with its own federal privacy obligations. Moreover, Section 30 is not merely a state privacy restriction on public disclosure—it is an affirmative authorization statute. It grants the KSBE the power to share data with federal agencies, but only under specified conditions. In this respect it functions not as an obstacle to federal authority but as a framework for cooperative federalism of the kind that the CRA's "trust but verify" design contemplates.

Furthermore, Section 30(3) through (8) establish a comprehensive procedural framework governing what the KSBE must do after a federal agency identifies a registrant as a noncitizen: flagging the registration, notifying the voter, providing a process to verify citizenship, allowing provisional voting, and forwarding registration information to the Office of the Attorney General for investigation. KRS Ch. 116, § 30(3)–(8). This framework presupposes a cooperative, agreement-based relationship between state and federal actors—not unilateral federal compulsion. The Motion to Compel seeks to short-circuit the very process that Kentucky law has now codified.

Accordingly, even if this Court were to find that the CRA facially authorizes the demanded production, Section 30 of HB 139 independently requires that any such production occur through a signed memorandum of understanding that limits the data fields provided to name, date of birth, and the last four digits of the registrant's Social Security number—expressly excluding the residential address and driver's license number that the United States demands. The Motion should be denied, or in the alternative, any order compelling production should be conditioned on compliance with the terms and data limitations mandated by Section 30 of HB 139.

## CONCLUSION

The United States' Motion to Compel is procedurally premature because Defendants issued a conditional, not an absolute, response to the demand—one grounded in legitimate questions about DOJ's own compliance with federal privacy law that the United States never adequately answered. On the merits, the SVRL falls outside the scope of records subject to compelled production under the plain text of 52 U.S.C. § 20701, as the *Benson* court correctly recognized. And independently, Kentucky HB 139 Section 30 requires that any federal data-sharing occur through a written memorandum of understanding that limits data fields to those

specified by statute—terms materially narrower than what the United States demands. For these reasons, Defendant respectfully requests that this Court deny the United States' Motion to Compel in its entirety.

Respectfully submitted,

/s/ Jay L. Phillips
Matt Malone (90508)
D. Eric Lycan (86032)
Jay L. Phillips (100068)
EMBRY MERRITT WOMACK NANCE, PLLC
201 East Main Street, 14th Floor
Lexington, Kentucky 40507
(859)543-0453
matt.malone@emwnlaw.com
eric.lycan@emwnlaw.com
jay.phillips@emwnlaw.com
*Counsel for Michael Adams, in his official capacity as Kentucky Secretary of State*

AND

*/s/ Jennifer S. Scutchfield w/permission*
Jennifer S. Scutchfield (87515)
Assistant Secretary of State
General Counsel
Office of the Secretary of State
700 Capital Avenue
State Capitol, Suite 152
Frankfort, KY 40601
(502)782-7417
*jscutchfield@ky.gov*
*Counsel for Michael Adams, in his official capacity as Kentucky Secretary of State*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 30, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

/s/ Jay L. Phillips

*Counsel for Defendant Michael G. Adams, in his official capacity as Kentucky Secretary of State*