## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

UNITED STATES OF AMERICA,

*Plaintiff*,

*v.*

MICHAEL ADAMS, in his Official Capacity as KENTUCKY SECRETARY OF STATE and as CHIEF ELECTION OFFICIAL for the KENTUCKY STATE BOARD OF ELECTIONS; ROSS OWENS, III in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; ERIC FARRIS in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; JOHN BROWN, III in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; SUE PERRY in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; DEANNA BRANGERS in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; CORY SKOLNICK in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; DWIGHT SEARS in his Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER; JULIE GRIGGS in her Official Capacity as KENTUCKY STATE BOARD OF ELECTIONS MEMBER,

*Defendants*.

Case No. 3:26-cv-00019-GFVT

**KENTUCKY ALLIANCE FOR RETIRED AMERICANS' CONSOLIDATED REPLY IN SUPPORT OF ITS MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S MOTION TO COMPEL**

**INTRODUCTION**

The Department of Justice ("DOJ") claims that it requires—and is entitled to use the federal judiciary to compel—Defendants to produce highly sensitive and personal information about every registered voter in Kentucky (indeed, in *every* state). DOJ further maintains that this Court is here to do little more than rubberstamp that demand, regardless of the basis for making it or what DOJ intends to do with the private information once it has it. DOJ constructs its novel legal theory by haphazardly stitching together a patchwork quilt of disparate federal statutes. It claims that it issued its demand to determine if Kentucky is complying with the National Voter Registration Act's (NVRA) and Help America Vote Act's (HAVA) requirements that states have a program that makes reasonable efforts to remove ineligible voters from their voter rolls. But DOJ does not actually allege a claim under either of those statutes. Instead, its entire case rests on the remarkable premise that, through a completely different statute—Title III of the Civil Rights Act of 1960 ("CRA")—Congress vested DOJ with an investigative tool that it may use without restraint, beyond the reach of meaningful judicial review, and without any discernable limit.

This expansive theory similarly animates thirty other lawsuits that DOJ has filed over the past several months against as many states, but courts considering these actions have repeatedly rejected DOJ's theories, both as to process and on the merits. When Intervenor submitted its motion to dismiss a little over a month ago, three federal courts—in California, Oregon, and Michigan—had already dismissed DOJ's similar complaints against those states. *See* Kentucky Alliance for Retired Americans' ("Alliance") Mot. Dismiss at 2–3, ECF No. 38 (citing decisions). Since then, three more have done the same—in Massachusetts, *see United States v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026), Rhode Island, *see United States v. Amore*, No. 25-CV-00639-MSMPAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026), and Arizona, *see United States v. Fontes*, No. CV-26-00066-PHX-SMB, 2026 WL 1145626 (D. Ariz. Apr. 28,

2026). This Court should similarly grant the motions to dismiss and deny DOJ's motion to compel here.

DOJ attempts to avoid this result here by arguing (as it unsuccessfully did in those other cases) that the Court has no authority to review the demand at all. *See* United States' Mot. to Compel Federal Election Records Under the CRA ("Mot. Compel") at 12, ECF No. 26. Other courts have rightfully rejected this argument, which relies on a distinguishable and decades-old out-of-circuit case, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), that was never binding on this Court and was implicitly overruled by the Supreme Court in *United States v. Powell*, 379 U.S. 48, 52 n.10 (1964). There, the Court held that (1) the Federal Rules apply when statutes—like the CRA—confer jurisdiction on federal courts "by appropriate process to compel" compliance with federal document demands, *id.*; and (2) courts may "inquire into the underlying reasons for" the demand. *Id.* at 52 & n.10, 58 & n.18; *see also* Alliance Mot. Dismiss at 10–12. DOJ's attempt to distinguish *Powell* ignores its clear language. *See Fontes*, 2026 WL 1145626, at *1. And DOJ's decision to initiate this action with a civil complaint only underscores that the Court must apply the Federal Rules of Civil Procedure and decide the motions to dismiss in accordance with those Rules. *See United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *Fontes*, 2026 WL 1145626, at *1.

Those motions must be granted. DOJ's demand is facially insufficient under the CRA's plain language, which requires that any demand made pursuant to the statute state both a basis and purpose. DOJ failed to identify any "basis" in its demand of Kentucky, and its post-hoc attempt to cobble one together fails. That is reason alone to dismiss its complaint. But if the Court were to go further, fundamental principles of statutory interpretation make clear that the CRA requires a *permissible* purpose (not *any* purpose, as DOJ contends). Its text, context, and history show that it

is a tool for the investigation and enforcement of *voting rights* laws—not list maintenance laws like the NVRA and HAVA, for which Congress provided different disclosure and enforcement authority. Indeed, to hold otherwise would create an irreconcilable conflict between the CRA—which threatens election officials with criminal penalty if they knowingly alter any record that comes within that statute's reach—and the NVRA and HAVA, which require election officials to *continuously* alter the computerized files that DOJ demands here.

Finally, it is worth emphasizing that Kentucky *has* already given DOJ its voter list—redacting *only* sensitive personal information protected by state law—and DOJ fails to show that Title III preempts those laws. Nor does DOJ dispute that its attempt to collect the private information of all of the State's registered voters implicates the Privacy Act; its failure to comply with that Act's requirements separately forbids its collection. *See United States v. Weber*, 816 F. Supp. 3d at 1193–94 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026). Any one of these failures requires dismissal of the complaint and denial of the motion to compel.

## ARGUMENT

**I.      DOJ cannot avoid this Court's review.**

**A.      The Federal Rules apply, requiring adjudication of the motions to dismiss.**

With its motion to compel, DOJ asks this Court to grant it the ultimate relief it seeks at the outset of this litigation and outside of the procedure set out in the Federal Rules. But those Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81," Fed. R. Civ. P. 1, including this one. The Court should reject DOJ's request to short-circuit the proper procedure in a federal action, deny the motion to compel on those grounds alone, and proceed to adjudicate the pending motions to dismiss.

Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—but none of the exceptions involve the CRA or

could otherwise be read to apply to this action. *See* Fed. R. Civ. P. 81(a). Just the opposite. Rule 81(a)(5) expressly provides that "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute" are subject to the Federal Rules, "except as otherwise provided by statute, by local rule, or by court order in the proceedings." As a result, even if (as DOJ argues) demands made under Title III of the CRA could be characterized as subpoenas, they would still be subject to the Federal Rules, as none of the sources listed in Rule 81(a)(5) provide an exception for requests under Title III.

As several courts have now found in parallel proceedings in which DOJ has sought the same relief from other states, there is *no* basis for its demand for an immediate grant of the final relief it seeks, and its arguments to the contrary are without merit and foreclosed by Supreme Court precedent. *See Weber*, 816 F. Supp. 3d at 1182–83; *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *Amore*, 2026 WL 1040637, at *3–4; *Fontes*, 2026 WL 1145626, at *1 & n.1. Here, again, DOJ relies on *Lynd*, 306 F.2d 222, a decades-old, out-of-circuit case, which described a Title III action as a "special statutory proceeding" with minimal judicial involvement. *Id.* at 225–26; *see also* United States' Consol. Resp. to Mot. Dismiss ("Opp'n") at 5–6, ECF No. 39. But *Lynd* was decided two years before the Supreme Court's decision in *Powell*, 379 U.S. 48, which "squarely rejects [DOJ's] contention and reliance on *Lynd*." *Oregon*, 2026 WL 318402, at *8.[1]

---

[1] The court in *Benson*, 2026 WL 362789, at *7, 9–11, likewise applied "the Rule 12(b)(6) standard to evaluate the United States' CRA claim" because (as here) DOJ filed "a traditional civil complaint." *Id.* at *7. Although the court indicated it might have come to a different conclusion had DOJ pled that case differently, its suggestion that the Federal Rules may not apply to a CRA demand is dicta and is also wrong; the decision relied on cases discussing administrative subpoena enforcement, but as the court itself recognized, DOJ brought its CRA demand based on "claims under the NVRA and HAVA, which do not confer administrative subpoena authority." *Id.* Another court denied DOJ's motion to compel outright and dismissed the case. *See Galvin*, 2026 WL 972129, at *6. That order does not address the parties' arguments about the appropriate procedural approach and thus sheds no additional light on that question.

4

In *Powell*, the Supreme Court confirmed that, when a statute uses the language employed in Title III—granting jurisdiction to federal courts to compel production "by appropriate process," but not identifying a particular process—the appropriate process is the ordinary process under the Federal Rules. 379 U.S. at 58 n.18. The Court came to that conclusion based on language in 26 U.S.C. § 7604(a) which is exactly like the relevant language in Title III, conferring jurisdiction on district courts "by appropriate process to compel" compliance with federal demands for documents or testimony. *Powell*, 379 U.S. at 57–58. The Court unequivocally held that, "[b]ecause [the statute] contain[ed] no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," and the court may "inquire into the underlying reasons for the" government's demand. *Id.* at 58 & n.18.

That holding controls here: Title III and the statute at issue in *Powell* use *identical* language, both providing that district courts "shall have jurisdiction by appropriate process to compel" production of the records at issue. *Compare* 52 U.S.C. § 20705, *with* 26 U.S.C. § 7604(a). *See also Fontes*, 2026 WL 1145626, at *1 (concluding that the Federal Rules apply to DOJ's parallel action in Arizona "in accord with" *Powell*). *Lynd* was never binding on this Court, and in light of *Powell*, it has not been good law for decades, even in the Fifth Circuit. *See, e.g.*, *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion 'establishes a rule of law inconsistent with' that precedent." (quoting *Gonzalez v. Thaler*, 623 F.3d 222, 226 (5th Cir. 2010), *aff'd*, 565 U.S. 134 (2012))).[2]

---

[2] DOJ's citations to *In re Coleman* ("*Coleman I*"), 208 F. Supp. 199 (S.D. Miss. 1962), and *Coleman v. Kennedy* ("*Coleman II*"), 313 F.2d 867 (5th Cir. 1963), *see* Opp'n at 2, 11, fail to support its motion for the same reason. Each decision relied entirely on *Lynd* for its analysis and conclusion, *see Coleman I*, 208 F. Supp at 200; *Coleman II*, 313 F.2d at 868, and each decision is, like *Lynd*, superseded by *Powell*. Similarly, the *Benson* court's conclusion that the purported basis and purpose of a demand are unreviewable also erroneously relied on *Lynd*. *See Benson*, 2026 WL 362789 at *8.

5

DOJ attempts to escape *Powell* by misreading it. DOJ claims that *Powell* based its conclusions on language in the Internal Revenue Code protecting taxpayers from "unnecessary examination or investigations," 26 U.S.C. § 7605(b), and argues that, because "no similar language limits" its "authority to compel records under" Title III, *Powell* does not apply. Opp'n at 8. But that is not what *Powell* says. The Court did *not* rely on section 7605(b) to justify its application of the Federal Rules. It held very squarely that, when there is "no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. Thus, Courts of Appeals treat *Powell* as a seminal case when reviewing investigative demands in many other contexts. *See, e.g.*, *CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*ACICS*"), 854 F.3d 683, 688 (D.C. Cir. 2017) (Consumer Financial Protection Bureau civil investigative demand); *SEC v. Marin*, 982 F.3d 1341, 1352 (11th Cir. 2020) (Securities and Exchange Commission subpoena); *United States v. Tan*, 16 F.4th 1346, 1353 (9th Cir. 2021) (Customs and Border Protection summons). DOJ cannot avoid its application here.[3]

DOJ is also wrong in its assertion that Title III vests it with broad pre-suit investigative authority. Opp'n at 6, 9. Here, DOJ cites *United States v. Bisceglia* to claim that "Title III invests the Attorney General with a power akin to a grand jury which 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" Opp'n at 6 (quoting 420 U.S. 141, 148 (1975)). But Title III says nothing of the sort, and *Bisceglia* does not construe Title III. The language that DOJ relies upon appears in *Bisceglia* in reference to the *Powell* Court's discussion of various federal agency authorities, and the cited portion actually

---

[3] *Donaldson v. United States*, 400 U.S. 517 (1971), and *Becker v. United States*, 451 U.S. 1306 (1981), *see* Opp'n at 8–9, also do not undercut *Powell*'s conclusion. *Donaldson* reaffirmed that "[t]he Civil Rules, of course, do have an application to a summons proceeding," 400 U.S. at 528, and *Becker* reaffirmed that "the Federal Rules apply" in the administrative subpoena context, 451 U.S. at 1307–08.

states that "[*T*]*he Federal Trade Commission*" has authority to act as described in the decision, not that *Title III* empowers *DOJ* to do what it attempts to do here. *Bisceglia*, 420 U.S. at 147–48 (alteration in original) (emphasis added) (quoting *Powell*, 379 U.S. at 57). DOJ also ignores that *Bisceglia* repeatedly makes clear the importance of close and careful court review when the government demands information pursuant to a statutory investigative authority, stressing that "[t]he cases show that the federal courts have taken seriously their obligation" to "scrutinize[]" government demands for information, including "by refusing enforcement." *Id.* at 146. That includes in *Bisceglia* itself, where the district court "conscientiously discharged its duty to see that a legitimate investigation was being conducted" and significantly narrowed the summons to ensure that it "was no broader than necessary to achieve its purpose." *Id.* at 151.

In short, the Court can and should deny DOJ's "Motion to Compel Federal Election Records Under the Civil Rights Act of 1960," which is not sanctioned by the Federal Rules or any statute, and adjudicate the motions to dismiss. The Federal Rules provide for motions to dismiss for a simple and sound reason: to test the sufficiency of the complaint. *See Ohio v. United States*, 849 F.3d 313, 318 (6th Cir. 2017). The Rules set an early deadline for motions to dismiss because Rule 12(b)(6) motions are meant to "weed[] out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

That is precisely what the motions to dismiss pending before this Court seek to do. Adjudicating DOJ's motion to compel would get things backwards, depriving Defendants and Intervenors of their opportunity to test the legal sufficiency of DOJ's claims at the outset, as the Rules envision. It would also severely prejudice the hundreds of thousands of individual Kentucky voters Intervenor represents, whose private and sensitive information is the subject of DOJ's demand. *See, e.g.*, *In re Sealed Case*, 237 F.3d 657, 664 (D.C. Cir. 2001) (recognizing in allowing

7

intervention when similar interests are at stake, once the information is disclosed, "the cat is out of the bag" (citation omitted)).

Finally, under the Federal Rules, if the Court were to find that DOJ's complaint survived the motions to dismiss, the next step would be to allow discovery on its claim. A key dispute in this case is whether DOJ's purported "purpose" for its demand—to assess compliance with the NVRA and HAVA—is a proper ground for invoking Title III. That inquiry requires the Court to assess not only the purposes DOJ alleges, but also whether DOJ's alleged purposes are in fact pretext for other aims. *See infra* Section II.D (discussing cases finding that a demand made based on pretext is improper as a matter of law). The Court is "not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom." *Weber*, 816 F. Supp. 3d at 1184. And there are many reasons to think DOJ's alleged purpose for pursuing this demand is pretextual. *See infra* Section II.

### B. The Court must review the lawfulness of DOJ's demand.

DOJ is also wrong to suggest that this Court cannot review whether its demand complies with Title III. Opp'n at 2–3. As explained, *see supra* Section I.A, this argument is foreclosed by *Powell*, which makes clear that courts have a duty to consider whether a governmental demand is appropriate under the law. This is because, as the Supreme Court emphasized, "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58.

Courts are thus not only empowered to decide whether demands comply with their authorizing statutes, but have a duty to do so—including by requiring the government to show its investigation serves "a legitimate purpose" and that "the inquiry" is "relevant to the purpose." *Id.* at 57. It is for this reason that courts regularly engage in meaningful review of government document requests issued under a variety of statutory schemes. *See, e.g.*, *ACICS*, 854 F.3d at 690

8

(D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose for civil investigative demand, because agencies are "not afforded unfettered authority to cast about for potential wrongdoing" (citation modified)); *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458–60 (5th Cir. 2018) (reversing order to enforce civil investigative demand after inquiry into the sufficiency of the purpose and basis of demand); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case); *United States v. Zack*, 521 F.2d 1366, 1368–69 (9th Cir. 1975) (considering whether agency issued summons for an improper purpose); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme, rejecting notion that "the Government's self-proclaimed say-so" is sufficient to "preclude any form of judicial review"), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *see also United States v. Millman*, 822 F.2d 305, 308–09 (2d Cir. 1987) (holding a summons recipient can successfully challenge a government document request by "showing bad faith on the part of the [agency]").

Here, Title III includes the express requirement that any demand state "the basis and the purpose" for the government's request. 52 U.S.C. § 20703. Courts have uniformly held that whether DOJ has satisfied that requirement is subject to judicial review. *See Oregon*, 2026 WL 318402, at *7–8 ("There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place."); *Weber*, 816 F. Supp. 3d at 1182–86 (granting motion to dismiss because stated basis and purpose were inadequate); *Galvin*, 2026 WL 972129, at *4 (dismissing case because there was no "basis" for DOJ's demand, and

thus demand was facially inadequate); *Amore*, 2026 WL 1040637, at *5–6 (granting motion to dismiss DOJ's case after concluding its demand lacks a "legally sufficient" basis or purpose).

DOJ claims that *Benson* came to the contrary result, but while that opinion states—unique among courts to have reached this issue in these cases—that Title III "does not allow courts to evaluate the substance of the DOJ's purported basis and purpose," Mot. Compel at 13 (quoting *Benson*, 2026 WL 362789, at *8–9), even that court concluded that courts may assess whether a basis and purpose was included in the demand and indeed it conducted such an assessment itself. *See Benson*, 2026 WL 362789, at *8. To the extent *Benson* meant to hold that courts can determine whether there was an asserted basis and purpose in a Title III demand, but not whether the basis or purpose was adequate or appropriate under that provision, it reached that conclusion in reliance on *Lynd*, but on this point too, *Lynd* was implicitly overruled by *Powell*. *See id.* (citing *Lynd*, 306 F.2d at 226); *Powell*, 379 U.S. at 58; *see also Gahagan*, 911 F.3d at 302 (5th Cir. 2018).[4]

Thus, this Court has a duty to evaluate "the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place." *Oregon*, 2026 WL 318402, at *8. Other courts have recognized as much by rejecting DOJ's parallel claims against other states under the Federal Rules. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1195–96; *Oregon*, 2026 WL 318402, at *10, *12; *Amore*, 2026 WL 1040637, at *4–5. Many more have proceeded with Rule 12 briefing, with motions to dismiss fully briefed in DOJ's parallel lawsuits in Maine, New York, Pennsylvania, Minnesota, New Mexico, Wisconsin, Nevada, New Hampshire, Maryland,

---

[4] DOJ's reliance on *Lynd* is further misplaced because the court in *Lynd* acknowledged that it had a role in resolving disputes as to whether any specific requested paper or record falls within the scope of Title III. *See Lynd*, 306 F.2d at 226 (holding that it would be "open for [the Court's] determination" whether "any specified particular paper or record comes within [the CRA's] statutory classification").

Delaware, Vermont, Georgia, Connecticut, Colorado, Hawaii, District of Columbia, and Illinois, and briefing ongoing in several other states.[5] This Court should similarly conclude that the Federal Rules govern here, deny DOJ's motion to compel on those grounds, and proceed to adjudicate this matter in accordance with the Federal Rules.

## II.     DOJ failed to provide an adequate basis and purpose for its demand.

### A.     DOJ failed to state *any* "basis" for its demand.

Neither in DOJ's demand—set forth in its August 14 letter, *see* KSBE Mot. Dismiss, Ex. 4, ECF No. 9-3 ("Aug. 14 Letter")—nor in its complaint, does DOJ state any "basis" for its request for Kentucky's state voter registration list. That omission alone requires dismissal. *See, e.g.*, *Amore*, 2026 WL 1040637, at *5–6.

To avoid this result, DOJ offers two arguments. Neither have merit. First, DOJ contends

---

[5] *See, e.g.*, Reply Mem. Supp. Mot. Dismiss, *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. Jan. 16, 2026), ECF No. 81; Reply Mem. Supp. of Mot. Dismiss & in Opp'n to Cross-Mot. Compel, *United States v. Bd. of Elections*, No. 1:25-cv-1338-MAD-PJE (N.D.N.Y. Jan. 20, 2026), ECF No. 86; Reply Mem. Supp. Mot. Dismiss, *United States v. Pennsylvania*, No. 2:25-cv-01481-CB (W.D. Pa. Jan. 30, 2026), ECF No. 122; Reply Mem. Supp. Mot. Dismiss, *United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. Feb. 6, 2026), ECF No. 114; Notice of Completion of Briefing, *United States v. Toulouse Oliver*, No. 1:25-cv-01193-JCH-JFR (D.N.M. Feb. 10, 2026), ECF No. 79; Reply Supp. Mot. Dismiss, *United States v. Wis. Election Comm'n*, No. 3:25-cv-01036-JDP (W.D. Wis. Feb. 12, 2026), ECF No. 65; Reply Supp. Mot. Dismiss, *United States v. Aguilar*, No. 3:25-cv-00728-ART-CLB (D. Nev. Feb. 18, 2026), ECF No. 55; Reply Supp. Mot. Dismiss, *United States v. Scanlan*, No. 1:25-cv-00371-JL (D.N.H. Feb. 27, 2026), ECF No. 53; Reply Supp. Mot. Dismiss, *United States v. DeMarini*s, No. 1:25-cv-03934-SAG (D. Md. Feb. 27, 2026), ECF No. 59; Reply Supp. Mot. Dismiss, *United States v. Albence*, No. 1:25-cv-01453-RGA (D. Del. Mar. 2, 2026), ECF No. 61; Reply Mem. Supp. Mot. Dismiss, *United States v. Copeland Hanzas*, No. 2:25-cv-00903-MKL (D. Vt. Mar. 3, 2026), ECF No. 65; Reply Supp. Mot. Dismiss, *United States v. Raffensperger*, No. 1:26-cv-485-ELR (N.D. Ga. Mar. 5, 2026), ECF No. 70; Reply Mem. Supp. Mot. Dismiss, *United States v. Thomas*, No. 3:26-cv-0021-KAD (D. Conn. Mar. 18, 2026), ECF No. 81; Reply Mem. Supp. Mot. Dismiss, *United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO (D. Colo. Mar. 18, 2026), ECF No. 62; Reply in Supp. of Renewed Mot. to Stay, *United States v. Nago*, No. 1:25-cv-00522-LEK-RT (D. Haw. Mar. 25, 2026), ECF No. 80 (currently stayed pending 9th Cir. Appeal); Reply Mem. Supp. Mot. Dismiss, *United States v. D.C. Bd. of Elections*, No. 25-cv-04403-RDM (D.D.C. Apr. 17, 2026), ECF No. 57; Reply Mem. Supp. Mot. Dismiss, *United States v. Matthews*, No. 3:25-cv-3398-CRL-DJQ (C.D. Ill. April 20, 2026), ECF No. 76.

that "the basis for the demand was Title III." Opp'n at 5. But that is the *authority* under which the request was purportedly made, not the factual *basis* for the request. *See, e.g.*, *Oregon*, 2026 WL 318402, at *8 ("The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."); *Galvin*, 2026 WL 972129, at *4 (finding DOJ stated no basis where its demand letter "contain[ed] nothing that could fairly be characterized as the factual basis for the demand"); *Amore*, 2026 WL 1040637, at *5 ("[T]he 'basis' contemplated by Title III is a factual, not legal basis."); *see also Basis*, *Black's Law Dictionary* (4th ed. 1968) (including definitions for "basis" as the "groundwork," "support," or "foundation" of something). DOJ's reading contravenes the "cardinal principle of statutory construction" that a statute should be construed such that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted); *Galvin*, 2026 WL 972129, at *4 (same). If Title III itself were an adequate "basis," the statute's "basis" requirement would be superfluous.[6]

Second, DOJ attempts to collapse "basis" and "purpose" into a single requirement, *see* Opp'n at 5, 18, but this fails for the same reasons. *See Galvin*, 2026 WL 972129, at *4 (rejecting this argument); *Oregon*, 2026 WL 318402, at *8–9 (same); *Amore*, 2026 WL 1040637, at *5 (same).[7] More broadly, if merely invoking Title III were sufficient, DOJ would have "virtually

---

[6] Even within DOJ's own response brief, it cannot keep straight what its asserted basis is for its demand in Kentucky. First it asserts that its basis, as allegedly articulated in its August 14 letter, is Title III. *See* Opp'n at 5. Several pages later, DOJ contends that the August 14 letter states a basis under Title III, the NVRA, and HAVA. *See id.* at 18. Regardless, for the reasons discussed above basis in Title III means factual basis, not statutory basis.

[7] As noted *supra* Section I, DOJ's past practice confirms that it also previously understood Title III to require both a factual basis and valid purpose for a demand. In *Lynd*, DOJ's demand stated that it had "information . . . tending to show" that racial discrimination in voter registration had occurred in the target jurisdiction. 306 F.2d at 229 n.6; *see also Coleman I*, 208 F. Supp. at 199–200 (upholding Title III demand "based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction"), *aff'd sub nom. Coleman II*, 313 F.2d 867.

limitless access to records required to be maintained under" that provision. *Oregon*, 2026 WL 318402, at *8. The written "basis" and "purpose" requirement would have no function under such a scheme. *See* Alliance Mot. Dismiss at 12–13.

If Congress had intended to grant DOJ such freestanding audit power over state voting records, it would have said so. But the legislative history says just the opposite. *See, e.g.*, *Hearings Before Subcomm. No. 5 of the H Comm. on the Judiciary*, 86th Cong. 212, 700 (1959), https://perma.cc/ET26-FKD9 ("It is not the purpose of title III to supervise State elections.") (statement of Rep. William M. McCulloch, a principal drafter of Title III). The "purpose of Title III" was to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Id.*; *see also id.* at 599 (Attorney General Rogers explaining Title III is meant to facilitate investigations into "complaints that qualified persons have been denied the right to vote in violation of Federal law").

DOJ argues in the alternative that it *has* provided a factual basis because the Court can extrapolate one from its various letters to Kentucky. Opp'n at 18. Specifically, DOJ contends that data from the Election Assistance Commission ("EAVS") that was cited in a separate letter sent on July 17, 2025—which did not mention Title III or the CRA—provides an adequate "basis." Opp'n at 20. But this does not suffice. First, as a matter of law, Title III explicitly mandates that "*th*[*e*] *demand* shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added). It does not allow for the basis to be inferred from separate communications that together purportedly provide "notice" to state election officials, as DOJ would prefer. *Accord Galvin*, 2026 WL 972129, at *4; *Oregon*, 2026 WL 318402, at *9 ("Plaintiff's patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails."); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (holding that statutory instructions similar to Title III require government to provide a "single document containing the required information, not a mishmash

13

of pieces with some assembly required").

Second, even if the July 17 letter could be considered part of DOJ's demand, DOJ has still failed to plausibly allege a "basis" as required by Title III, first, because this allegation is not in its complaint. *See* Compl. ¶¶ 35–36 (alleging only that the August 14 letter constituted DOJ's "demand"). Moreover, DOJ fails entirely to explain how the EAVS data, even if true, constitute a "purported anomal[y]" in Kentucky's voter registration data that could plausibly provide a basis for suspecting that the state is failing to comply with some requirement of the CRA—or even its obligations under the NVRA or HAVA (assuming DOJ could use the CRA to investigate such suspicions, which it cannot, *see, e.g.*, Alliance Mot. Dismiss at 10–20; *infra* Section I). *Galvin*, 2026 WL 972129, at *4 (citation omitted); *Amore*, 2026 WL 1040637, at *5. This is especially true given KSBE's removal of around 735,000 voters from its voter rolls from 2018 to 2025. *See* Alliance Mot. Dismiss at 15–16. DOJ seeks to downplay its defense of KSBE's list maintenance efforts just last year in a different lawsuit by arguing that case did not involve HAVA. Opp'n at 19. But in doing so, it does little more than gesture to HAVA's voter registration requirements and point to a solitary enforcement action in an entirely different state. *See id.* DOJ notably fails to explain why that different action against a different state is relevant here and fails to identify *anything* that could give rise to a reasonable suspicion that *Kentucky* has failed to comply with HAVA. *See id.*

In short, because DOJ's demand to Kentucky includes no "basis" under Title III, it is facially inadequate, and the complaint must be dismissed on that reason alone.

## B.     DOJ did not provide a legally sufficient "purpose" for its demand.

Separate and independent from its failure to satisfy Title III's explicit requirement that it state a "basis" for its demand in its demand, DOJ also fails to satisfy the provision's "purpose" requirement. The plain language, statutory framework, and history of Title III all confirm that what

14

the CRA allows DOJ to do is investigate discrete *violations of voting rights*—not exercise supervisory oversight over all state voting data for all purposes. *See, e.g.*, Alliance Mot. Dismiss at 11–14, 17–20; KSBE Mot. Dismiss at 15–19, ECF No. 9; Secretary Adams Mot. Dismiss at 3, 6–8, ECF No. 33; League of Women Voters ("LWV") et al. Mot. Dismiss at 11–15, ECF No. 8-6.

But DOJ *concedes* this is not its purpose in making its demand of Kentucky. Instead, it reiterates that its purpose is "to ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA." Aug. 14 Letter at 2; Opp'n at 5. It maintains that it may use the CRA for effectively any purpose it desires, and that its decision to do so is not reviewable by this Court. Mot. Compel at 12. This argument is based on overruled, out-of-circuit precedent, and it clashes sharply with Title III's text, statutory framework, and history, as well as the Supreme Court's decision in *Powell*. As a result, DOJ's failure to establish a purpose that falls within the reach of Title III's authority provides a separate and independent basis for dismissal of its complaint.

As Intervenor explained in its motion to dismiss, investigating Kentucky's compliance with its list maintenance obligations under federal law cannot be a permissible purpose for *the CRA's* inspection provision, which Congress enacted to aid DOJ in the enforcement of civil rights laws, specifically the CRA. *See* Alliance Mot. Dismiss at 13–14, 17–20; *see also Weber*, 316 F. Supp. 3d at 1183. DOJ also continues to ignore that Congress has spoken *expressly* as to how DOJ can enforce the federal list maintenance requirements it claims to be enforcing here, *see, e.g.*, 52 U.S.C. §§ 20510, 21111, including through a different inspection tool Congress made available specifically for that purpose in the NVRA itself, *see id.* § 20507(i); *see also* Alliance Mot. Dismiss at 20 (discussing same).

Dissatisfied with the tool Congress provided, DOJ instead seeks to rely on a provision of the CRA that is unrelated to either the NVRA or HAVA. But DOJ cannot supplant the tool

15

Congress did provide for federal list maintenance supervision with the one DOJ *wishes* Congress provided. Doing so would violate the "well established canon of statutory interpretation . . . that the specific governs the general." *RadL/IX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotation marks and citation omitted). Where "a general authorization and a more limited, specific authorization exist side-by-side," the canon "avoids . . . the superfluity of a specific provision [being] swallowed by the general one" by determining that "the specific [provision] presumptively governs." *Id.* at 645, 647–48. In this instance, the presence of specific provisions that speak to list maintenance elsewhere in the federal statutory code make clear that DOJ cannot rely on the more general demand requirement of the CRA. The NVRA, for example, includes a provision that requires states to "make available for public inspection . . . records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1), and limits the records available for inspection to "the names and addresses" of persons to whom NVRA notices are sent, *id.* § 20507(i)(2). This specific provision "presumptively governs" demands for records concerning voter list maintenance, as opposed to the more general demand provision in the CRA. *RadL/IX*, 566 U.S. at 648. The Sixth Circuit routinely employs this canon to avoid "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Ohio Telecom Ass'n v. Fed. Commc'ns Comm'n*, 150 F.4th 694, 716 (6th Cir. 2025) (alteration in original) (quoting *RadL/IX*, 566 U.S. at 645).

DOJ does not address any of these arguments. Instead, it argues only that Title III investigations cannot be limited to those based on racial discrimination or violations of the right to vote. Opp'n at 10–11. But this is not the argument Intervenor makes. What Intervenor explains is that the structure, language, and context of Title III confirm its role as an enforcement tool to

16

*protect federal voting rights*. *See* Alliance Mot. Dismiss at 17–19.[8] Nor can DOJ cite any case in which a court has required a state to release its voter list in response to a demand made under Title III to assess a State's HAVA compliance, or for *any* purpose beyond investigation into the infringement of federal voting rights.

DOJ also fails to grapple with the sweeping implications of its assertion of federal power. Under its theory, nothing would stop it from demanding state election records to investigate compliance with *any* federal statute, no matter how far afield. *See* Alliance Mot. Dismiss at 1, 9, 13, 18. It could use state voter data to investigate violations of admiralty, bankruptcy, or—as it has elsewhere acknowledged it intends to do—immigration law.[9] If Congress intended such a sweeping result, it would have said so. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."). *But see Hearings Before Subcomm. No. 5 of the H Comm. on the Judiciary*, *supra*, at 700 ("It is not the purpose of title III to supervise State elections."); *id.* (stating "purpose of Title III" was to preserve records

---

[8] DOJ bizarrely claims that rejecting its reading of Title III would prevent DOJ from enforcing "requirements in HAVA and the NVRA that help protect voting rights." Opp'n at 12. But DOJ does not even pretend that it seeks to enforce the rights-protecting provisions of HAVA and the NVRA. Quite to the contrary, Assistant Attorney General Harmeet Dhillon has very publicly promised that suits like this one will result in "hundreds of thousands of people in some States being *removed* from the voter rolls." *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some States being removed from the voter rolls."). As the Ninth Circuit recently made clear, the NVRA's disclosure provision was enacted to serve the opposite purpose: "The public disclosure provision serves a transparency function, ensuring that the public may verify that list-maintenance activities are implemented lawfully and not in a manner that causes 'poor and illiterate voters [to be] caught in a purge system which will require them to needlessly re-register.'" *Pub. Int. Legal Found. v. Nago*, No. 24-6629, 2026 WL 1144703, at *2 (9th Cir. Apr. 28, 2026) (alteration in original) (quoting S. Rep. No. 103-6, at 18 (1993)).

[9] *See* Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026), https://www.cbsnews.com/news/justice-dept-finalizing-deal-voter-roll-data-homeland-security/.

17

for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right").

DOJ also argues that its effort to obtain statewide voter lists is not new, and points to a few consent decrees from the mid-2000s where some states voluntarily agreed to produce or retain records in response to a demand from DOJ. *See* Opp'n at 21–22. But "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986). Because "[t]he force of a consent decree comes from 'the parties' acquiescence, not rules of law,'" *Mote v. City of Chelsea*, 252 F. Supp. 3d 642, 657 (E.D. Mich. 2017) (quoting *City of Warren v. City of Detroit*, 495 F.3d 282, 287 (6th Cir. 2007)), they provide no persuasive authority in support of DOJ's claims.[10]

DOJ leans heavily on *Lynd* again, but in every meaningful way, the circumstances—and DOJ's demand—in *Lynd*, were different. *First*, in *Lynd* it was undisputed that DOJ's demand "adequately stated the basis and the purpose therefor" under Title III's requirements, where DOJ sought records from targeted jurisdictions "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [those] jurisdiction[s]." 306 F.2d at 229 & n.6. DOJ's

---

[10] Additionally, the circumstances that DOJ points to in Georgia and Texas, Opp'n at 21, are distinguishable from those here, most obviously because they were targeted demands, not part-and-parcel of a nationwide effort to obtain private voter data from all of the states. Further, at the time the states at issue entered into the consent decrees that DOJ cites, they were covered by the pre-clearance requirements of the Voting Rights Act. *See Jurisdictions Previously Covered By Section 5*, U.S. Dep't of Justice, C.R. Div. (May 17, 2023), https://www.justice.gov/crt/jurisdictions-previously-covered-section-5. Thus, it is reasonable to assume that DOJ was likely exercising its supervisory authority under that provision, which was based on a history of racial discrimination in voting in those states and meant to ensure that the voting rights of racial minorities was not adversely impacted when those jurisdictions made changes to their voting laws and procedures.

18

demand of Kentucky here lacks any similar assertion. *See supra* Section II.A.[11] <u>*Second*</u>, there was

*no* "genuine dispute" as to whether the information DOJ sought in *Lynd* "c[ame] within" the reach

of Title III, and if there had been the court was clear that the court "would, of course, be open for

its determination." *Id.* at 226. The lack of dispute was not surprising, given that—as the *Lynd* court

itself found—Title III's "clearest purpose" is to permit investigations "concerning infringement or

denial of . . . voting rights." *Id.* at 228; *see also Alabama ex rel. Gallion v. Rogers*, 187 F. Supp.

848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed

to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen.

of U.S.*, 285 F.2d 430 (5th Cir. 1961); *Weber*, 816 F. Supp. 3d at 1182 ("The purpose of Title III

is to detect voting-related racial discrimination."); *Oregon*, 2026 WL 318402, at *10 (The purpose

of a Title III demand "must relate to . . . investigating violations of individuals' voting rights.").

<u>*Third*</u>, the court emphasized that it was "of great importance" that the records DOJ sought were

"public records which ought ordinarily to be open to legitimate reasonable inspection," *not*

"confidential, private papers." *Lynd*, 306 F.2d at 231. Here, DOJ is specifically *targeting*

confidential, private information. Thus, even *Lynd* cannot justify DOJ's demand here.

DOJ argues in its motion to compel that the data it seeks is a "record subject to production

under Title III," Mot. Compel at 14–18, but this is wrong not only for the reasons laid out in

Intervenor's motion to dismiss (at 17–22) and above, but also because it cannot be reconciled with

Title III's plain text. That provision is a record retention statute designed to investigate denials of

right to vote, *not* a mechanism allowing DOJ to force states to share their voters' private

---

[11] Nor was there any serious question in *Lynd* that DOJ had a factual basis to believe that the targeted jurisdictions were violating voting rights: "[n]o Negro had been registered in Forrest County during defendant Lynd's term of office," while "none of the defendants nor their deputies were able to testify to any individual white person who had been rejected." *United States v. Lynd*, 301 F.2d 818, 821 (5th Cir. 1962) (enjoining alleged voting rights violations pending appeal).

information. *See* Alliance Mot. Dismiss at 19. It traces its genesis to a 1959 report by the U.S. Commission on Civil Rights, tasked with "investigat[ing] allegations . . . that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, §104(a)–(b), 71 Stat. 634, 635. Through reviewing and comparing registration forms submitted by Black and White applicants across the South, the Commission identified widespread arbitrary and discriminatory denials of Black citizens' voter registration applications. *See* Report of the U.S. Commission on Civil Rights 87–91 (1959) ("Comm. Rpt."). It thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137. Under the pre-1960 statutory scheme, however, DOJ had "no existing power in civil proceedings to require the production of [voter registration] records." H.R. Rep. No. 86-956, at 7 (1959). State and local authorities therefore could—and did—obstruct DOJ investigations, by refusing DOJ access to records, *id.*, and by destroying them altogether, *see, e.g.*, *Gallion*, 187 F. Supp. at 856 n.4.

In line with that purpose, to allow for the investigation of discrimination in voter registration, Title III was enacted in 1960 to require election officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Importantly, Title III expressly prohibits "any person, whether or not an officer of election or custodian," from willfully "alter[ing]" records subject to that "retain[] and preserve[]" requirement. *Id.* § 20702. This is no idle direction: any person who willfully violates these requirements risks imprisonment. *Id.* §§ 20701–20702. Thus, read naturally, Title III covers documents like voter application forms submitted by voters—but not, as DOJ claims, the interactive, and ever-changing computerized databases maintained by election officials, like Kentucky's voter list. *See Benson*, 2026 WL 362789, at *9–10 (adopting this argument); *Fontes*, 2026 WL 1145626, at *3–5 (same).

20

That Title III does not include the state voter registration list is further supported by the fact that HAVA and the NVRA—the laws that DOJ purports to be seeking to enforce here— require election officials to *continually alter* the voter list. In stark contrast to Title III's mandate that materials covered by it be retained and preserved and not altered (on threat of criminal penalty), HAVA commands the states to create an "interactive computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1), in which "[a]ll voter registration information obtained by" election officials "shall be electronically entered into the computerized list on an expedited basis," *id.* § 21083(a)(1)(A)(vi); that election officials must "perform list maintenance with respect to the computerized list on a regular basis," *id.* § 21083(a)(2)(A); and that officials must "ensure that voter registration records in the State are accurate and are updated regularly," *id.* § 21083(a)(4). Similarly, "the NVRA creates a scheme, under which, states are required to 'protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll.'" *Fontes*, 2026 WL 1145626, at *4 (quoting 52 U.S.C. § 20507(b)).

DOJ's claim here that the statewide voter list is a "record" subject to Title III's disclosure, retention, and non-alteration requirements, would put the CRA into direct conflict with HAVA and the NVRA, subjecting election officials to irreconcilable obligations. Under the CRA, election officials would be required to preserve the voter list and would be subject to criminal punishment if they altered it. 52 U.S.C. §§ 20701–20702. But under HAVA, election officials are *required* to alter the list every time they receive new or updated voter registration information. *Id.* § 21083(a)(1)–(2). And "the NVRA outlines a variety of situations in which states are required to modify their [voter registration lists] where [the CRA] would prohibit such an alteration." *Fontes*, 2026 WL 1145626, at *4. DOJ fails entirely to grapple with this serious issue, and the Court should avoid DOJ's novel and strained reading. Courts "interpret Congress's statutes as a harmonious whole rather than at war with one another," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018),

21

and "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Applying these principles, the CRA cannot be read to reach the statewide voter registration list as DOJ proposes. *See Fontes*, 2026 WL 1145626, at *3–5 (dismissing DOJ's complaint and concluding that "[i]f the [state voter registration list] were deemed" to be a document under § 20701, "then § 20702 would prohibit the [list] from being altered," which "would directly conflict with both the NVRA and the HAVA").

Practical considerations also compel the conclusion that Kentucky's statewide voter registration list cannot be subject to Title III. DOJ's reading of Title III would necessarily require election officials to "retain and preserve" *every iteration* of the State's voter list whenever it changes, 52 U.S.C. § 20701—a scheme that would be entirely unworkable. The list is altered whenever a name is removed (e.g., when someone moves or reaches voting age and registers), or any data is updated to reflect new information about any individual voter (e.g., a change of address, updated driver's license number, or vote history). In a state of more than 4.5 million people, this results in an enormous number of changes. And, as required by HAVA, those changes are not only made by the Secretary of State's office but also by numerous *local* officials dispersed throughout the State. 52 U.S.C. § 21083(a)(1)(A)(v)–(vii). It is simply not plausible to conclude that each of these election officials are required to save and retain the voter list—subject to the threat of criminal punishment—every time they change any field on the list. Indeed, in determining that the state voter registration list was not a "record" under the CRA, the court in *Fontes* agreed that "nothing in the CRA's text implies an intent to require states to preserve every election-related record that they create." 2026 WL 1145626, at *4 (citation omitted). Because "alternative interpretations consistent with the legislative purpose are available," the Court should reject DOJ's expansive reading of Title III and its "nonsensical" results. *Linney's Pizza, LLC v. Bd. of*

22

*Governors of Fed. Rsrv. Sys.*, 804 F. Supp. 3d 717, 738 (E.D. Ky. 2025) (Van Tatenhove, J.) (quoting *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 869 (6th Cir. 2023), *appeal docketed*, No. 25-6038 (6th Cir. Nov. 13, 2025).[12]

### C.     None of DOJ's counterarguments support their demand for the unredacted statewide voter list

None of DOJ's arguments to the contrary support reading Title III to include the state voter registration list or otherwise support DOJ's demand. For example, DOJ cites to a passage in *Gallion*, 187 F. Supp. at 855—another 1960s era decision from the Fifth Circuit—in which the Court emphasizes the temporal reach of the CRA; namely, that "records and papers" subject to the CRA must be preserved "for a period of twenty-two months 'from the date of any general, special, or primary election,'" "[r]egardless of when these records came into the possession of the election official." Opp'n at 15 (quoting *Gallion*, 187 F. Supp. at 855). But *Gallion* says nothing to support the claim that the state voter registration list is a record subject to Title III. *See Fontes*, 2026 WL 1145626, at *5 (concluding *Gallion* "d[id] not make any affirmative findings which would suggest that the [state voter registration list] is covered by [the CRA]"). Nor would it have made any sense

---

[12] One such alternative reading is that endorsed by the courts in *Benson* and *Fontes*—namely, that the CRA's reference to records that "come into [a custodian's] possession" are limited to those that a voter submits as part of the registration process—and addressed in more detail in the motions to dismiss by the election official Defendants in this case. *See, e.g.*, Bd. of Elections Mot. to Dismiss 11–15; Sec'y of State Mot. to Dismiss 8–10; Clerk Yates Mot. to Dismiss at 2–4. This reading is supported by the "obvious alternative" language Congress had at its disposal. *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1050 (8th Cir. 2017). Congress could have, for instance, written Title III to cover papers and records "in the possession" of election officials, or simply "all records" without qualification (as it did in the NVRA, *see* 52 U.S.C. §20507(i)), rather than those that "come into" possession of such officials. Indeed, other courts, including ones relying on dictionaries published contemporaneously with the CRA, have likewise interpreted the phrase "come into possession" to mean receiving, acquiring, or obtaining something from another source. *See, e.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed. 1966, unabridged))).

23

for the court to do so. The state voter registration list was not at issue in *Gallion*, and HAVA and the NVRA's list maintenance requirements did not exist at the time.

Nor does *United States v. Mississippi*, 380 U.S. 128, 134 (1965), support DOJ's claim. *See* Opp'n at 16. There, the Court simply stated, "Title III of the Civil Rights Act of 1960 . . . requires that records of voting registration be kept," *id.*, but that decision also says nothing about whether the state voter registration list is such a record. If anything, the decision supports Intervenor's reading because the Court discussed Title III's requirements in reference to allegations that the State of Mississippi "destroy[ed]" individual voter "application forms." *Id.* at 133–34. It made no mention of state voter registration lists. Similarly, in *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), the court included a list of records that it construed Title III to encompass, *see* Opp'n at 16 (citing *Morgan*, 624 F. Supp. at 664), but notably absent from the list is the unredacted state voter registration file.[13]

*Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019), also cannot be read to support DOJ's demand here because that decision did not construe any provision of the CRA nor did it require the release of sensitive personal information. While the court in *Lamone* found section 8(i) of the NVRA to require the release of a county voter list, essential to the court's conclusion was that the "list contain[ed] only a subset of the voter data, including information, such as voter name and address, *and excluding other information, such as a Social Security number.*" *Id.* (emphasis added). That court made clear that all of the information that would be

---

[13] DOJ also makes the (uncited) assertion that Intervenor's reading would "undermine the [CRA's] purpose," Opp'n at 16, but that is dead wrong. The statute's purpose could not have been to allow DOJ to investigate the list maintenance requirements of NVRA and HAVA since the CRA predates those statutes by more than three decades. Rather, as stated by the drafters, and consistent with the *Benson* court's reading, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector"—that is, voter applications. *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, *supra*, at 700 (statement of Rep. William M. McCulloch).

released was information that was otherwise available for public release under state law "through the State's 'Application for Voter Registration Data.'" *Id.* at 441. Here, Kentucky has already provided DOJ with Kentucky's voter registration list in accordance with state law, which also requires redaction of sensitive personal information. *See* KSBE Mot. to Dismiss, Ex. 7 (Oct. 17 Ltr.) at 3, ECF No. 9-7. Neither *Lamone* nor any case cited by DOJ can be read to support the release of Kentuckians' sensitive personal information. *See Fontes*, 2026 WL 1145626, at *6 (finding "little probative value in the Attorney General's citations to [*Lamone*], *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), and *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)" because "Title III was not at issue or even discussed in those cases").

    **D.**    **Even if DOJ's asserted purpose was germane, there is vast evidence that it is not DOJ's true purpose.**

Even if DOJ's purpose were valid on its face, there is ample evidence it does not reflect DOJ's true or full purpose, and DOJ is not entitled to the state voter registration list "under the guise of a pretextual investigative purpose." *Weber*, 816 F. Supp. 3d at 1186. In the context of a government demand, "the dispositive question . . . is whether the [agency] is pursuing the authorized purposes in good faith." *United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995) (second alteration in original) (quoting *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317–18 (1978)). A "request grounded in pretext cannot be made in good faith." *United States v. Adams*, 777 F. Supp. 3d 185, 232 (S.D.N.Y. 2025). "Under federal law, pretext is established where a plaintiff shows the proffered reason is unworthy of belief." *Hirsch v. AZ Auto. Corp.*, No. 07-10887, 2008 WL 115532, at *4 n.6 (E.D. Mich. Jan. 10, 2008). As Intervenor has explained, DOJ's actions and positions taken in prior litigation in Kentucky about the state's list maintenance efforts undercut DOJ's assertions a year later that the state has been delinquent in their responsibilities

25

and investigation of the state's efforts are necessary. *See* Alliance Mot. Dismiss at 15.

Additionally, although DOJ presently denies that it intends to create a "nationwide voter database," Opp'n at 3, other courts have questioned these representations because of DOJ's and the Administration's statements and conduct outside of the courtroom.[14] *See Weber*, 816 F. Supp. 3d at 1185 ("Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection."); *Oregon*, 2026 WL 318402, at *11 ("Plaintiff has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists."). Indeed, since Intervenor filed its motion to dismiss, President Trump issued an Executive Order on March 31, 2026, titled "Ensuring Citizenship Verification and Integrity in Federal Elections," which directs the Secretary of Homeland Security to compile "State Citizenship Lists" of "confirmed" U.S. citizens who are eligible voters in each state and directs the Postal Service not to transmit ballots from any person not on those lists.[15] It seems implausible that DOJ's efforts here (and in the 30 similar cases it is currently litigating) would not be used to build these lists. *Cf. Weber*, 816 F. Supp. 3d at 1184 ("The Court is not obliged to accept a contrived statement and purpose.").

Even in the confines of these lawsuits, DOJ keeps changing its story. For example, in seeking to expedite its appeals in California, Oregon, and Michigan, DOJ claimed for the first time

---

[14] DOJ's denial that it is not creating a "national database" is also likely semantic. For instance, during a hearing in DOJ's parallel case in Maine, DOJ admitted that it was gathering every state's voter list but tried to justify that action by stating that "[n]o state data [will be] joined together." Hrg. Tr. at 51:6–8, 15–16, *United States v. Bellows*, No. 1:25-cv-468-LEW (D. Me. Mar. 26, 2026). DOJ however proceeded to note that it still intended to take all of these state lists and run the voter data against other databases, describing such an act as "routine" and something "the United States has done in the past." *Id.* 51:21–23.

[15] Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026), https://perma.cc/UL2Y-TYKX.

that it needs the files to identify noncitizens on the rolls before the 2026 elections—a purpose nowhere mentioned in its papers before the district courts in those cases, or in its demand to Kentucky or its filings here. *See* Alliance Mot. Dismiss at 16. Now, in its merits briefing in those appeals, it has abandoned this argument entirely. *See generally* DOJ Br., *United States v. Weber*, No. 26-1232 (9th Cir. Mar. 18, 2026); DOJ Br., *United States v. Oregon*, No. 26-1231 (9th Cir. Mar. 18, 2026); DOJ Br., *United States v. Benson*, No. 26-1225 (6th Cir. Mar. 24, 2026).

All of these facts point to a substantial likelihood that the purported purpose behind the demand is pretextual. This Court need not "ignore the disconnect between the decision made and the explanation given"—or "exhibit a naiveté from which ordinary citizens are free." *Weber*, 816 F. Supp. 3d at 1185 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019)). At the very least, these are questions about which the parties should be allowed to inquire in discovery, should the case survive a motion to dismiss. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into the government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"); *cf. Elvis Presley Enters. v. Elvisly Yours, Inc.*, 936 F.2d 889, 893 (6th Cir. 1991) ("Mindful of the burden on the nonmoving party to produce evidence showing the existence of a genuine issue of material fact, summary judgment should not be granted unless the nonmoving party has had the opportunity to discover information essential to opposition.").

## III.    Title III does not preempt Kentucky law protecting sensitive voter information.

DOJ has failed to establish its entitlement to the sensitive personal information of Kentucky voters. Kentucky law requires election officials to redact highly sensitive personal information prior to releasing state voter records, and nothing in Title III prohibits such redaction. The statutes that DOJ is purportedly attempting to enforce here—the NVRA and HAVA—also do not prohibit

27

the redaction of sensitive personal information. Even *Lynd* made clear that Title III is intended to reach *only* "public records," *not* "confidential, private papers and effects." 306 F.2d at 231.

Pursuant to KRS § 116.095, a "registered voter's Social Security number . . . shall be redacted by the county clerk" before the registration record may be "inspect[ed] or . . . cop[ied]." In addition, KRS § 61.878(1)(a) precludes the disclosure, without a court order, of "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." And the Court of Appeals of Kentucky has concluded that disclosure of a person's social security number constituted a "clearly unwarranted invasion of personal privacy" under KRS § 61.878(1)(a). *Zink v. Commonwealth*, 902 S.W.2d 825, 829–30 (Ky. Ct. App. 1994).

DOJ's attempts to circumvent these state law protections fail. First, DOJ claims that the demand is appropriate because Kentucky law allows disclosure pursuant to a "legitimate government need" or "legitimate government function." Opp'n at 37 (quoting KRS § 61.878(5)). But that simply begs the question of whether Title III requires the disclosure of sensitive voter information in the first place. Nothing in the statutory text specifically extends to such information, and the early caselaw confirms that the CRA did not extend to "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. DOJ's related claim that Kentucky law only protects records from public disclosure, which DOJ attempts to distinguish from disclosure to DOJ, *see* Opp'n at 38, fails too. Nothing in KRS § 116.095 relaxes the requirement that "the Social Security number [in a registration record] *shall* be redacted . . . before it is . . . furnished" to a requestor, based on whether the requestor is from DOJ. The statute simply precludes release to "any citizen" without redaction, and that is true for DOJ employees as well as private citizens. *Id.*

DOJ next claims that, to the extent Kentucky's privacy protections require redaction of voters' sensitive private information, they are preempted, *see* Opp'n at 3, 37, but DOJ identifies

28

no evidence of Congress' purported intent to preempt state law in this way in the CRA. *See* Alliance Mot. Dismiss 20–22. Congress's preemptive authority extends only "so far as it is exercised, and no farther," *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted). Title III does not evince a "clear and manifest purpose" that Congress intended to preempt state privacy laws that protect highly sensitive information. *Arizona v. United States*, 567 U.S. 387, 400 (2012). Since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. §21083(a)(5)(A)(i), Congress's purpose in enacting the CRA could not possibly have extended to requiring disclosure of such information.

Neither do the NVRA or HAVA require the disclosure of sensitive personal information. To the contrary, courts have consistently held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases); *Torrez*, 160 F.4th at 1083 n.14 (same). And HAVA contains no disclosure provision at all. If Congress had thought that it was necessary to preempt state voter privacy laws to further DOJ's list-maintenance investigations by requiring the release of sensitive personal information, it would have done so in the NVRA or HAVA—the statutes that actually relate to list maintenance.

Indeed, DOJ itself does not seem to seriously believe that the NVRA or HAVA require the disclosure of sensitive personal information. Although DOJ asserted claims under the NVRA and HAVA when it brought its initial round of lawsuits in September 2025, *see* Alliance Mot. Dismiss at 7 n.4, it abandoned those claims in subsequent suits, including this one, *id.* at 7 n.5, implicitly conceding that the NVRA and HAVA do not require the disclosure of the information DOJ seeks. For this same reason, it does not follow from the fact that the CRA includes a privacy provision that the CRA must be construed to require the disclosure of voters' sensitive information, *see*

29

Opp'n at 35–36. It makes no sense to say that Congress intended the CRA to preempt privacy laws protecting highly sensitive information—and to do so implicitly through a privacy provision—so DOJ could assess compliance with voter list maintenance under the NVRA and HAVA, when those statutes reflect a congressional judgment *not* to preempt such laws.

**IV.     DOJ's collection of Kentucky's unredacted voter registration list would violate the Privacy Act.**

As the Alliance argued in its opening brief, even if DOJ could use Title III to demand Kentucky's unredacted state voter registration list (and it cannot), its demand would separately fail due to DOJ's failure to comply with the Privacy Act, 5 U.S.C. § 552a *et seq.*; *see* Alliance Mot. Dismiss at 22–25. Nothing in DOJ's response provides reason to find otherwise.

First, DOJ argues that the Court should not consider the requirements of the Privacy Act at this stage, *see* Opp'n at 34, but that is wrong for several reasons. Even just in the context of the motion to dismiss, "where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Here, it is clear on the face of the complaint that DOJ has utterly failed to comply with the Privacy Act, therefore, dismissal on these grounds is warranted.

But, in this case, the question of whether the Court should consider this claim at the motion to dismiss stage is rendered largely academic because, by filing its motion to compel, DOJ has made it necessary for the Court to grapple with the question. This is because, if the motion to compel is granted, it would provide DOJ with the ultimate relief that it seeks—i.e., access to and custody of the data. In this way, the motion to compel is akin to a motion for summary judgment because granting it would "dispose[] of the case." *Rosenfeld v. Montgomery Cnty. Pub. Schs.*, 25 F. App'x 123, 130 (4th Cir. 2001). The Court cannot and should not consider whether to require

Defendants to hand over the sensitive and private information of all Kentucky voters, without deciding whether DOJ's collection of that data would violate the Privacy Act.

It would. By its plain terms, the Privacy Act is triggered whenever an agency "collects" or "maintains" any "system of records." *See* 5 U.S.C. § 552a(a)(3)–(4), (e). DOJ does not dispute that Kentucky's voter file is a "system of records," or that its attempt to "collect" it invokes the Privacy Act. DOJ also does not dispute that, to comply with the Act, it was required to publish a System of Records Notice ("SORN") that applies to Kentucky's statewide voter list before collecting it. A SORN must include the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, how records are retrieved within the system, and all "routine uses" to which the system can be put as well as the "categories of users and the purpose of such use." *League of Women Voters v. U.S. Dep't of Homeland Sec.* ("*LOWV*"), No. 25-cv-3501, 2025 WL 3198970, at *2 (D.D.C. Nov. 17, 2025).

DOJ's attempt to rely on the existing SORN labeled, "JUSTICE/CRT – 001," Opp'n at 35, fails because the broad and indefinite language in that SORN is insufficient for the unprecedented system of records that DOJ is attempting to build though this demand. *See* Alliance Mot. Dismiss at 23 ("[W]hen an agency 'establish[es] *or revis*[*es*]' any 'system of records, 'it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records'" (alterations in original) (emphasis added) (quoting *LOWV*, 2025 WL 3198970, at *2)). As DOJ reports, the purpose of "JUSTICE/CRT – 001," is to assist the Division "in maintaining names of . . . investigation targets, victims, witnesses or potential witnesses." Opp'n at 35 (quoting Privacy Act of 1974; System of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003)). It is not plausible to understand that language to countenance the compilation of records for every registered voter in Kentucky (and, if DOJ is successful, every registered voter in the country). The SORN also

31

describes the categories of records in this system to "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *Id.* While this language would cover run-of-the-mill files maintained for specific investigations and litigation matters, it would be a startling construction of these terms to find that they extend to a statewide (or nationwide) voter registration list that has never before been compiled by the federal government. In short, the SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level." *Weber*, 816 F. Supp. 3d at 1193–94.

DOJ's claim that this SORN authorizes collection of Kentucky's voter list because "the statutes cited . . . include enforcement of HAVA, the NVRA, and the [CRA]," Opp'n at 35–36, is incorrect: the Federal Register notices cited by DOJ do not include any specific mention of those statutes. *See* Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003); Privacy Act of 1974; System of Records, 70 Fed. Reg. 43904 (July 29, 2005); Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147 (May 25, 2017). And, in any event, the Privacy Act requires substantially more disclosure than "citing" an enforcement statute; as *Weber* held, this SORN is insufficient many times over. 816 F. Supp. 3d at 1193. "If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs." *Id.* Because DOJ has failed to comply with the Privacy Act, its complaint and motion to compel should be dismissed.[16]

---

[16] DOJ's demand also violates the Drivers Privacy Protection Act, which prohibits the disclosure of drivers' license numbers and social security numbers, subject to exceptions not applicable here. *See* Alliance Mot. Dismiss at 25 n.15 (citing 18 U.S.C. § 2721). It presents another independent basis to dismiss DOJ's complaint. Indeed, DOJ has waived any opposition to this claim by failing to address it at all in its opposition to the motions to dismiss.

## CONCLUSION

For the foregoing reasons, the Court should dismiss DOJ's complaint with prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and deny DOJ's motion to compel.

Dated: April 30, 2026                                Respectfully submitted,

**TRUE GUARNIERI AYER, LLP**

/s/ J. Guthrie True
J. Guthrie True
124 West Clinton Street
Frankfort, KY  40601
Telephone:  (502) 605-9900
Facsimile:  (502) 605-9901
E-mail: gtrue@truelawky.com


**ELIAS LAW GROUP LLP**

Elisabeth Frost
Lucas Lallinger
Tina Meng Morrison
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law
llallinger@elias.law
tmengmorrison@elias.law
Tel: (202) 968-4490

*Counsel for Intervenor the Kentucky Alliance for Retired Americans*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served on all counsel of record this 30th day of April, 2026, by filing a copy of the same with the Electronic Court Filing System of the United States District Court for the Eastern District of Kentucky.


/s/ J. Guthrie True
Counsel for Intervenor


33