# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*,<br><br>    v.<br><br>MICHAEL ADAMS, in his Official Capacity as Kentucky Secretary of State, *et al.*<br>    *Defendant*. | No. 3:26-cv-00019-GFVT |

**OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL AND REPLY IN SUPPORT OF MOTION TO DISMISS OF INTERVENOR-DEFENDANTS THE LEAGUE OF WOMEN VOTERS OF KENTUCKY, THE NEW AMERICANS INITIATIVE, ZITSI MIRAKHUR, AND JOERN SOLTAU**

**INTRODUCTION**

Across its response opposing all motions to dismiss,[1] and its motion to compel,[2] the United States never identifies a proper factual basis or a legitimate, non-pretextual purpose for its unprecedented request for Kentucky's complete and unredacted Statewide Voter Registration List (SVRL)—let alone "*the* basis" and "*the* purpose"—that Title III of the Civil Rights Act of 1960 (Title III) requires (emphasis added). These are not empty formalities; they are statutory prerequisites to invoke the Court's authority.

Nor does the United States offer any adequate explanation as to why, even if production were appropriate, redactions are not permissible to protect Kentucky voters' sensitive personal information, as is common with productions under analogous provisions of the National Voter Registration Act (NVRA). Instead, the United States attempts to short-circuit both the statutory requirements of Title III and bedrock procedural protections—including Rule 12(b)(6) scrutiny—of the Federal Rules of Civil Procedure.

Title III requires none of this. Notwithstanding the United States' characterizations, the landmark civil rights law exists to protect the right to vote, not to undermine that right by disseminating voters' confidential information for purposes that are—at best—questionable. Title III imposes meaningful requirements on the federal government when it makes a records request and creates a vital role for courts to oversee compliance with the Civil Rights Act of 1960 (CRA).

---

[1] *See* U.S.'s Consolidated Resp. to Mots. to Dismiss by Defs. & Intervenor-Defs. ("Response" or "Resp."), Dkt. No. 39.

[2] *See* U.S.'s Mot. to Compel Federal Election Records Under the Civil Rights Act of 1960 and Supporting Memorandum ("Mot. to Compel"), Dkt. No. 26.

Every federal court to consider materially identical demands from the United States—including, most recently, the District of Arizona in *United States v. Fontes*—has rejected them, either dismissing the United States' complaint, denying a motion to compel, or both. *See* Am. Order, No. 2:26-cv-66-PHX-SMB, ECF No. 50 (Apr. 28, 2026); *see also United States v. Amore*, No. 1:25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, No. 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, (C.D. Cal. 2026). This Court should do the same, by denying the Motion to Compel and dismissing the Complaint.

## ARGUMENT

I.   **The United States' claim fails as a matter of law and is subject to dismissal under Rule 12(b)(6).**

A. **Title III actions are governed by the Federal Rules of Civil Procedure, and the United States must meet Rule 12(b)(6).**

Title III actions are governed by the Federal Rules of Civil Procedure, and the United States must satisfy Rule 12(b)(6). The United States errs at the outset in asserting that this Court may bypass core procedural safeguards—in particular, scrutiny of the pleadings under Federal Rule 12. Resp. at 5–10. Nothing in Title III suggests such a departure. To the contrary, "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 816 F. Supp. 3d at 1182. As a result, the U.S. District of Arizona most recently rejected the United States' argument, joining the uniform reasoning of courts to find "that the [Federal Rules] apply to the Attorney General's lawsuit." *Fontes*, ECF No. 50, at 2 n.1 (citing cases).

Start with the relevant text. Title III provides that when the Attorney General makes a demand for voting-related records or papers, the federal district court where such a demand is made "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules, which "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Federal Rules explicitly provide for limited and narrow carveouts to their own application, none of which include claims under Title III. *See* Fed. R. Civ. P. 81. Indeed, Rule 81 affirmatively states that the Federal Rules *do* apply in "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute . . . ." Fed. R. Civ. P. 81(a)(5). That is precisely what the United States seeks here: compelled production of documents under a federal statute.

The Federal Rules' drafters knew how to exempt particular proceedings from the Rules' categorical application and did not do so for Title III. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)). The Federal Rules—including mechanisms they provide for testing the sufficiency of pleadings—therefore apply in this civil action.

Binding precedent confirms the point. Shortly after Congress enacted Title III, the Supreme Court held, in a case regarding administrative summons by the Internal Revenue Service (IRS), that proceeding under the IRS's authority to compel production of records was governed by the Federal Rules. *See United States v. Powell*, 379 U.S. 48, 57–58 (1964). It was also the government's burden to establish the statutory requirements prior to enforcement. *Id*. And where

3

a statute authorizes enforcement "by appropriate process" but does not specify procedures, "the Federal Rules of Civil Procedure apply." *Id*. at 58 & n.18.

The United States claims *Powell* points to such a statute, analogizing the United States' authority under Title III to the investigatory powers of the IRS Commissioner and other executive agencies. *See* Resp. at 6–7. But the statute at issue in *Powell* is virtually identical to Title III. The Internal Revenue Code provides that district courts "shall have jurisdiction by appropriate process to compel" compliance with IRS demands. 26 U.S.C. § 7604(a). Title III likewise provides that district courts "shall have jurisdiction by appropriate process to compel the production" of requested election records. 52 U.S.C. § 20705. Because the operative language is materially identical, *Powell*'s holding directly applies. *See Fontes*, ECF No. 50, at 2 (finding "Federal Rules of Civil Procedure appl[y] to this action" in "accord with [*Powell*]"); *Weber*, 816 F. Supp. 3d at 1182 n.15 (explaining *Powell*'s holding "that courts should apply standard civil procedures in ensuring [statutory] prerequisites are satisfied under a similarly worded statute"). *Powell* nowhere suggests that the IRS statute authorizes special proceedings that deviate from the Federal Rules.[3] *See* 379 U.S. at 57–58 & n.18.

The United States resists this by noting that the Internal Revenue Code separately bars the IRS from subjecting taxpayers to "unnecessary examination or investigations," 26 U.S.C. § 7605(b), while Title III does not. Resp. at 8. But that *substantive* limitation contained elsewhere in the Internal Revenue Code has nothing to do with the "appropriate *process*" relevant to requests

---

[3] Moreover, even under the deferential framework governing administrative demands, the United States' request fails. *Powell* requires that such demands be issued for a legitimate purpose and seek information relevant to that purpose. 379 U.S. at 57–58. Here, as multiple courts have recognized, the United States has failed to articulate a genuine factual basis or a non-pretextual purpose for its demand. *See infra* Section III, A; *see also Amore*, 2026 WL 1040637, at *5; *Weber*, 816 F. Supp. 3d at 1183–1184. The United States can therefore not satisfy even the minimal requirements *Powell* describes.

under Title III. 52 U.S.C. § 20705 (emphasis added). The Supreme Court's holding that the Federal Rules govern did not rest on 26 U.S.C. § 7605(b), it rested on the statute's authorization of enforcement by "appropriate process" and the absence of contrary procedural instructions. *See Powell*, 379 U.S. at 57–58 n.18.

Unable to meaningfully distinguish *Powell*,[4] the United States relies heavily on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), and related Fifth Circuit decisions from the early 1960s to argue that it is entitled to summary proceedings. Resp. at 5–7. But those decisions predate *Powell* and must be read in light of subsequent Supreme Court authority; are not binding; and arose in extraordinary factual circumstances far removed from this case.

Crucially, *Lynd* and related decisions arose in a materially different context. *Lynd* was decided by the Jim Crow-era Fifth Circuit, which covered jurisdictions where election officials openly used every possible means to block Black Americans from registering to vote. *See generally* Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944–1969* (1976). Indeed, by the time *Lynd* was decided, the county registrar defendants had spent eighteen months filing endless procedural maneuvers with no clear-cut ruling and no order for production. 306 F.2d at 227. That is why the Fifth Circuit emphasized the need for summary resolution of Title III requests and concluded that further "judicial review or ascertainment" was not warranted. *Id*. at 226. That

---

[4] Reliance on *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), is also misplaced. Resp. at 6. *Morton Salt Co.* addressed the Federal Trade Commission's (FTC) investigative authority, when it acted under a broad statutory mandate and congressionally conferred subpoena power. 338 U.S. at 647–49. Indeed, even the FTC must identify the conduct under investigation and the applicable law in each civil investigative demand it issues. 15 U.S.C. § 57b-1(c)(2). But the FTC does so under an express congressional grant authorizing investigation of any person with relevant information. Title III confers no such power; it permits inspection only of "records and papers" upon a written demand stating a "basis" and "purpose." 52 U.S.C. § 20701. In any event, unlike the FTC in *Morton Salt Co.*, the United States here has not identified concrete facts suggesting a violation of federal law, nor has it sought information through a tailored demand tied to a specific investigation. *See Galvin*, 2026 WL 972129, at *3–5; *Amore*, 2026 WL 1040637, at *5.

context is miles away from this one, where the United States seeks sensitive voter information for unprecedented purposes, with absolutely no allegation that Kentucky has discriminated in voter registration.

Nor is the information sought here analogous to the data requests at issue in *Lynd*. At that time, states did not collect the sensitive personal identifying information—such as a Social Security or driver's license number—that the United States seeks here, and the Fifth Circuit expressly emphasized that the records at issue were not confidential. *Lynd*, 306 F.2d at 231 ("[W]e are not discussing confidential, private papers and effects. We are . . . dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . ."). *Lynd* also predates the enactment of landmark federal statutes protecting the now-sought information—e.g., the Privacy Act of 1974,[5] the Driver's Privacy Protection Act of 1994,[6] or the Federal Information Security Modernization Act of 2014.[7] In any event, *Lynd* recognized that courts may have the obligation to issue protective orders in the appropriate case under Title III—such as an order requiring the redaction of sensitive voter information. *Id*. at 230. That distinction alone places this case far outside the historical core of Title III.

Ultimately, the United States cannot distinguish this case from *Weber* and *Oregon*. Those decisions arose from identical demands to the one the United States now makes of Kentucky and apply the text of Title III and ordinary principles of statutory interpretation that govern here. They do not "misread" *Powell* by requiring too much of the government at the pleading stage. Resp. at 7. Rather, they recognized that *Powell* did not eliminate judicial review of administrative demands;

---

[5] Pub. L. No. 93-579, 88 Stat. 1896 (1974), *codified at* 5 U.S.C. § 552a.

[6] Pub. L. No. 103-322, 108 Stat. 1796 (1994), *codified at* 18 U.S.C. § 2721.

[7] Pub. L. No. 113-283, 128 Stat. 3073 (2014), *codified at* 44 U.S.C. §§ 3351 *et seq*.

it defined the baseline showing the United States must make—namely, that its request is issued for a legitimate purpose and seeks information relevant to that purpose. 379 U.S. at 57–58. *Weber* and *Oregon* applied that standard faithfully to require the United States to articulate a concrete factual predicate and a non-pretextual purpose sufficient to make its demand plausible. 816 F. Supp. 3d at 1183–84; 2026 WL 318402, at *10–11. Therefore, *Weber* and *Oregon* do not depart from *Powell* and other binding precedent: they only confirm that the United States' demand fails even *Powell*'s minimum standard.

At any rate, the United States affirmatively chose to commence this action by filing a complaint. It invoked the Federal Rules of Civil Procedure to start this litigation and cannot now disclaim those choices because results have proved unfavorable elsewhere and ought to do so here again. *See Oregon*, 2026 WL 318402, at *8 n.1 ("Even if *Lynd* applied . . . the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation."); *Amore*, 2026 WL 1040637, at *4 n.1. Because the Federal Rules apply, and because the Complaint fails to plausibly allege compliance with Title III, dismissal under Rule 12(b)(6) is required.

## II.    Section 301 does not reach Statewide Voter Registration Lists.

Section 301 does not authorize the United States to compel production of a statewide voter registration list. Its text limits inspection to discrete records that "come into [officials'] possession," not databases created and maintained by the State. 52 U.S.C. § 20701.

The United States' contrary reading (Resp. at 14–18), would treat the phrase "come into [their] possession" as if it were not there at all. *See Benson*, 2026 WL 362789, at *9–11. But that phrase does important work: it confines Section 301 to discrete, source documents that election officials acquire while administering elections, such as voter applications and related submissions. And as *Benson* recognized, the "next words in the [statutory] sentence"—which directly refer to

7

"any application, registration, payment of poll tax," i.e., "records that election officials *receive*, rather than *create*"—only "bolster[s]" this limiting function. *Id*. at *9. A statewide voter file, by contrast, is not a record that "comes into" possession. It is a synthesized, evolving database generated by the State from those underlying materials. Treating such a database as a covered "record" that "comes into [officials'] possession" would collapse the distinction Congress drew between original election materials and derivative compilations.

Nor can the government rely on the statute's use of "all records and papers" to override this limitation. Resp. at 16; Mot. to Compel at 16. That phrase is broad, but not boundless. It is expressly qualified by the "comes into possession" requirement, and courts must give effect to both. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("'A statute should be construed so that effect is given to all its provisions . . .'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). *Benson* did exactly that, harmonizing the statute's breadth with its textual limits. *See* 2026 WL 362789, at *9–11. The United States' interpretation, by contrast, reads the qualifier out of the statute. *See Fontes*, ECF No. 50, at 6. This is what *Fontes* recognized when it rejected the United States' attempt to expand Title III beyond its text, emphasizing that courts must adhere to the statute's plain language, rather than policy arguments about investigative utility. *See id*. at *2–3.

Title III's structure reinforces that conclusion. As *Benson* explained, Congress enacted Section 301 against a backdrop of concern that officials were destroying or withholding original records—particularly voter registration applications—needed to investigate discrimination. 2026 WL 362789, at *9–10. Those concerns map naturally onto documents voters have submitted, which can reveal whether applications were improperly rejected or mishandled. A finalized voter list, however, cannot serve that function: it reflects only who successfully registered, not whether unlawful practices affected those who did not. *Id*. The United States' insistence that it must review

8

the SVRL to assess list maintenance thus misapprehends the statute's focus and confirms that its request reaches beyond the materials Congress intended to preserve and produce. The United States also misrelies on NVRA cases like *Project Vote/Vote for America, Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012), and *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019). Resp. at 18; Mot. to Compel at 15–16. "[T]itle III was not at issue or even discussed in those cases." *Fontes*, ECF No. 50, at 10. These cases arose under the NVRA's public disclosure provision, which requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). But this provision contains no limiting language like Section 301's requirement that covered materials be those that "come into [an official's] possession," 52 U.S.C. § 20701, and reflects Congress's distinct goal of promoting transparency through public access, *see Project Vote/Voting for Am.*, 682 F.3d at 339. Title III, by contrast, has carefully circumscribed categories of producible records. Accordingly, the interpretive question here turns on text that is absent from the NVRA.

The United States' policy arguments do not justify a different result. Its suggestion that a narrower reading of Section 301 would "thwart" federal investigatory powers is overbroad. Resp. at 16 (quoting Donaldson v. United States, 400 U.S. 517, 533 (1971)). Courts do not read statutory text more expansively than necessary based on perceived enforcement needs. As *Fontes* aptly recognized, policy arguments about what the Attorney General "*should*" be entitled to obtain are irrelevant; the question is what the statute actually authorizes. *Fontes*, ECF No. 50, at 3.

Nor do the cases the United States cites support its position. *United States v. Clarke*, for example, addressed when and how a taxpayer may examine IRS officials' motive in a summons enforcement proceeding; it did not expand the scope of materials subject to summons or authorize

9

courts to rewrite statutory limits in the name of investigative efficiency. 573 U.S. 248, 254–55 (2014). And *New York State Department of Social Services v. Dublino*, which the United States invokes for the unremarkable proposition that courts should not interpret statutes to "negate their own purposes," is even further afield. Resp. at 16 (quoting 413 U.S. 405, 419–20 (1973)). *Dublino* used that principle to reject a reading that would have preempted "cooperative" state welfare programs that complemented federal ones, emphasizing that courts must respect the balance Congress struck rather than expand federal authority. 413 U.S. at 418. Applied here, the same principle forecloses the United States' position, because it is the United States' interpretation—not that of any of the Defendants—that would negate Title III's purpose by reading out its terms.

In short, Section 301 is limited to records that "come into [officials'] possession." 52 U.S.C. § 20701. An SVRL—created, maintained, and continuously updated by the State—falls outside that definition.

### III. The United States has failed to plausibly plead compliance with Title III's "Basis" and "Purpose" requirements.

To survive a motion to dismiss, the United States must plausibly allege compliance with Title III's statutory prerequisites. It has not done so.

#### A. DOJ did not set forth an adequate "Basis" for its demand.

The United States has not set forth a "basis" for its demand. The "basis" for a CRA request is a statement of *why* the United States believes there may be some relevant violation of the law. *See Lynd*, 306 F.2d at 229 n.6; *accord Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided . . . regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Galvin*, 2026 WL 972129, at *3 (the "basis" under Title III "must be 'the' factual basis, not just a conceivable or possible basis," for the demand); *Amore*, 2026 WL 1040637, at *5 ("[T]he 'basis' contemplated by Title III is a factual,

10

not legal basis."). Yet the Complaint alleges no such basis, and the United States' August 14, 2025, letter—which first invoked the CRA—is likewise deficient as to why the United States believes Kentucky's list maintenance procedures may violate the NVRA or the Help America Vote Act (HAVA). *See* Compl., Dkt. No. 1; *see also* Dkt. No. 26-5.

The Department of Justice (DOJ) claims that its "basis" for the demand for Kentucky's unredacted SVRL was "Title III . . . the NVRA, and HAVA." Resp. at 18. But the United States' entire suit is predicated on a single claim alleging a violation of Title III of the CRA based on its demands for records. *See* Compl. ¶¶ 34–38, Dkt. No. 1 at 8. Put simply, a statute is not a factual basis; it is the legal authority under which a demand is made. And reading "basis" to just mean "reference to Title III" would erase the Title III "basis" requirement: if invoking the statute were enough to justify a request, then every demand would automatically satisfy it. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (statutes should not be interpreted to render terms superfluous). Courts have rejected that exact argument in the context of these lawsuits. As *Galvin*, explained, the United States "confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." 2026 WL 972129, at *5. That distinction is dispositive. *Accord Oregon*, 2026 WL 318402, at *9 (the United States' demand "contain[ed] no statement of a factual basis").

Nor does the United States plead an alternative "basis." Neither the August 14 letter, Dkt. No. 26-5, nor the Complaint, Dkt. No. 1, identify any concern with Kentucky's list maintenance practices. *See also Galvin*, 2026 WL 972179, at *4; *Amore*, 2026 WL 1040637, at *2. And although the United States suggests that just invoking "possible violations" may suffice, Resp. at 2, its Complaint nowhere identifies such possibilities, and Title III does not authorize fishing expeditions

11

untethered to any identified issue with a jurisdiction's practices. *Weber*, 816 F. Supp. 3d at 1184; *Galvin*, 2026 WL 972129, at *3; *Amore*, 2026 WL 1040637, at *2.

The United States then points to Election Assistance Commission's Election Administration and Voting Survey (EAVS) data—specifically, to Kentucky's claimed failure to report any duplicate registration removals, and its alleged low rate of confirmation notices—as its factual basis.[8] Resp. at 20. But that reliance on EAVS fails as a matter of law. Standing alone, aggregate national survey data reflecting normal variation in state practices is not a sufficient "basis" for an extraordinary demand for Kentuckians' sensitive personal data. The EAVS Report is a biennial survey that compiles aggregate public election-administration data submitted by all fifty states and U.S. territories; it provides a broad overview of the nation's decentralized electoral system and expressly reflects that registration practices vary significantly among states. It does not distinguish between lawful differences in state procedures and possible noncompliance, nor does it provide the underlying transactional or process-level data needed to evaluate whether a state has made a "reasonable effort" under the NVRA. The United States never pleaded—nor does it now explain—how any of these metrics EAVS captures could suggest that Kentucky's list maintenance program fails the NVRA's "reasonable effort" standard. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" which "need not be perfect, or even optimal"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026).

---

[8] The United States also dismisses reliance on its decision to allow Kentucky's prior consent decree to expire, asserting that it did not address HAVA and predates the EAVS data on which it now relies. Resp. at 19. But that response only underscores the problem: The United States identifies no current, concrete facts suggesting a violation of federal law. Title III requires a present factual basis for a demand, not a shifting rationale untethered to specific allegations. *See Amore*, 2026 WL 1040637, at *5.

Nor does the United States' assertion that "[o]btaining an SVRL to assess and enforce HAVA and the NVRA is not new" cure the defects in its demand. Resp. at 21. Again, the United States brings a single claim: alleging a violation of the CRA. Compl., at 8, Dkt. No. 1. Even if other statutes or past practices have involved access to voter list data, Title III covers only records that "come into [an official's] possession," 52 U.S.C. § 20701, and that constraint cannot be overcome by pointing to practices under materially different statutory schemes. Nor can the United States identify a prior instance in which a court, applying Title III, compelled production of a statewide voter registration database.

This is why the United States' reference to investigations or consent decree resolutions in other cases misses the point. Resp. at 21–22; Mot. to Compel at 18. The consent agreement that resolved *United States v. Maine*, itself shows that the case did not involve a Title III demand or an effort to compel production of voter records in the absence of an identified violation.[9] No. 06-86-B-W, 2007 WL 1059565, at *1–2 (D. Me. Apr. 4, 2007). Rather, it was an enforcement action under HAVA and the NVRA in which the State admitted to significant compliance failures, including the absence of a functioning statewide voter registration system and an inability to

---

[9] Just as importantly, other States' past choices with respect to their voters' information shed no light on the United States' ability to compel an unwilling state to turn over private information under Title III. Regardless, several States that the United States names—Georgia, Maine, and New Jersey (*see* Resp. at 21–22)—have recently refused to turn over their States' unredacted voter files in response to materially identical demands to the one Kentucky faces. *See United States v. Raffensperger*, 1:26-cv-485-ELR, ECF 16-1 at 13 (N.D. Ga. Feb. 5, 2026) (Georgia's motion to dismiss arguing—among other things—that "[t]he CRA does not entitle the DOJ to the [personal identifying information] of Georgia voters because it does not preempt the Georgia statutes that protect that information"); *United States v. Bellows*, 1:25-cv-468-LEW, ECF 54 at 2 (D. Me. Dec. 12, 2025) (Maine arguing that "[n]o responsible Secretary of State, charged under state and federal law with protecting the confidentiality of voters' [personal data], would have acquiesced to such an audacious and inscrutable demand" from DOJ); *United States v. Caldwell*, 3:26-cv-2025, ECF 1 ¶¶ 20–36 (D.N.J. Feb. 26, 2026) (describing New Jersey repeatedly refusing to turn over the unredacted voter list).

identify ineligible voters. *Id.* The resulting consent decree's limited data-sharing provisions were tied to those adjudicated deficiencies and implemented under court supervision as part of a remedial scheme. Thus, nothing in *Maine* suggests that the United States may demand a complete, unredacted statewide voter file in the absence of a factual basis that a violation exists under Title III.

The same is true of other consent decrees and stipulated orders that the United States cites. Resp. at 21–22. In Indiana, the United States sued to enforce the State's NVRA obligations. The ensuing consent decree reflected findings that the State had failed to conduct adequate list maintenance, which required specific remedial measures. *See* Dkt. No. 39-9 (Consent Decree & Order, *United States v. Indiana*), at 1–3. Likewise, in New Jersey, the United States filed a complaint alleging violations of both HAVA and the NVRA, including failures to implement a compliant statewide registration system and to conduct reasonable list maintenance. Dkt. No. 39-8 (Stipulation & Order, *United States v. New Jersey*), at 2–3. The resulting stipulated order imposed detailed, prospective obligations to cure those deficiencies. *Id.* In each instance, any obligation to provide data arose only in the context of an enforcement action, grounded in concrete allegations of statutory violations that were subject to judicial oversight.[10]

And the United States' references to its enforcement of Uniformed and Overseas Citizen Absentee Voting Act (UOCAVA) or the Voting Rights Act (VRA) also fall flat. Resp. at 22–23. To start, the Complaint nowhere references either of these statutory schemes, so the fact that the

---

[10] The later *Indiana* order requiring production of a statewide voter registration list follows the same pattern. It amended the existing consent decree in a pending enforcement action and was entered under the court's continuing jurisdiction to implement a remedy. Dkt. No. 39-11 (Order, *United States v. Indiana*), at 2. The compelled production was thus part of a court-supervised remedy, not a freestanding investigative demand like the one at issue here.

14

United States has previously linked Title III to their enforcement is beside the point. *See* Compl., Dkt. No. 1.

But further, mechanisms to enforce UOCAVA and the VRA differ materially from Title III. They empower the United States to bring civil actions based on based on claimed violations and obtain appropriate relief through ordinary litigation processes. *See, e.g.*, 52 U.S.C. § 20307(a) (authorizing U.S. Attorney General to "bring a civil action in an appropriate district court for such . . . relief as may be necessary to carry out" UOCAVA); 52 U.S.C. § 10308(d) (authorizing U.S. Attorney General to "institute . . . action for preventive relief"). That is precisely what the United States did in the actions that the United States cites. *See, e.g.*, *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021) Compl., ECF No. 1 (arising under Section 2 of the VRA and alleging detailed, fact-specific violations tied to provisions of state law and their alleged discriminatory effects). Neither UOCAVA nor the VRA eliminate the requirement that the government identify a factual predicate for its claims. So insofar as courts in the cases ordered or approved the production of voter-related information, they did so as part of court-supervised remedies tied to specific violations, not as a means of initiating an investigation untethered to concrete evidence of noncompliance.

### B.  DOJ did not set forth an adequate, non-pretextual "Purpose" for its demand.

Even if the United States had articulated a "basis" for its demand—which it did not—it separately fails to state a "purpose" connected to its request for the complete, unredacted SVRL. As *Galvin* recognized, the purpose requirement demands an explanation of how the requested records could actually advance the stated investigation—not merely a restatement of statutory objectives. 2026 WL 972129, at *4.

15

###### 1. *The United States' stated purpose is facially inadequate.*

The United States asserts that its purpose is "to assess Kentucky's compliance with the SVRL maintenance provisions of the [NVRA]." Resp. at 18 (quoting Aug. 22 Letter, Dkt. No. 26-5 at 2). But it does not explain how a complete, unredacted SVRL would allow it to do so. That failure is dispositive.

A statewide voter file reflects only a snapshot of current registration data. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4), and HAVA requires states to "perform list maintenance . . . on a regular basis" in accordance with the NVRA, 52 U.S.C. § 21083(a)(2)(A). But both laws delegate the mechanisms for list maintenance to the states. And the requested records—a complete, unredacted voter file—would not, without more, allow the United States to evaluate Kentucky's compliance with these laws, because the file reflects just one point in time. Even if the United States identified voters who could permissibly be removed under the NVRA, their presence on the list would not establish that Kentucky failed to comply with federal law.

Nor is the demand necessary to assess compliance. HAVA requires states to collect driver license numbers or partial Social Security numbers. 52 U.S.C. § 21083(a)(5)(A). The United States can "ascertain Kentucky's compliance," Resp. at 5 (quoting Aug. 22 Letter, Dkt. No. 26-5), by reviewing Kentucky's voter registration application form, inquiring into Kentucky's collection practices and data-entry procedures, or reviewing a redacted voter file showing whether the required fields are populated. *Cf. Oregon*, 2026 WL 318402, at *6 ("Plaintiff cites no provision of HAVA that Defendants violated by failing to produce an unredacted voter registration list, nor could it because HAVA contains no record disclosure provision."); *Weber*, 816 F. Supp. 3d at 1191 (finding "California cannot have violated" HAVA by "failing to turn over the full unredacted voter

16

list" because HAVA does not require states to do so). The United States may not second guess Kentucky's "specific choices on the methods of complying with the requirements of [HAVA]." 52 U.S.C. § 21085.

> 2. *The United States has not disclosed its intended uses for the requested data and therefore has not stated "the purpose" that Title III requires.*

Even if the United States' stated purpose were facially adequate, it would still fail to satisfy Title III's requirement that the United States set forth "*the* purpose" for its demand. 52 U.S.C. § 20703 (emphasis added). That requirement is not satisfied by generating one purpose in litigation, while concealing the actual purposes behind a request. Indeed, the United States' asserted purpose is not only facially inadequate and incomplete, but also pretextual.

Internal documents recently produced in response to Freedom of Information Act (FOIA) requests demonstrate that DOJ lawyers have contemplated or planned uses for state voter files different from those described in its letters to Kentucky officials and papers in this action. *See CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*, Citizens for Resp. & Ethics in Wash. (published Dec. 19, 2025) https://www.citizensforethics.org/legal-action/lawsuits/crew-sues-doj-for-failing-to-produce-records-on-voter-data-collection/ [https://perma.cc/2BB3-WMN2] (last accessed Apr. 29, 2026).

These documents show that DOJ entered into an agreement with the DHS in July 2025 to run state voter lists through the Systemic Alien Verification for Entitlements (SAVE) program. *See* Ex. 1, Apr. 14, 2026 Records, Part 1, CREW v. DOJ-CRT-00828 (https://perma.cc/CQU6-68RR). Notwithstanding the NVRA and HAVA's delegation of authority to the States—not the federal government—to conduct list maintenance, internal DOJ documents reflect DOJ lawyers' intention to "inform" states that their "voter list should be run against [SAVE] . . . as part of their list maintenance responsibilities under the NVRA and HAVA." Ex. 2, Apr. 14, 2026 Records, Part 1,

17

CREW v. DOJ-CRT-00752 (https://perma.cc/CQU6-68RR). The documents also indicate that DOJ contemplated using the data for criminal enforcement. *See* Ex. 3, Apr. 14, 2026 Records, Part 2, CREW v. DOJ-CRT-001182 (noting "Crim Section may have some uses for the data . . . once we get results from SAVE") (https://perma.cc/T9B9-XJQW).

These are not the purposes that the United States disclosed to Kentucky or has advanced in this litigation. And the FOIA documents make clear that the United States' silence on these additional uses was deliberate: DOJ lawyers simultaneously took the position in internal discussions that the Department had no obligation "to give the states information about what we are going to do with the data." Ex. 4, Apr. 14, 2026 Records, Part 2, CREW v. DOJ-CRT-001163 (https://perma.cc/T9B9-XJQW). Put simply, the United States cannot say it has stated "the purpose" of its demand while internal documents show its lawyers meant to disavow any obligation to disclose its intended uses. The United States has accordingly failed to satisfy Title III's requirements.

Other available court materials and publicly available information indicate that one of the United States' chief aims in demanding sensitive voter data is to facilitate the creation of a centralized federal database. Courts confronting identical demands have reached this conclusion, finding the United States' stated purpose of merely verifying compliance with federal laws including Title III and HAVA not merely insufficient but "contrived." *Weber*, 816 F. Supp. 3d at 1184.

The United States denies that it presently "amass[es] a nationwide voter database," Resp. at 3, but that carefully worded statement does not disclaim future aggregation of the data or its potential use by other federal entities such as the Department of Homeland Security (DHS) or the Department of Government Efficiency (DOGE). Indeed, when asked in recent litigation whether

18

the Attorney General could use state voter files to "look at every person who has voted in the country," DOJ counsel sated that he did "not know the answer." Hr'g Tr., *United States v. Simon*, No. 25-cv-3761 (D. Minn. Mar. 4, 2026), ECF No. 161 at 49–50. Under these circumstances, the United States has not stated "*the* purpose" of its demand as Title III requires. 52 U.S.C. § 20703 (emphasis added).

The United States does not meaningfully contest the evidence that Intervenor-Defendants present in their motion to dismiss, claiming instead that only "hearsay" supports the idea that work is ongoing to centralize voter information in a federal database. Resp. at 20–21. But the broader pattern of conduct of federal officials' actions and those of counsel for the United States confirms that its stated rationale is pretext. For example, it is a matter of public record that the United States sued thirty States and the District of Columbia, seeking their unredacted voter files. *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026), https://perma.cc/7DRC-UG5R. Counsel for the United States has also admitted to sharing state voter roll information with outside groups seeking to deny election results, as well as unknown amounts of social security data on an unapproved third-party server, in a manner "outside [the U.S. Social Security Administration's] security protocols." Notice, *Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, ECF No. 197 at 5–6 (D. Md. Jan. 16, 2026).

Further, it was then-U.S. Attorney General Pamela Bondi who wrote Minnesota's Governor in January, tying immigration enforcement operations—specifically, "Operation Metro Surge"—to that State's refusal to turn over its unredacted voter file. *Read Bondi's Letter to Minnesota Governor*, N.Y. Times (Jan. 24, 2026), https://perma.cc/H5GY-ZKBS. That letter purported to set out three actions that Minnesota—one of the States the United States has sued to demand sensitive

voter data—could have taken at that time to "restore the rule of law . . . and bring an end to the chaos in Minnesota," one of which was to "allow the [DOJ] to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by [Title III]." *Id*. at 2–3. These are not thus third-party allegations; they are the words of U.S. officials and lawyers representing the United States.

Federal courts confronting this same pattern have not hesitated to reach an obvious conclusion: "It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184. *Weber* rejected the United States' attempt to justify similar demands as routine enforcement, explaining that the asserted purpose did not plausibly match the scope of the data sought. *Id*. at *9–10. And the court in *Oregon* also found that "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." 2026 WL 318402, at *11.

This Court should reach similar conclusions. In adjudicating motions to dismiss, it may "draw on its judicial experience and common sense" to determine if the United States' statements about the basis and the purpose of its request are—or are not—"plausible." *United States ex rel. US4NU, LLC v. Wolf Creek Fed. Servs.*, 34 F.4th 507, 515 (6th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). It may also "consider . . . matters of which a court may take judicial notice." *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (citation and internal quotation marks omitted). These include public records, *MacIntosh v. Clous*, 69 F.4th 309, 313 (6th Cir. 2023), other court dockets, *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010), and government records, *see generally* Fed. R. Evid. 201(b)(2). The Court need not blind itself to reality.

20

\* \* \*

The United States' stated purpose fails to satisfy the statutory standard on independent grounds: it is facially inadequate, incomplete, and pretextual. Accordingly, the United States has failed to provide a statement of "*the* purpose" underlying its request. 52 U.S.C. § 20703 (emphasis added). And because the United States has failed to plausibly allege a valid basis and purpose as Title III requires, the Complaint fails to state a claim under Federal Rule 12(b)(6).

**IV.     Nothing in Title III entitles the United States to unredacted records.**

Finally, the United States asserts that voters' important privacy interests, and federal and state protections of them, pose no barrier to its request for Kentucky's voter file. Resp. at 34–35. That is wrong, for several reasons. Failure to comply with the Privacy Act and other applicable privacy laws would be enough for dismissal, but at a minimum, production ought to be subject to a protective order requiring redaction of sensitive voter information.

*First*, the United States' argument that privacy-law arguments are "affirmative defenses" that cannot be resolved on a Rule 12 motion misses the mark. Resp. at 34. Intervenor-Defendants do not invoke the Privacy Act and other privacy laws as a freestanding defense but as a part of the statutory analysis: a demand that would require unlawful disclosure simply cannot satisfy Title III's requirement of a *valid* "basis" and "purpose." 52 U.S.C. § 20701. That defect would go to the sufficiency of the United States' claim, not to an affirmative defense. In any event, courts may resolve even affirmative defenses at the pleadings where, as here, "the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief." *Marsh v. Genentech, Inc.*, 693 F.3d 546, 554–55 (6th Cir. 2012) (quoting Wright, Miller, Kane & Marcus, *Fed. Prac. & Procedure § 1357* at 713 (3d ed. 2004)). Because the United States' demand indisputably seeks categories of information that implicate statutory confidentiality protections, its claim fails as a matter of law.

21

*Second*, the United States hangs its hat on the language of "all records and papers" contained in Title III to argue it is entitled to unredacted sensitive data in Kentucky's voter file. *See* Resp. at 25 (quoting 52 U.S.C. § 20701). But that argument proves too much. A document can both be a covered "record" subject to disclosure under federal election laws and be produced with appropriate redactions. The United States' own authorities confirm as much. Elsewhere in its brief, the United States emphasizes that voter registration lists are records for purposes of Section 8(i) of the NVRA, which obligates elections officials to retain and produce certain voter registration "records." *See* Resp. at 18 (citing *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019)). But Section 8(i)—like Title III—is silent as to how to treat sensitive personal information, and cases interpreting it have consistently required officials to preserve the right to vote through careful redactions.

*Third*, as noted in *Benson*, SVRL may not even constitute covered "records" under Title III because they do not "come into" elections officials' possession from an outside source—rather, they are generated by election officials themselves. *Benson*, 2026 WL 362789, at *9–11. The United States disputes this reading, but even if a court accepts its position on coverage, that holding says nothing about whether such records must be produced unredacted.

*Fourth*, the United States also asserts that private parties have been given "even more detailed voter data" than it requests, citing *Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025). Resp. at 27. *Scanlan* is a challenge to a New Hampshire law requiring proof of citizenship to register to vote, and review of the State's voter file was deeply relevant to determine the challenged law's impact. 2025 WL 1503937, at *3. But *Scanlan* proves Intervenor-Defendants' point. There, the produced over file did not include sensitive information like Social Security numbers or driver's license numbers, and was produced

22

in discovery subject to numerous and severe restrictions, including a protective order that designated the file "[h]ighly [c]onfidential," restricted its use to the *Scanlan* litigation, limited viewing to a small number of personnel using "air gapped computers," and directed that the data would be destroyed upon the case's conclusion. *See* Protective Order at 4, 13–17, Sched. A at 2–3, *Coal. for Open Democracy v. Scanlan*, No. 24-cv-312-SE (D.N.H. July 17, 2025), ECF Nos. 73 & 73-1. The United States, by contrast, seeks the complete and unredacted Kentucky SVRL—with voters' full Social Security numbers and other sensitive personal information—subject to nothing more than its own dubious assurances that it will comply with federal privacy rules.

*Fifth*, the United States asserts that Kentucky shares sensitive voter information through the Electronic Registration Information Center (ERIC) to facilitate its compliance with federal list-maintenance requirements. Resp. at 27. This is misleading, at best: Voter data is converted via a hashing algorithm into a sequence of random characters prior to transmission to ERIC, meaning it can be used to identify duplicate records without requiring the actual transmission of sensitive data. *See* Elec. Registration Info. Ctr., *Technology & Security Overview* (Sept. 29, 2025), https://perma.cc/H8YU-MCB7. In other words, voters' private data is not actually shared as part of participation in ERIC. In any event, even if sensitive information were shared with ERIC, a state's voluntary participation in an interstate election-administration compact bears no resemblance to compelled disclosure to the federal government—particularly when the federal government has expressed an intent to build a national voter database that would violate federal law.

23

*Sixth*, these privacy concerns are not hypothetical.[11] The United States asserts that it will comply with privacy laws, including the federal Privacy Act and Title III's confidentiality provision, 52 U.S.C. § 20704. *See* Resp. at 38–39.[12] But the United States itself has recently admitted to misuse of voter data by federal actors. As documented in Intervenor-Defendants' opening brief and *supra*, the United States acknowledged in Social Security Administration (SSA) litigation that SSA's DOGE team executed a "Voter Data Agreement" with a political advocacy group with the "stated aim . . . to find evidence of voter fraud and to overturn election results in certain States." Federal actors also shared Social Security data on an unapproved third-party server in a "manner [that] is outside SSA's security protocols."

Lastly, Kentucky law independently reinforces this conclusion. Kentucky Revised Statute Section 116.095 expressly requires the redaction of Social Security numbers before registration records are furnished to a requesting party. The United States seeks to override this state privacy

---

[11] Independent experts have identified serious deficiencies in the United States' voter-data security practices. A recent analysis by the Electronic Privacy Information Center concluded that the United States has violated the requirements of the Federal Information Security Modernization Act of 2014 with respect to its collection and retention of voter registration list data. *Analyzing DOJ's MOU for Voter Registration List Data for FISMA Compliance*, Elec. Priv. Info. Ctr. (Feb. 2026), https://epic.org/documents/analyzing-dojs-mou-for-voter-registration-list-data-for-fisma-compliance/. Identified deficiencies include inadequate encryption, insufficient access controls, lack of audit log review, absence of breach-reporting protocols, and failure to explain safeguards for third-party contractor access. *Id*. Most concerningly, the United States plans to "archive" the data permanently, creating a federal repository of sensitive voter information—including the full Social Security numbers of every registered voter in Kentucky. *Id*.; *see also* Lisa Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, Brennan Ctr. for Just. (Feb. 25, 2026), https://perma.cc/4WSD-DJKU.

[12] In internal discussions, DOJ lawyers incorrectly stated that neither this court (nor any other) had the power to impose any conditions on the United States' use of the requested data. *See* Ex. 4 ("[O]ur reply should be: 'We will use the data in a manner consistent with Federal law' and say nothing more. . . . No judge will have authority to limit us beyond a promise of Federal law compliance.") (https://perma.cc/T9B9-XJQW). This Court has the power—and responsibility—to ensure DOJ does not misuse the requested data, including by ordering it produced subject to redactions to protect voter privacy.

24

protection on the theory of federal supremacy. But where—as here—the federal government does not adequately explain why it needs unredacted sensitive personal information, federal supremacy doctrine provides no license to ride roughshod over state privacy laws that protect citizens' most sensitive data. The United States is not seeking public disclosure, it argues—but that is precisely why a protective order requiring redaction is the appropriate remedy, not compelled production of unredacted records. *See Lynd*, 306 F.2d at 230 (holding that "appropriate process" as used in Title III includes "the power and duty to issue protective orders").

In sum, the United States has offered no adequate basis for compelling disclosure of voters' most sensitive personal information without meaningful safeguards.

## CONCLUSION

For all these reasons, Intervenor-Defendants respectfully request that the United States' Motion to Compel be denied and the Complaint dismissed.

Dated: April 30, 2026                              Respectfully submitted,

/s/ Corey M. Shapiro
Corey M. Shapiro
William E. Sharp
Bethany N. Baxter
ACLU of Kentucky Foundation
325 W. Main St. #2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org
bbaxter@aclu-ky.org

Adriel I. Cepeda Derieux*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 457-0800
acepedaderieux@aclu.org

25

Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

*admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record who have appeared.

/s/ Corey M. Shapiro