**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**
**CASE NO. 3:26-cv-00019-GFVT**

**THE UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**v.**

**KENTUCKY STATE BOARD OF ELECTIONS,** *et al.*                    **DEFENDANTS**

---

**KENTUCKY STATE BOARD OF ELECTIONS'**
**COMBINED RESPONSE TO THE UNITED STATES' MOTION TO COMPEL AND**
**REPLY IN SUPPORT OF THE BOARD'S MOTION TO DISMISS[1]**

---

The Board has asked the Court to dismiss the Complaint [R.9], and to deny the Department's motion to compel [R.26]. For its response to the Department's motion to compel, and in support of its motion to dismiss, the Board states as follows:

**INTRODUCTION**

This case presents a straightforward question of statutory authority. The Department of Justice seeks to compel the Commonwealth of Kentucky, through the State Board of Elections, to produce its statewide voter registration list under Title III of the Civil Rights Act. But before this Court may enforce that demand, it must answer two threshold questions: whether the Department complied with the statute's requirements, and whether the records it seeks fall within the statute's scope. For the reasons below, the answer to both questions is: No. Courts across the country agree, and the Department's motion and response provide no sufficient basis to conclude otherwise.

---

[1]    Because the Board responds to the Department's motion to compel [R.26], and replies in support of the Board's motion to dismiss [R.9], this brief complies with the page limit stated in Local Rule 7.1(d).

1

**ARGUMENT**

The Department's request does not comply with the basis and purpose requirement stated in the Civil Rights Act. Even if it did, the Department is not entitled to Kentucky's voter registration list because it is not a record that "comes into the Board's possession," and the Department fails to adequately address the federal privacy statutes. For these reasons, the Court should deny the Department's demand for Kentucky's statewide voter registration list, and dismiss its Complaint for failure to state a claim under Rule 12.

I.    **The Court must determine the Department's statutory authority before enforcing its expansive demand.**

The United States' response proceeds from a flawed premise: That this Court may compel production first and decide statutory authority later, if at all. Not so. Courts do not enforce demands untethered from statutory authorization. Even under the summary framework the United States endorses, the Court must determine *whether* the Department's demand is authorized by Congress *before* enforcing it against the Board. Because it isn't, it can't.

The Department attempts to sidestep the threshold analysis by characterizing this case as a "summary proceeding" with a "severely limited" inquiry. But it relies on cases that presupposed and assumed that the records sought fell within the statute's reach. Here, that is *the* question presented; it cannot be assumed. Instead, that question must be answered before the Board is compelled to produce any records.

To justify its demand, the Department leans heavily on *Kennedy v. Lynd*. But it puts too much weight on that case. Even if *Lynd* had any precedential or guiding value (*it does not*), *Lynd* is nothing like this case. In *Lynd*, the United States Attorney General clearly articulated a "basis" and "purpose" for his specific records request: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction. . . . 'The purpose of this demand is to

2

examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.'"[2] Following guidance by the Supreme Court, the Sixth Circuit has warned that "drive-by jurisdictional rulings have no precedential effect."[3] *Lynd* assumed the records sought were covered. This Court doesn't have that option.

Instead, this Court must first address the statutory construction question presented. That is because, even in summary proceedings, "the rights of the party summoned are protected and an adversary hearing, if requested, is made available,".[4] The adverse party "may challenge the summons on any appropriate ground,"[5] and the Court may "inquire into the underlying reasons for the examination."[6] The Department seems to think otherwise. Unconvincingly, it tries to distinguish *United v. Powell*, but it fails to meaningfully acknowledge the constraints in Section 20703 and the ways in which the Court may determine if the demand is made on an "appropriate ground," which help ensure the Board's rights, as "the party summoned," "are protected."[7]

Even using the Department's rubric, there is a "genuine dispute."[8] Whether these are summary proceedings or not, this Court's role is not to serve as a rubber stamp. As the Department must agree, it "is emphatically the province and duty of [this Court] to say what the law is."[9] Before granting the Department's demand, the Court must address the very question the Department wants to avoid: the

---

[2]     *Kennedy v. Lynd*, 306 F.2d 222, 231 n.6 (5th Cir. 1962) (emphasis added).

[3]     *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (collecting cases).

[4]     *Becker v. United States*, 451 U.S. 1306, 1308 (1981).

[5]     *United States v. Powell*, 379 U.S. 48, 58 (1964).

[6]     *Id.*

[7]     Although the Department objects to *any* discovery, the Board submits none is required nor would any be appropriate at this juncture. That is because the Board has moved to dismiss the Complaint in its entirety. If, however, the Court does not dismiss the Complaint, the Board reserves the right to seek appropriate discovery to determine whether the demand has "been issued for an improper purpose." *Id.*

[8]     Department's Mot. to compel at 5 [R.26,PageID#468].

[9]     *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

3

scope and meaning of Section 20703.[10]. Properly applied, the CRA does not reach the records sought. For that reason, the Department's demand must be denied, and its Complaint must be dismissed.

## II.    The Department's demand does not comply with the text of 52 U.S.C. §§20703.

The Department claims that a Jim Crow era statute entitles it to *every* voter registration list from every State in the Country. To be blunt, that's not how statutory construction works, it's not what the CRA does, and it's not how the Framers and Congress have structured the United States' election laws. The Department's motion should be denied, and its Complaint should be dismissed.

### A.  The Statute requires a factual basis for investigating alleged violations of federal law, and the Department's demand does not include one.

By its text, the statute demands that the Attorney General's request "contain a statement of the basis and the purpose therefor." As the Board explained in its motion to dismiss, the Department failed to do that, and its demand must therefore be denied and its Complaint should be dismissed.

Section 20703 is clear. The Department must articulate a "basis" and "purpose" for its demand. Each requirement must be given independent meaning, and the Department has not properly stated its demand. The terms "basis" and "purpose" cannot be synonymous. The Department made a nearly identical demand in Oregon. But the district court there rejected the notion that the Department's statement complied with the statute. As it explained, "[r]eading 'basis' in the way Plaintiff suggests collapses its meaning with that of 'purpose.' Title III explicitly requires a statement of 'the basis and the purpose.' When 'and' is used to join two concepts, it is usually interpreted to

---

[10]    The Department points to *Benson* to suggest summary proceedings are appropriate. In *Benson*, the Department sued under the NVRA, HAVA, and the CRA. On that basis, the *Benson* court concluded that the "procedural circumstances [were] somewhat abnormal," and that because the NVRA and HAVA "do not confer administrative subpoena authority. . . [t]he United States' complaint thus takes the form of a traditional civil complaint," and "not a petition for summary enforcement." The *Benson* court was thus able to avoid the summary proceeding question. Of course, the Department engaged a different strategy here. It did not sue under the NVRA and HAVA. Yet the Department cannot seriously contend that the statutory question presented is beyond this Court's review at this stage.

require 'not one or the other, but both.'"[11] As the district court explained, "Plaintiff's interpretation fails to give full meaning to both 'basis' and 'purpose.' The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."[12] Thus the court there concluded that "Plaintiff's August 14 Letter contain[ed] no statement of a factual basis for believing Oregon violated the NVRA or HAVA."[13]

The Department's claim was recently rejected in two other federal courts. In *United States v. Galvin*, the United States made a similar claim to justify its demand in Massachusetts. There, the Department raised "its twin contentions that Title III was enacted as an investigatory tool to identify violations of federal election law, and that the Attorney General cannot be required to prove a violation before seeking evidence of the same."[14] The district court rejected both claims, as well as the Department's unsupported claim "that Title III's 'statement of the basis' prerequisite requires only a citation to the statute itself."[15] To the contrary, the district court explained, it "was the Attorney General's practice, in the wake of Title III's enactment, to include a statement of the factual (not merely legal) basis, a practice the courts noted favorably."[16]

So too in Rhode Island. In *United States v. Amore*, the Rhode Island district court came to the same conclusion. There, the district agreed "with *Weber*, *United States v. Oregon*, and *Galvin* that the 'basis' contemplated by Title III is a factual, not legal basis."[17] That reading, the court explained, "is

---

[11]   *United States v. Oregon*, --- F.Supp.3d ----, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *9 (D. Or. Feb. 5, 2026) (on appeal).

[12]   *Id.*

[13]   *Id.*

[14]   *United States v. Galvin*, --- F.Supp.3d ----, No. CV 25-13816-LTS, 2026 WL 972129, at *6 (D. Mass. Apr. 9, 2026).

[15]   *Id.* at *5 (collecting authorities).

[16]   *Id.*

[17]   *United States v. Amore*, --- F.Supp.3d ----, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637, at *5 (D.R.I. Apr. 17, 2026).

consistent with the line of Fifth Circuit cases, most notably *Lynd*, upon which the United States presses the [c]ourt to rely here."[18] The court also concluded that "the purpose stated in the Attorney General's demand—purportedly, to ensure compliance with the NVRA and HAVA—does not plausibly relate to individual voting rights."[19]

What's true in Oregon, California, Rhode Island, and Massachusetts, is true in Kentucky. To justify its demand for Kentucky's list, the Department similarly reads "basis" in a way that suggests it collapses its meaning with that of "purpose." In making its demand on Kentucky, the Department said the "basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to 'assess Kentucky's compliance with the SVRL maintenance provisions of the National Voter Registration Act (NVRA).'"[20] As in those other States, the Department's "August 14 Letter contains no statement of a factual basis for believing [Kentucky] violated the NVRA or HAVA."

Sensitive to the failure in its demand, the Department now tries to clean it up. In a post-hoc rationalization for its demand, the Department explains that an earlier letter provided context for its later demand. It did not, and that earlier letter is no cure for the deficiency in its later demand. *Now*, the Department tries to explain, it wants to evaluate the Commonwealth's "very high registration rate of 94.3 percent of the citizen voting age population."[21] But that high registration rate is not news. The State Board has been working diligently to clean up its rolls. As this Court knows, in 2017, the State Board was sued—*in this Court*—for alleged violations of the NVRA. The Department intervened, and a consent judgment was entered in 2018, and later extended once before expiring in March 2025. That

---

18      *Id.*

19      *Id.* at *6.

20      Combined Resp. at 18 [R.39,PageID#727] (quoting Aug. 14, 2025, correspondence [R.26-5]). According to the Department's August 14, 2025, correspondence, the "purpose of the request is to ascertain Kentucky's compliance with the list maintenance requirements of the NVRA and HAVA." Aug. 14, 2025 correspondence, at 2 [R.26-5,PageID#504].

21      Department's Mot. to compel at 13 [R.26,PageID#476].

decree required the Board to implement a general program making a reasonable effort to remove ineligible voters from the rolls consistent with the NVRA's procedural safeguards. The Board has done exactly that, and reports its progress publicly.[22] By the time the decree was set to expire in March 2025, the Board had removed roughly 735,000 ineligible registrants, and publicly reaffirmed that clean voter rolls are required by state and federal law and pledged continued compliance after the decree's sunset. The Board's work continues.

But the Court should set aside the Department's new-found justification. Even if the Court's review is deferential, it is "not required to exhibit a naiveté from which ordinary citizens are free."[23] The "basis and purpose" requirement is not unique to the CRA. In other administrative contexts, similar "reasoned explanation requirements" are "meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[24] Judicial review is "more than an empty ritual,"[25] and "[a]ccepting contrived reasons would defeat the purpose of the enterprise."[26]

Here again, the Department relies on *Kennedy v. Lynd*. Yet *Lynd* supports the Board. The text of the Civil Rights Act demands that the Department articulate a basis *and* purpose. The Department asks this Court to ignore those distinct requirements, offers contrary and contradictory post-hoc rationalizations for its demand, and worse still, points to a handful of prior "successful matters" to imply that its sweeping demand for Kentucky's statewide voter registration list—including highly sensitive personal identifiers—rests on established legal footing.

---

[22]    State Board of Elections Kentucky Election Integrity Process (KEIP), https://perma.cc/D5QC-MF7T.

[23]    *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

[24]    *Id.*

[25]    *Id.*

[26]    *Id.*

To take the last point first, the "successful matters" to which it points are cases in which the States settled.[27] Those are not cases in which a judge issued an opinion interpreting Title III of the Civil Rights Act as the Department asks this Court to do. They are settlement agreements reached between parties for reasons that likely have nothing to do with the merits of the Department's legal theory, and they do not reflect the reasoned judgment of a court because the "interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function."[28]

On top of that, no court in this country has yet to embrace the Department's expansive legal theory. So far, its win/loss rate stands at 0-5. At the same time the Department overstates the force of *Lynd* and the cases it has settled, it ignores contrary authority. For example, in *In re Gordon*, the court addressed the reach of Title III and warned that it is a "mistaken view to assume that such investigation of such records is an unlimited discovery device which may be employed and used without restraint."[29] Even so, the Department endorses an interpretation of Title III that would entitle it to exactly that— "unlimited discovery" of every record in the possession of every State elections officials. That can't be right—especially where its endorsed interpretation would convert its authority to investigate to the ability to an unrestrained authority to supervise voter list maintenance.

The Department also points to *Coleman v. Kennedy*. That case is no help to the Department. There, the Fifth Circuit summarily affirmed a lower court using curt language and legislative history. Presumably, the Department rests on that same legislative history, in which one member of one Congress expressed his "understanding" that a "sufficient statement would be the assertion that the

---

[27]     Mot. to Compel, [R.26,PageID#481] ("The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements."). The United States repeats this claim in its Combined Response [R.39,PageID#23n.8].

[28]     *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 544 (1940).

[29]     *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963).

demand was made for the purpose of investigating possible violations of a Federal statute."[30] Yet the Fifth Circuit rested on several other cases, including *Lynd*, which the Board has addressed above and in its motion to dismiss, and *Kennedy v. Bruce*. *Kennedy v. Bruce* does not help the Department here either. That is because, as in *Lynd*, the "demand" stated a basis and purpose. In *Bruce*, the Department clearly articulated the basis and purpose for its targeted review of specific voting records, there "the voting records of Wilcox County, Alabama."[31] In "compliance with the requirements of the statute," the Attorney General said: "This demand is *based* upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction," and the "*purpose* of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."[32] Not so here. Nothing close.

Incredibly, however, the Department asks this Court to *ignore* the statutory limitations in the text in favor of the "legislative history." That is, it asks this Court to rely instead on the statement of one member of one chamber of Congress.[33] According to the Department, the "only language that is required in the Attorney General's demand is that it 'was made for the purpose of investigating possible violations of a Federal statute.'"[34] Yet Justice Scalia said it best: "The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. As the Court said in 1844: The law as it passed is the will of the majority of both houses, and the only

---

[30]    *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963).

[31]    *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) .

[32]    *Id.*

[33]    Combined Resp. at 11 [R.39,PageID#720] (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate").

[34]    *Id.*

mode in which that will is spoken is in the act itself."[35] Thus, the "use of legislative history is illegitimate and ill advised in the interpretation of any statute—and especially a statute that is clear on its face."[36] Section 20703 is clear on its face, and "when the language of the statute is plain, legislative history is irrelevant."[37] Thus, the Department's request to rely—*in any way*—on "legislative history" would be "illegitimate and ill advised."[38] Whatever one senator may have said whenever he said it, the text of Section 20703 speaks for itself. That text controls.[39]

**B. The Court should read "come into possession" as the limiting principle that Congress provided, and because the voter registration list does not "come into the Board's possession" it is not the proper subject of a demand under Section 20703.**

Continuing its pattern, the Department again asks the Court to ignore the text when it comes to the limiting principle that Congress provided. Although the Department asks this Court to ignore certain provisions of the text, those textual provisions provide important guardrails. Section 20701 grants the Department access to records that "c[a]me into [the state's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."[40] Kentucky's voter registration list is not such a record.

In *United States v. Benson*, the district court convincingly reasoned that the "phrase 'come into [their] possession' naturally refers to a process by which someone acquires an item from an external

---

[35]     *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J. concurring) (quoting *Aldridge v. Williams*, 44 U.S. 9 (1845).

[36]     *Zedner v. United States*, 547 U.S. 489, 511 (2006) (Scalia, J. concurring in part and concurring in the judgment).

[37]     *Id.* at 510 (Scalia, J. concurring in part and concurring in the judgment)

[38]     *Id.*; *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254 (1992) (citations and internal quotation marks omitted) (Thomas, J. delivering the opinion of the Court) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.").

[39]     *Conroy*, 507 U.S. at 519 (Scalia, J. concurring) ("We are governed by laws, not by the intentions of legislators.").

[40]     52 U.S.C. § 20701.

source," and "Congress frequently uses the phrase 'come into possession' to refer to items that a person obtains rather than creates."[41] That reading is bolstered, the court reasoned, "by the next words in the sentence: 'relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.' Each of these terms refers to something that the voter submits or does as part of the registration process."[42]

Yet the Department perceives no limitations in the text. It believes it may demand "all records" in the Board's possession,[43] and claims that nothing in the text restricts "'all records and papers' to only those records and papers submitted by voters."[44] To reach that conclusion, the Department wrings its hands that such a reading would eliminate the statute's purpose. But if "come into [their] possession" was supposed to mean "all records," as the Department suggests, why wouldn't Congress have said "all records" without any qualifications? This Court must "presume Congress says what it means and means what it says,"[45] and "if that is not what Congress meant then Congress has made a mistake and *Congress* will have to correct it."[46]

To knock down its own strawman, the United States argues that the Defendants believe "that the Attorney General . . . plays no role at all."[47] Not so. The Constitutional default assigns primary responsibility to the States, and that has been repeatedly confirmed by Congress in federal law. On the other hand, the Attorney General *may* investigate within the limits prescribed by Congress. When proceeding under the Civil Right Act, the Attorney General must identify, as discussed above, a "basis

---

[41]    *United States v. Benson*, --- F.Supp.3d ----, No. 1:25-CV-1148, 2026 WL 362789, at *9 (W.D. Mich. Feb. 10, 2026) (collecting authority).

[42]    *Id.*

[43]    Combined Resp. at 14–15 [R.39,PageID#723–24].

[44]    *Id.* at 16 [R.39,PageID#725].

[45]    *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016).

[46]    *Conroy*, 507 U.S. at 528 (Scalia, J. concurring) (emphasis added).

[47]    Combined Resp. at 31 [R.39,PageID#740].

11

and purpose" for her investigative demand, and can obtain only those records to which he is entitled. The Attorney General didn't do that here, and the voter registration list is not a record to which he is entitled. That's the Board's point—not that the Attorney General has no role, but that he is claiming a role that is not his. The Attorney General may investigate, but the Board is responsible for election administration. That leads to the Board's next point.

### III.    The Major Questions Doctrine should inform this Court's conclusion that the Department has no authority to use the CRA in the way it proposes.

Congress "does not . . . hide elephants in mouseholes,"[48] and it "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."[49] If Congress had intended for the Federal Government to engage in voter list maintenance or setup a super-structure in the Department to micromanage the States' work, it would have said so. It hasn't and it didn't. Yet the Department now claims the absolute and unrestricted right to every voter registration list in the Country without having to provide any factual basis for its demand. This case thus raises a major question.

Fortunately, the Constitution provides the answer. The Elections Clause says: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."[50] The Constitution establishes a structural default: States prescribe the "times, places and manner" of federal elections, and Congress—not the Executive—may "make or alter" those state regulations. Congress has not altered this default.

Yet the Department is seizing on an ancillary statutory provision that requires specific, factual "basis and purpose" to request discrete records to assert a broad-based demand for a vast number of

---

[48]    *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

[49]    *Id.*

[50]    U.S. Const. Art. I, § 4, cl. 1.

records containing the names and personal information of *millions* of Kentuckians and *hundreds of millions* of American voters. Why? Because the Department wants to compare those names against federal databases, and second-guess voter list maintenance in Washington.

To avoid the Major Questions Doctrine, the Department says it is "not claiming any delegated authority." Yet that is no answer. In *Biden v. Nebraska*, the State of Nebraska challenged the Biden Administration's attempt to restructure and cancel student loans. There, the Secretary of Education claimed that the HEROES Act allowed him to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency."[51] The Court was blistering in rejecting that plan: "The Secretary's plan has 'modified' the cited provisions only in the same sense that 'the French Revolution 'modified' the status of the French nobility'—it has abolished them and supplanted them with a new regime entirely."[52] Worse still, the Court found the Secretary had taken a staggering action of "'economic and political significance'" based on "a wafer-thin reed on which to rest such sweeping power."[53] "All this," the Court explained, "leads us to conclude that the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself," and that in "such circumstances, we have required the Secretary to point to clear congressional authorization to justify the challenged program."[54]

The same should be true here. The Department is using an ancillary provision of law to modify and re-write the structure of election administration set up by the Constitution and Congress. That action has massive "political significance," and is similarly based on "a wafer-thin reed." The Attorney

---

[51]     *Biden v. Nebraska*, 600 U.S. 477, 494 (2023).

[52]     *Id.* at 496.

[53]     *Id.* at 499.

[54]     *Id.* at 506.

General "claims the authority to exercise control over"[55] election administration using only a nebulous and broad-based investigative powers. Whatever it may say, the Department "claim[s] to discover in a long-extant statute an unheralded power" representing a "transformative expansion in [its] regulatory authority."[56] According to the Department, its investigative authority gives it license to double-check the voter list maintenance efforts of every State in the Union—without any factual basis to do so. But federal law assigns the responsibility for voter list maintenance to the *States*—not to the Department of Justice. "Given these circumstances, there is every reason to hesitate before concluding that Congress meant to confer on [the Department] the authority it claims under [52 U.S.C. § 20703]."[57] And the power to investigate is not a backdoor mechanism to claim the power to supervise voter list maintenance. That is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'"[58] Like the Secretary in *Biden*, the Department therefore should be required to "point to 'clear congressional authorization' to justify the challenged program."[59] It cannot do that here.

Otherwise, the Department suggests it's merely engaged in a run-of-the-mill investigation, that the text is clear, and that it's not claiming any delegated authority. To normalize its demand, the United States points to a handful of prior "successful matters"[60] to imply that its sweeping demand for Kentucky's statewide voter registration list—including highly sensitive personal identifiers—rests on established legal footing. It does not. The cases it cites are not judicial decisions interpreting Title III of the Civil Rights Act. They are settlements—agreements reached between parties for reasons that

---

[55]    *Id.* at 503.

[56]    *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)).

[57]    *Id.* at 725.

[58]    *Id.*

[59]    *Biden v. Nebraska*, 600 U.S. at 506.

[60]    Mot. to Compel, [R.26,PageID#481].

14

often have little to do with the merits of the Government's legal theory. But just as "drive-by jurisdictional rulings have no precedential effect,"[61] settlements—particularly those shaped by the leverage of federal enforcement—fare no better. They may resolve disputes, but they do not define the law or bind this Court in any way. And guidance memos may give the Department's views on things,[62] but those views are not informative here. "No binding of anyone occurs merely by the agency's say-so"—even if it is the Department of Justice.[63]

**IV.    The Department fails to meaningfully engage with State and federal privacy protections, which prohibit the Department demands.**

Even if Title III applies, the Department has not shown that Title III overrides State and federal privacy laws, and this Court should not infer implied repeal or preemption from silence. The Department's Response talks past the Board's privacy concerns. State and federal law prohibit the Board from disclosing Social Security and driver's license numbers. In response, however, the Department says, "Trust us."

Federal law says otherwise. The Privacy Act prohibits the disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless the disclosure meets one of thirteen exceptions not relevant here.[64] Because the Board contracts with the Kentucky Transportation Cabinet to aid in its voter-list maintenance program, the Drivers Privacy Protection Act prohibits the Board from disclosing "personal information" about any individual that is obtained in connection with a "motor vehicle record."[65]

---

[61]    *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (collecting cases).

[62]    Combined Resp. at 23 n.8 [R.39,PageID#732].

[63]    *Cf. Kisor v. Wilkie*, 588 U.S. 558, 584 (2019) ("In short, courts retain the final authority to approve—or not—the agency's reading of a notice-and-comment rule.").

[64]    5 U.S.C. § 552a(b).

[65]    18 U.S.C. § 2721(a)(1).

15

The Department claims it complies with federal law, and that the Board's concerns are best addressed as affirmative defenses. Yet here again, the Department misses the point. The privacy concerns are threshold issues that must be addressed if this Court concludes, first, that the "demand" stated a basis and purpose (it did not), and second, that the voter registration list is a record that "comes into the Board's possession" (again, it is not).

The United States seeks extraordinarily sensitive information, including data that—by its own description—includes Social Security and driver's license numbers. Even so, the Department's treatment of privacy law is cursory. It asserts, in passing, that it will "comply" with applicable protections, but it does not explain how its sweeping demand can be reconciled with those protections, how competing statutory obligations may be harmonized, and whether it has issued the notice required by federal law. The Department does not engage in any meaningful preemption analysis.[66] Instead, it merely cites *Arizona v. Inter Tribal Council of Ariz., Inc.* No analysis. No explanation. The Department simply asserts that federal law trumps, and *Inter Tribal's* currency and relevance is questionable. And although the Department gestures at past Systems of Records Notices to suggest compliance, none of those notices clearly apply or articulate the vast data collection in which the Department is currently

---

[66] That is likely because there is no express preemption, and an implied preemption "argument, like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (Alito, J. delivering the opinion of the Court). "In rare cases, the Court has found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation, but that is certainly not the situation here." *Id.* (cleaned up). Election administration, however, is entrusted to the States. *Millsaps v. Thompson*, 259 F.3d 535, 538–39 (6th Cir. 2001) ("The power of the States to prescribe the *539 "times, places and manner" for electing federal representatives encompasses nearly every procedural facet of a federal election."). Thus, there is no implied preemption. Besides, "there is a strong presumption against federal preemption of state law." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015).

16

engaged, and all were issued *years* or *decades* before the current set of demands were issued to the States.[67]

The Department's demand for "all records" cannot be construed to override every federal law that protects those same records, particularly where Congress has imposed specific safeguards governing their use and disclosure. The Department suggests the Defendants "ask the Court to legislate limitations conspicuously absent from Title III." Not so. This Court need not "legislate" any privacy restrictions. Congress has already done that work. Though the Department treats those protections as merely incidental afterthoughts, they are not. And without engaging and complying with them, the Department's demand for those categories must fail as a matter of law.

Finally, the Department is too dismissive in its treatment of personal information under the Kentucky Open Records Act. It claims that the Board may share such information under KRS 61.875(5), and goes so far as to claim that "Kentucky law cannot restrict 'the exchange of public records or the sharing of information between public agencies when the exchange is serving a legitimate government need or is necessary in the performance of a legitimate government function." Yet the Supreme Court of Kentucky has said that "absent a statute to the contrary, Kentucky's private citizens retain a more than *de minimus* interest in the confidentiality of the personally identifiable information collected from them by the state."[68] Thus, the Court demands that the reason for disclosure outweigh "those persons' substantial privacy interests."[69]

The Department's stated interest doesn't outweigh the public's substantial privacy interests. The Department merely asserts that it "needs to review the unredacted data to verify that the HAVA

---

[67]    *See* Combined Resp. at 35 (citing previously issued SORNS, including 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); 82 Fed. Reg. 24147-01 (May 25, 2017)).

[68]    *Kentucky New Era, Inc. v. City of Hopkinsville*, 415 S.W.3d 76, 85 (Ky. 2013).

[69]    *Id.* at 88.

identifiers are being collected by the Commonwealth."[70] Again, not so. If the HAVA identifiers are not being collected, there would be nothing to redact. The Department's claimed interest in disclosure is self-defeating. It doesn't need access to highly sensitive private information to satisfy its interest in the Board's information gathering practices.

Even so, the Department claims "Kentucky law does not prohibit the disclosure of the state's SVRL." But the Board's privacy concerns are real. They are also shared by Kentucky's policymakers in the 2026 General Assembly. Before it adjourned *sine die* on April 15, 2026, the General Assembly adopted House Bill 139 over the Governor's veto.[71] In House Bill 139, the General Assembly expressly authorized the State Board of Elections, beginning on January 1, 2028,[72] to work with federal agencies "to identify individuals who are deceased or who are not citizens of the United States but are registered to vote in this state."[73] Although the General Assembly authorized the Board to share the statewide voter registration list, it instructed the Board *only to share* the "name, date of birth, and last four (4) digits of the Social Security number, if available, of registered voters within the state,"[74] and *not to share* "any other information, including but not limited to the residential or mailing address, driver's license number, voting history, or political party affiliation of registered voters within the state."[75] House Bill 139 confirms what was already true: Kentucky law prohibits the disclosure the Department demands.

*     *     *

*One final point.* The Department repeatedly insists it *needs* Kentucky's full voter registration list. Yet the questions it raises can all be addressed to the Board, and don't require unfettered access to the

---

[70]     Combined Resp. at 37 [R.39,PageID#746].

[71]     House Bill 139 Actions, https://perma.cc/D9KF-XTF3.

[72]     House Bill 139 § 51 ("Section 30 of this Act takes effect January 1, 2028.").

[73]     *Id.* at § 30(1).

[74]     *Id.* at § 30(2)(b)(1),(2).

[75]     *Id.* at § 30(2)(b)(3).

18

voter list. If the Department worries the Board has not collected HAVA identifiers,[76] it can ask the Board. If it wonders why the Board has sent a certain number of confirmation notices,[77] it can ask the Board. If the Department wonders whether the Board has a Social Security number for each person registered to vote,[78] it can ask the Board. That is the respect that should be accorded another sovereign,[79] and under the balance struck by the Constitution, and reaffirmed by Congress in federal law, that is the proper method for addressing the Department's concerns.

## CONCLUSION

The Civil Rights Act does not authorize the Department's demand.[80] The Complaint should be dismissed, and its motion to compel should be denied.

Respectfully submitted,

*/s/ Carmine Gennaro Iaccarino*

| | |
|---|---|
| Carmine G. Iaccarino | Taylor Austin Brown |
| Emma J. Redinger | *General Counsel* |
| Sturgill, Turner, Barker & Moloney, PLLC | State Board of Elections |
| 333 West Vine Street, Suite 1500 | 140 Walnut Street |
| Lexington, KY 40507 | Frankfort, Kentucky 40601 |
| Telephone No.: (859) 255-8581 | TaylorA.Brown@ky.gov |
| Carmine@sturgillturner.com | |
| ERedinger@sturgillturner.com | |

*Counsel for the State Board of Elections and each of its members in their official capacities as Board members*

---

[76]   Combined Resp. at 19 [R.39,PageID#728].

[77]   *Id.* at 20 [R.39,PageID#729].

[78]   *Id.* at 26 [R.39,PageID#735].

[79]   *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) ("Thus, both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'")

[80]   *See United States v. Oregon*, --- F.Supp.3d ----, No. 6:25-CV-01666-MTK, 2025 WL 3496571 (D. Or. Dec. 5, 2025) (on appeal); *United States v. Weber*, --- F.Supp.3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (on appeal); *United States v. Benson*, --- F.Supp.3d ----, No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (on appeal); *United States v. Galvin*, --- F.Supp.3d ----, No. CV 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, --- F.Supp.3d ----, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026).

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2026, I filed this brief with the Clerk of this Court using the Court's CM/ECF system, which will send notification to all registered parties.

> /s/ Carmine Gennaro Iaccarino
> *Counsel for the Kentucky State Board of Elections and each of its members in their official capacities as Board members*